# Exhibit 1

Exhibit 26

Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 1

11TH JUDICIAL DISTRICT COURT FOR THE PARISH OF SABINE

STATE OF LOUISIANA

DOCKET NO: 66609

CUMMINGS CUMMINGS & DUDENHEFER, A PROFESSIONAL LAW
CORPORATION

VERSUS

CAPITOL PROPERTIES, LLC AND NANTUCKET BAY SUBDIVISION, L.L.C

FILED: _____

_____
DEPUTY CLERK

AMENDED PETITION TO COLLECT SUMS DUE ON A PROMISSORY NOTE AND
TO RECOGNIZE AND ENFORCE A MORTGAGE

NOW INTO COURT, through undersigned counsel, comes Cummings, Cummings &
Dudenhefer, a Professional Law Corporation ("CC&D" or "Plaintiff"), who, files this Amended
Petition to Collect Sums Due on Promissory Notes and to Recognize and Enforce a Mortgage
(the "Amended Petition"), and represents as follows:

THE PARTIES

1.

Plaintiff, CC&D, a Professional Law Corporation, is a corporation organized under the
laws of the State of Louisiana with both its domicile and principal place of business located in
the Parish of Orleans, State of Louisiana.

2.

Defendant, Capitol Properties, L.L.C. ("Capitol"), is a Louisiana limited liability
company with both its domicile and principal place of business located in the Parish of Sabine,
State of Louisiana.

3.

Defendant, Nantucket Bay Subdivision, L.L.C. ("NBS", collectively with Capitol, the
"Defendants"), is a Louisiana limited liability company with both its domicile and principal
place of business located in the Parish of Sabine, State of Louisiana.

**VENUE**

4.

Upon information and belief, each of the documents sued upon here, including without limitation all notes and mortgages, were executed by the Defendants in the Parish of Orleans, State of Louisiana. In addition, funding of the various promissory notes was likewise made in the Parish of Orleans.

5.

Consequently, venue before this Honorable Court is proper.

**BACKGROUND FACTS**

**A. The December 17, 2009 Loan to Capitol**

**1.    The Note**

6.

On December 17, 2009, Capitol executed a Promissory Note ("The Note") in favor of CC&D in the original principal amount of FOUR HUNDRED FORTY-FIVE THOUSAND AND 00/100 DOLLARS ($445,000), without interest. The Note is payable, in full, on December 17, 2011. A copy of the Note is attached hereto as **Exhibit "A."**[1]

7.

In addition, Capitol agreed to "pay the fees of any attorney-at-law employed by Lender to recover sums owed or to protect the Lender's interest with regard to this note and such attorneys' fees are secured by collateral furnished for the payment hereof." *See* Exhibit A.

**2.    The Mortgage**

8.

On December 17, 2009, NBS, through its manager Christina Singleton, executed that certain Multiple Indebtedness Mortgage in favor of CC&D, and filed the same in the mortgage records of Sabine Parish, State of Louisiana, at Book 404, Page 896 (the "Mortgage"). A true and accurate copy of the Mortgage is attached hereto as **Exhibit "B."**

---

[1] The original Note was attached to the *Verified Petition to Collect Sums Due on Promissory Notes and Guarantees and for Declaratory Relief as to Extent, Validity, and Enforceability of Mortgage*, filed in Civil District Court, Parish of Orleans, under Case No. 2014-07139, and subsequently transferred to this Court under Case No. 66609.

9.

The Mortgage secures repayment of "any and all indebtedness, obligations and present and future obligations of Mortgagor to Mortgagee including that evidenced by the Notes, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges, together with all other indebtedness, obligations, costs and expenses for which the Mortgagor is responsible under this mortgage. Without limiting the foregoing, the term 'Indebtedness' shall include all obligations of Mortgagor as guarantor of the obligations of Capitol Properties, L.L.C. to Lender…Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness that may be outstanding at any time and from time to time that this Mortgage secures shall be Six Hundred Fifty Thousand Dollars ($650,000)."

10.

The Mortgage also provides for a confession of judgment, which provides that "for purposes of foreclosure under Louisiana executory process procedures, Mortgagor confesses judgment and acknowledges to be indebted to Mortgagee, up to the full amount of the Indebtedness in principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges…To the extent permitted under applicable Louisiana law, Mortgagor additionally waives: (i) the benefit of appraisal as provided in Articles 2332, 2336, 2723 and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (ii) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (iii) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iv) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (v) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above."

11.

The Mortgage encumbers that certain property more particularly described in **Exhibit "C"** hereto (the "Mortgage Property").

### 3.    Balance Due

12.

As of June 23, 2014, the total balance due under the Note  is $445,000.

13.

In addition, per the terms of the Note, CC&D is entitled to recover its attorneys' fees and costs incurred in connection with its attempts to recover sums owed or to protect its interests with regard to the Note.

14.

The Note provides that the above sums were payable, in full, on December 17, 2011. Given that the Note has matured and the amounts due thereunder have not been paid to CC&D, both Capitol and NBS are in default of their respective obligations to CC&D.

### COUNT I

### JUDGMENT FOR BALANCE DUE ON THE NOTE

15.

Plaintiff incorporates each and every allegation asserted in the previous paragraphs into Count I as if copied *in extenso.*

16.

The Defendants have failed to satisfy their respective payment obligations under the Note.

17.

Consequently, Plaintiff is entitled to a judgment against Defendants for all amounts due pursuant to their respective payment obligations, as set forth above, under the Note.

### COUNT II

18.

Plaintiff incorporates each and every allegation asserted in the previous paragraphs into Count II as if copied *in extenso.*

19.

Via this ordinary proceeding, Plaintiff is further entitled to a judgment recognizing the extent, validity, and priority of the Mortgage, and that it is fully enforceable pursuant to Louisiana law.

**WHEREFORE**, Plaintiffs, Cummings Cummings & Dudenhefer, A Professional Law Corporation, respectfully prays that:

1. Defendants, Capitol Properties, L.L.C., and Nantucket Bay Subdivision, L.L.C. be served with, and cited to respond to, the Amended Petition;

2. Pursuant to Count I - After all due proceedings are had, a judgment be rendered in favor of Cummings Cummings & Dudenhefer, A Professional Law Corporation, and against Capitol Properties, L.L.C., and Nantucket Bay Subdivision, L.L.C., for the total outstanding principal balance owed under the Note of $445,000;

3. Pursuant to Count I - After all due proceedings are had, a judgment be rendered in favor of Cummings Cummings & Dudenhefer, A Professional Law Corporation, and against Capitol Properties, L.L.C., and Nantucket Bay Subdivision, L.L.C., pursuant to the Note for all reasonable attorneys' fees and costs incurred by Cummings Cummings & Dudenhefer, A Professional Law Corporation, in enforcing its rights under the Note and Mortgage;

4. Pursuant to Count II - After all due proceedings are had, a judgment be rendered recognizing and maintaining the extent, validity, priority and enforceability of the Mortgage; and

5. For all costs and other just, legal, general and equitable relief to which Plaintiff may be entitled.

Respectfully submitted,

_____
R. PATRICK VANCE (LA #13008)
LAURA F. ASHLEY (LA #32820)
TYLER J. RENCH (LA #34049)
Jones Walker LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170
Telephone: (504) 582-8000/Fax: (504) 589-8336
pvance@joneswalker.com
lashley@joneswalker.com
trench@joneswalker.com

**SHERIFF PLEASE SERVE:**

1)      Capitol Properties, L.L.C.
        Through its registered agent
        Christina Singleton
        48 Graces Lodge Road
        Zwolle, LA 71486

4)      Nantucket Bay Subdivision, L.L.C.
        Through its registered agent
        Christina Singleton
        48 Graces Lodge Road
        Zwolle, LA 71486

# Exhibit A

## PROMISSORY NOTE

$445,000.00                                                    December 17, 2009

    For value received, Capitol Properties, L.L.C. ( "Borrower") promises to pay to the order of Cummings, Cummings & Dudenhefer, a Professional Law Corporation ("Lender") at 416 Gravier Street, New Orleans, LA  70130, the sum of Four  Hundred Forty-five Thousand and 00/100 ($445,000.00) Dollars, without interest.  This note is payable in full on December 17, 2011.

    Borrower waives presentment for payment, demand, notice of dishonor, protest, pleas of discussion and division and Borrower is bound jointly, severally and solidarily with any and all other makers, endorsers and guarantors for the full and timely payment of this note in accordance with its terms.

    Borrower agrees to the following terms and conditions:

    1.    If any event of default occurs shall occur and be continuing under the terms of a mortgage or any other security document or guaranty securing this note, then at the option of the Lender, the entire remaining balance due on this note and all other obligations and liabilities, direct or contingent, of Borrower to Lender shall be immediately due and payable.

    2.    Borrower agrees to pay the fees of any attorney-at-law employed by Lender to recover sums owed or to protect the Lender's interests with regard to this note and such attorneys' fees are secured by collateral furnished for the payment hereof.

    3.    The provisions of this note may not be waived or modified except in writing, signed by Lender.  No failure or delay of Lender in exercising its rights shall be construed as a waiver.

    4.    This note shall be deemed to be a contract under the internal laws of the State of Louisiana and of the United States of America, without regard to principles of conflicts of laws, and for all purposes shall be construed and enforced in accordance with such laws.

Capitol Properties, L.L.C.

By: _____
          Christina Singleton, Manager

804394.1

# Exhibit B

 

# MULTIPLE INDEBTEDNESS MORTGAGE

By:     Nantucket Bay Subdivision, L.L.C.

United States of America

State of Louisiana

To:     Cummings, Cummings & Dudenhefer, a
        Professional Law Corporation, and any future
        holder or holders

Parish of Orleans

BE IT KNOWN, that on this 17th day of December, 2009,

BEFORE ME, the undersigned Notary Public, and in the presence of the undersigned competent witnesses,

PERSONALLY APPEARED:

Nantucket Bay Subdivision, L.L.C., a Louisiana limited liability company, having a mailing address of 1039 Lakeshore Blvd., Slidell, LA 70461, appearing herein through Christina Singleton, its Manager, duly authorized by certificate annexed hereto

(hereinafter referred to as "Mortgagor"),



who declared that Mortgagor grants this Multiple Indebtedness Mortgage in favor of Cummings, Cummings & Dudenhefer, a Professional Law Corporation, having a mailing address of 416 Gravier Street, New Orleans, LA 70130 (hereinafter referred to as "Mortgagee" or "Lender"), and any future holder or holders of the Indebtedness, under the following:

## TERMS AND CONDITIONS:

INDEBTEDNESS. The word "Indebtedness" as used in this Mortgage means individually, collectively and interchangeably any and all indebtedness, obligations and present and future obligations of Mortgagor to Mortgagee including that evidenced by the Notes, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges, together with all other indebtedness, obligations, costs and expenses for which the Mortgagor is responsible under this mortgage. Without limiting the foregoing, the term "Indebtedness" shall include all obligations of Mortgagor as guarantor of the obligations of Capitol Properties, L.L.C. to Lender. In addition, the word "Indebtedness" also includes any and all other loans, extensions of credit, obligations, debts and liabilities, plus interest thereon, of Mortgagor, that may now or in the future be owed to or incurred in favor of Mortgagee, as well as all claims by Mortgagee against Mortgagor, whether existing now or later; whether they are voluntary or involuntary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether Mortgagor may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges; whether Mortgagor may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations; and whether such Indebtedness may be or hereafter may become void or otherwise unenforceable. *Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness that may be outstanding at any time and from time to time that this Mortgage secures shall be Six Hundred Fifty Thousand Dollars ($650,000.00).*

GRANTING OF MORTGAGE. And now, in order to secure the prompt and punctual payment and satisfaction of the Indebtedness, in principal, interest, costs, expenses, attorneys' fees and other fees and charges, and additionally to secure repayment of any and all Additional Advances that Mortgagee may make on behalf of Mortgagor as provided in this Mortgage, together with interest thereon, Mortgagor does by these presents specifically mortgage,



804383



affect and hypothecate unto and in favor of Mortgagee, or any future holder or holders of the Indebtedness, any and all of Mortgagor's present and future rights, title and interest in and to the following described Property located in Sabine Parish, Louisiana (the "Property"):

The Property is specifically described as follows:

> See Exhibit "A" or other description document which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

> > Together with any and all present and future buildings, constructions, component parts, improvements, attachments, appurtenances, fixtures, rights, ways, privileges, advantages, batture, and batture rights, servitudes and easements of every type and description, now and/or in the future relating to the Property, and any and all items and fixtures attached to and/or forming integral or component parts of the Property in accordance with the Louisiana Civil Code.

**MORTGAGE SECURING FUTURE INDEBTEDNESS.** This Mortgage has been executed by Mortgagor pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing Mortgagor's Indebtedness that may now be existing or that may arise in the future as provided herein, with the preferences and priorities provided under applicable Louisiana law, However, nothing under this Mortgage shall be construed as limiting the duration of this Mortgage or the purpose or purposes for which Mortgagor's Indebtedness may be requested or extended. Mortgagor's additional loans will automatically be secured by this Mortgage without the necessity that Mortgagor agrees or consents to such a result at the time additional Indebtedness is incurred under the Construction Contract.

**COLLATERAL ASSIGNMENT OF LEASES AND RENTS.** In order to further secure the full and punctual payment and performance of the Indebtedness up to a maximum of $50,000,000.00, the Mortgagor hereby pledges, pawns, conveys, assigns and transfers unto the Mortgagee, the Leases and the Rents. The assignment of Leases and Rents in this Article is, and is intended to be, an assignment from the Mortgagor to the Mortgagee made in accordance with and to the fullest extent permitted by La. R.S. 9:4401. Mortgagee has not heretofore assigned the Rents. Mortgagor covenants with Mortgagee to observe and perform all the obligations imposed upon the lessor under any of the Leases and not to do or permit to be done anything to impair the security thereof; not to collect any of the rents, income and profits arising or accruing under the Leases or from the mortgaged Property more than one (1) month in advance of the time when the same shall become due; not to execute any other assignment of lessor's interest in the Leases or assignment of rents arising or accruing from the Leases or from the mortgaged Property; at Mortgagee's request, to assign and transfer to Mortgagee any and all subsequent Leases upon all or any part of the mortgaged Property; and to execute and deliver at the request of Mortgagee all such further assurances and assignments as Mortgagee shall from time to time reasonably require. **So long as no Event of Default has occurred and is continuing, Mortgagor shall have the right and license to collect at the time of, but not more than one (1) month prior to, the date provided for the payment thereof, all rents, income and profits arising under the Leases or from the mortgaged Property and to retain, use and enjoy the same.**

Without limiting any further term hereof, upon the occurrence of an Event of Default, Mortgagee may at its option during the continuation of such Event of Default, without regard to the adequacy of the security for the said principal sum, interest and indebtedness secured hereby and by the Mortgage, either by a representative or by agent, with or without bringing any action or proceeding, or by a receiver or a keeper appointed by a court, take possession of the mortgaged Property and have, hold, manage, lease and operate the same on such terms and for such period of time as Mortgagee may deem proper and either with or without taking possession of the mortgaged Property in its own name, demand, sue for or otherwise collect and receive all rents, income and profits, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may seem proper to Mortgagee and to apply such rents, income and profits to the payment of: (a) all expenses of managing the mortgaged Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees as Mortgagee may deem necessary or desirable and all expenses of operating and maintaining the mortgaged Property, including, without being limited thereto, all taxes, charges, claims, assessments, water rents, sewer rents and any other taxes and premiums for all insurance which Mortgagee may deem necessary or desirable and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the mortgaged Property; and (b) the principal sum, interest

304383







and indebtedness secured hereby and by the Mortgage, together with all costs and attorneys' fees, in such order of priority as to any of the items mentioned in this Paragraph as Mortgagee in its sole discretion may determine, any statute, law, custom or use. The exercise by Mortgagee of the option granted hereby and the collection of the rents, income and profits and the application thereof as herein provided shall not be considered a waiver of any Event of Default.

Prior to any foreclosure proceeding under this Mortgage, Mortgagee shall not be liable for any loss sustained by Mortgagor resulting from Mortgagee's failure to let the mortgaged Property during the continuance of an Event of Default or from any other act or omission of Mortgagee in managing the mortgaged Property.  Nor shall Mortgagee be obligated to perform or discharge nor does Mortgagee hereby undertake to perform or discharge any obligation, duty or liability under any of the Leases or under or by reason of this Assignment, and Mortgagor shall, and does hereby agree, to indemnify Mortgagee for, and to hold Mortgagee harmless from, any and all liability, loss or damage which may or might be incurred under the Leases or under or by reason of this assignment and from any and all claims and demands whatsoever which may be asserted against Mortgagee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases.  Should Mortgagee incur any such liability under the Leases or under or by reason of this assignment or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured hereby and Mortgagor shall reimburse Mortgagee therefor immediately upon demand and upon the failure of Mortgagor so to do, Mortgagee may, at its option, during the continuation of such condition declare all sums secured hereby and by the Mortgage immediately due and payable.  And it is further understood that this Assignment shall not operate to place responsibility for the control, care, management or repair of the mortgaged Property upon Mortgagee, nor for the carrying out of any of the terms and conditions of the Leases; nor shall it operate to make Mortgagee responsible or liable for any waste committed on the mortgaged Property by the tenants or any other parties, or for any dangerous or defective condition of the mortgaged Property, or for any negligence in the management, upkeep, repair or control of the mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Mortgagor hereby authorizes and directs the lessees named in the Leases or any other or future lessees or occupants of the mortgaged Property described herein upon receipt from Mortgagee of written notice to the effect that Mortgagee is then the holder of the Notes and this Mortgage and that a default exists thereunder to pay over to Mortgagee all rents, income and profits arising or accruing under the Leases or from the mortgaged Property described therein or in said Notes and this Mortgage and to continue so to do until otherwise notified by Mortgagee.



**DURATION OF MORTGAGE.** This Mortgage will remain in effect until (i) all of the Indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness; and (ii) Mortgagor cancels this Mortgage by filing a written cancellation instrument signed by Mortgagee.  When all of the indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness, Mortgagor may request Mortgagee to sign such a written cancellation instrument by writing Mortgagee at the above address or at such other address as Mortgagee may advise. Mortgagee may delay providing Mortgagor with such a mortgage cancellation instrument for a period of sixty (60) days following receipt of Mortgagor's written request, or such longer time as may be necessary for Mortgagee to verify that all conditions, precedent for mortgage cancellation have been satisfied.

**PROHIBITIONS REGARDING PROPERTY.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign or pledge the Property or do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**REPRESENTATIONS AND WARRANTIES CONCERNING THE PROPERTY.** Except as previously disclosed to Mortgagee in writing, Mortgagor represents and warrants that: (i) Mortgagor is and will continue to be the lawful owner of the Property; (ii) Mortgagor has the right to mortgage the Property to Mortgagee; (iii) as of the time this Mortgage is recorded, there are no encumbrances affecting the Property; (iv) the security rights and interest granted under this Mortgage will at no time become subordinate or junior to any security rights, interests, liens, or claims of, or in favor of, any person, firm, corporation, or other entity; and (v) this Mortgage is binding upon Mortgagor, as well as, Mortgagor's heirs, successors, legatees, administrators, executors, representatives and warranties, and all other representations and warranties contained in this Mortgage, are and will be continuing in





nature and will remain in full force and effect until such time as this Mortgage is cancelled in the manner provided above.

**INSURANCE PROVISIONS.** The following insurance provisions are a part of this Mortgage:

**Required Insurance.** So long as this Mortgage remains in effect, Mortgagor shall, at its sole cost, keep and/or cause others, at their expense, to keep the Property constantly insured against loss by fire, by hazards included within the term "extended coverage," and by such other hazards (including flood insurance, where applicable) as may be required by Mortgagee. Such insurance shall be in an amount not less than the full replacement value of the Property, or such other amount or amounts as Mortgagee may require or approve in writing. Mortgagor shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Mortgagor and Mortgagee as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, occupancy, possession, operation and condition of the Property, and further containing a broad form contractual liability endorsement covering Mortgagor's obligations to indemnify Mortgagee as provided hereunder. Should the Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Mortgagor agrees to obtain and maintain Federal Flood Insurance, if available, in the amount of the full unpaid principal balance of the loan and any prior liens on the Property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Mortgagee, and to maintain such insurance for the term of the loan.

**Insurance Companies and Policies.** Mortgagor may purchase such insurance from any insurance company or broker that is acceptable to Mortgagee, provided that such approval may not be unreasonably withheld. All such insurance policies, including renewals and replacements, must also be in form and substance acceptable to Mortgagee, and must additionally contain a lender's loss payee endorsement in favor of Mortgagee, providing in part that (i) all proceeds and returned premiums under such policies of insurance will be paid directly to Mortgagee, and (ii) no act or omission on the part of Mortgagor, or any of its directors, officers, agents, employees or representatives, nor breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Mortgagee. Such policies of insurance must also contain a provision prohibiting cancellation, nonrenewal, or the alteration of such insurance without at least thirty (30) days prior written notice to Mortgagee of such intended cancellation, renewal or alteration. Mortgagor agrees to provide Mortgagee with originals or certified copies of such policies of insurance. Mortgagor further agrees to promptly furnish Mortgagee with copies of all renewal notices and, if requested by Mortgagee, with copies of receipts for paid premiums. Mortgagor shall provide Mortgagee with originals or certified copies of all renewal or replacement policies of insurance no later than fifteen (15) days before any such existing policy or policies should expire. If Mortgagor's insurance policies and renewals are held by another person, Mortgagor agrees to supply original or certified copies of the same to Mortgagee within the time periods required above.

**Property Losses and Claims.** Mortgagor agrees to immediately notify Mortgagee in writing of any material casualty to or accident involving the Property, whether or not such casualty or loss is covered by insurance. Mortgagor further agrees to promptly notify Mortgagor's insurance company and to submit an appropriate claim and proof of claim to the insurance company in the event that any of the Property is lost, damaged, or destroyed as a result of an insured hazard. Mortgagee may submit such a claim and proof of claim to the insurance company on Mortgagor's behalf, should Mortgagor fail to do so promptly for any reason. Mortgagor hereby irrevocably appoints Mortgagee as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance and to endorse the name of Mortgagor on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more Events of Default exist under this Mortgage, Mortgagee will not settle or adjust any such claim without the prior approval of Mortgagor (which approval shall not be unreasonably withheld).

**Insurance Proceeds.** Mortgagor shall have the right to directly receive the proceeds of all insurance protecting the Property. In the event that Mortgagor should receive any such insurance proceeds, Mortgagor agrees to immediately turn over and to pay such proceeds directly to Mortgagee. All insurance








proceeds may be applied, at Mortgagee's sole option and discretion, and in such a manner as Mortgagee may determine (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or fees necessarily paid or incurred by Mortgagee in this connection), for the purpose of: (i) repairing or restoring the lost, damaged or destroyed Property; or (ii) reducing the then outstanding balance of the Indebtedness and any Additional Advances that Mortgagee may have made on Mortgagor's behalf, together with interest thereon. Mortgagee's receipt of such insurance proceeds and the application of such proceeds as provided herein shall not, however, affect the lien of this Mortgage. Nothing under this section shall be deemed to excuse Mortgagor from its obligations to promptly repair, replace or restore any "loss or damaged Property, whether or not the same may be covered by insurance, and whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Mortgagee. Furthermore, unless otherwise confirmed by Mortgagee in writing, the application or release of any insurance proceeds by Mortgagee shall not be deemed to cure or waive any Event of Default under this Mortgage.

**TAXES AND LIENS.** Mortgagor shall promptly pay or cause to be paid when due, all taxes, local and special assessments, and governmental and other charges, as well as all public and/or private utility charges, of every type and description, that may from time to time be imposed, assessed and levied against the mortgaged Property or against Mortgagor.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Mortgagor agrees that Mortgagor's possession and use of the Property shall be governed by the following provisions.

**Use of Property.** Mortgagor shall not use the Property and shall not permit others to use the Property, for any purpose or purposes other than those previously disclosed to Mortgagee in writing, and in no event shall any of the Property be used in any manner that would damage, depreciate, or diminish its value, or that may result in a cancellation or termination of insurance coverage. Mortgagor additionally agrees not to do or to suffer to be done anything which may increase the risk of fire or other hazard to the Property or any part or parts thereof. Mortgagor shall not permit the Property, or any portion thereof, to be used by the public and others as may make possible a claim or claims of adverse usage, easement, servitude, right of way or habitation, or adverse possession by the public and others, or any implied, tacit or other dedication of the Property.

**Compliance with Applicable Laws and Regulations.** Mortgagor shall observe and abide by, and shall cause others to observe and abide by, all present and future laws, ordinances, orders, rules, regulations, restrictions, and requirements of all federal, state and municipal governments, courts, departments, commissions, boards, agencies, and officers, affecting the Property and its use.

Mortgagor shall further promptly perform and observe, and shall cause others to promptly perform and observe, all the terms, covenants and conditions of any requirements, instruments and agreements affecting the Property, non-compliance with which may adversely affect the priority of this Mortgage, or which may impose any duty or obligation upon Mortgagor, or upon any lessee or other occupant of the Property. Mortgagor shall further do and cause to be done all things necessary to preserve intact and unimpaired any and all easements, servitudes, appurtenances and other interests and rights in favor of, or constituting any portion of, the Property.

**Compliance With Environmental Laws.** Mortgagor represents and warrants to Mortgagee that: (i) During the period of Mortgagor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (ii) Mortgagor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Mortgagee in writing, (a) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (iii) except as previously disclosed to and acknowledged by Mortgagee in writing, (a) neither Mortgagor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on,



Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 15



under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Mortgagor authorizes Mortgagee and its agents to enter upon the Property to make such inspections and tests, at Mortgagor's expense, as Mortgagee may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Mortgagee shall be for Mortgagee's purposes only and shall not be construed to create any responsibility or liability on the part of Mortgagee to Mortgagor or to any other person. The representations and warranties contained herein are based on Mortgagor's due diligence in investigating the Property for Hazardous Substance.

Mortgagor hereby (i) releases and waives any future claims against Mortgagee for indemnity or contribution in the event Mortgagor becomes liable for cleanup or other costs under any such laws; and (ii) agrees to indemnify and hold harmless Mortgagee against any and all claims, losses, liabilities, damages, penalties, and expenses which Mortgagee may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Mortgagor's ownership or interest in the Property, whether or not the same was or should have been known to Mortgagor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Mortgagee's acquisition of any interest in the Property, whether by foreclosure or otherwise.



**ERISA.** Mortgagor represents and warrants to Lender that the granting of this Mortgage and the consummation of any loan or loans or other transactions contemplated or secured thereby will not violate the provisions of, and will not constitute a prohibited transaction under the ERISA.

**Alterations.** Mortgagor shall not, without the prior written consent of Mortgagee, demolish, remove, construct, restore, add to or alter any building(s) or other improvements to or upon the Property, or any part or parts thereof, or consent to, or permit any such demolition, removal, construction, restoration, addition or alteration. Mortgagor shall further not, without the prior written consent of Mortgagee, remove or permit the removal of any present or future fixtures and other property forming part of the Property, except as contemplated by the Construction Contract and any other construction contract hereafter entered into by Mortgagor to complete the project contemplated by Construction Contract. Mortgagee may condition its consent to permit Mortgagor to demolish or to remove such improvements, fixtures and/or other property upon Mortgagor's agreement to replace the same with new improvements and/or fixtures of at least equal value then satisfactory to Mortgagee.

**Abandonment of Property.** Mortgagor shall not, nor shall Mortgagor permit others to, abandon, commit waste, or destroy the Property, or any part or parts thereof.

**Repairs and Maintenance.** Mortgagor shall keep and maintain, and/or cause others to keep and maintain, the Property and the sidewalks and curbs adjoining the Property, in good order, repair and condition. Mortgagor shall further make and/or cause all necessary repairs to be made to the Property (including the repair and restoration of any portion of the Property that may have been damaged, lost or destroyed).

**ENCUMBRANCES.** The following provisions relating to Encumbrances on the Property are a part of this Mortgage:

**Prior Encumbrances.** To the extent applicable, Mortgagor shall fully and timely perform any and all of Mortgagor's obligations under any prior Encumbrances affecting the Property. Without limiting the foregoing, Mortgagor shall not commit or permit to exist any breach of or default under any such prior Encumbrances. Mortgagor shall further promptly notify Mortgagee in writing upon the occurrence of any event or circumstances that would, or that might, result in a breach of or default under any such prior Encumbrance. Mortgagor shall further not modify or extend any of the terms of any prior Encumbrance or any indebtedness secured thereby.

**Future Encumbrances.** Mortgagor shall not, without the prior written consent of Mortgagee, grant any Encumbrance that may affect the mortgaged Property, or any part or parts thereof, nor shall Mortgagor





permit or consent to any Encumbrance attaching to or being filed against any of the mortgaged Property in favor of anyone other than Mortgagee. Mortgagor shall further promptly pay when due all statements and charges of mechanics, materialmen, laborers and others incurred in connection with the alteration, improvement, repair and maintenance of the mortgaged Property, or otherwise furnish appropriate security or bond, so that no future Encumbrance may ever attach to or be filed against the Property or any of Mortgagor's Rights.

**Notice of Encumbrances.** Mortgagor shall immediately notify Mortgagee in writing upon the filing of any attachment, lien, judicial process, claim, or other Encumbrance. Mortgagor additionally agrees to notify Mortgagee immediately in writing upon the occurrence of any default, or event that with the passage of time, failure to cure, or giving of notice, might result in a default under any of Mortgagor's obligations that may be secured by any presently existing or future Encumbrance, or that might result in an Encumbrance affecting the mortgaged Property, or should any of the mortgaged Property be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than Mortgagee.

**ADDITIONAL ADVANCES FOR SPECIFIC PURPOSES.** Mortgagee shall have the right, within Mortgagee's sole option and discretion, to make Additional Advances on Mortgagor's behalf for the following purposes:

**Insurance.** If Mortgagor should for any reason fail to maintain insurance on the Property as required under this Mortgage, Mortgagee may make additional Advances on Mortgagor's behalf for the purpose of purchasing and maintaining, and Mortgagee may purchase and maintain such insurance coverage (including insurance protecting only Mortgagee's interests in the Property).

**Taxes.** If Mortgagor should for any reason fail to promptly pay, when due, taxes, assessments and governmental and other charges as required under this Mortgage, Mortgagee may, but is not required to, make Additional Advances on Mortgagor's behalf for the purpose of paying, and Mortgagee may pay, such taxes, assessments and governmental and other charges.

**Repairs.** If Mortgagor should for any reason fail to make all necessary repairs to the Property and to keep the Property in good working order and condition as required under this Mortgage, Mortgagor agrees that Mortgagee may make Additional Advances on Mortgagor's behalf for the purpose of making, and Mortgagee may make, such repairs and maintenance to the Property as Mortgagee may deem to be necessary and proper within its sole discretion,

**Encumbrances.** If Mortgagor should permit or allow any Encumbrance to attach to or be recorded or filed against the Property, without having first obtained Mortgagee's prior written consent, or if Mortgagor should for any reason default under any obligation secured by any presently existing or future Encumbrance, Mortgagee may make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to pay and fully satisfy such obligation and/or Encumbrance, to cure or rectify any such default or defaults, and to prevent the occurrence of any future defaults.

**Other.** Mortgagee may further make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to cure and rectify any actions or inactions on Mortgagor's part, as are required under this Mortgage, that are not listed immediately above.

**No Obligations.** Nothing under this Mortgage shall obligate Lender to make any such Additional Advances or to take any of the above actions on Grantor's behalf, or as making Lender in any way responsible or liable for any loss, damage or injury to Grantor, or to any other person or persons, resulting from Lender's election not to advance such additional sums or to take such action or actions. In addition, Lender's election to make Additional Advances and/or to take the above actions on Grantor's behalf shall not constitute a waiver or forbearance by Lender of any Event of Default under this Mortgage.



304383

 

 **OBLIGATION TO REPAY ADDITIONAL ADVANCES; INTEREST.** Mortgagor unconditionally agrees to repay any and all Additional Advances that Mortgagee may elect to make on Mortgagor's behalf, together with interest as provided herein, immediately upon demand by Mortgagee. Mortgagor further agrees to pay Mortgagee interest on the amount of such Additional Advances at the legal rate of interest provided under applicable law from the date of such Advance until all such Advances are, repaid in full. Mortgagor's obligations to repay Additional Advances to Mortgagee, together with interest thereon, shall be secured by this Mortgage.

**COLLATERAL ASSIGNMENT AND PLEDGE OF RIGHTS AS ADDITIONAL SECURITY.** As additional security for the prompt and punctual payment and satisfaction of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon as provided herein, and, as additional collateral, Mortgagor hereby assigns, pledges and grants Mortgagee a continuing security interest in and to:

> **Proceeds.** Any and all proceeds derived or to be derived from the sale, transfer, conveyance, insurance loss, damage, destruction, condemnation, expropriation, or other taking of the Property, or other proceeds and proceeds of proceeds, and any unearned insurance premiums relating thereto, including the rights of Mortgagor to receive such proceeds directly from the obligor or obligors therefor, and to further enforce any rights that Mortgagor may have to collect such proceeds, including without limitation, Mortgagor's rights to commence an appropriate collection or enforcement action or actions incident thereto.

> **Leases, Rents and Profits.** Any and all present and future leases or subleases affecting the mortgaged Property, and all rents, income, and profits therefrom, including without limitation, any and all rents, income, profits, bonuses, revenues, royalties, cash or security deposits, advance rentals and other payments, and further including Mortgagor's rights to enforce all present and future leases or subleases and to receive and enforce any rights that Mortgagor might have to collect rental and all other payments.

> **Deposits.** *Any and all present and future deposits or other security or advance payments, including rental payments,* made by or on behalf of Mortgagor to others, with respect to (i) utility service regarding the Property, (ii) cleaning, maintenance, repair, or similar services regarding the Property, (iii) refuse removal or sewer service regarding the Property, (iv) rentals of equipment, if any, used in the operation by or on *behalf of Mortgagor regarding the Property, and/or (v) parking or similar services or rights regarding the* Property.

> **Options.** Any and all present and future options to sell or lease the mortgaged Property or any interest *therein.*

> **Contract Rights.** To the extent assignable and/or transferable, any and all of Mortgagor's present and future contract rights, instruments, documents, and general intangibles necessary for use or useful in *connection with the ownership* and operation of all or any part of the Property, whether now existing or hereafter created, or otherwise acquired by Mortgagor, and all liens, security interests, guaranties, remedies, privileges and other rights pertaining thereto, and all rights and remedies of any kind forming the subject matter thereof.

**REPRESENTATIONS AND WARRANTIES CONCERNING RIGHTS.** Mortgagor represents and warrants that: (i) Mortgagor is and/or will be the lawful owner of all of the Rights to the Property; (ii) Mortgagor has the right to collaterally assign and pledge all such Rights to Mortgagee; (iii) to the extent applicable, all of Mortgagor's Rights that consist of or give rise to obligations of third parties, represent and/or will at all times continue to represent bona fide obligations of the obligors thereunder, free of any offset, compensation, deduction or counterclaim, The collateral assignment and pledge of Mortgagor's Rights are further binding upon Mortgagor, as well as Mortgagor's heirs, successors, representatives and/or assigns, and are legally enforceable in accordance with the foregoing terms and conditions.

 **ADDITIONAL OBLIGATIONS OF MORTGAGOR WITH REGARD TO COLLATERALLY ASSIGNED AND PLEDGED RIGHTS.** Mortgagor additionally agrees:

804383





**Prohibitions Regarding Property.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign, pledge, do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**No Settlement or Compromise.** Mortgagor shall not, without the prior written consent of Mortgagee, compromise, settle, adjust or extend payment under or with regard to any of Mortgagor's Rights subject hereto.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Mortgagee to examine and audit Mortgagor's books and records at all reasonable times.

**Notice to Obligors.** Upon request by Mortgagee, Mortgagor immediately will notify individual obligors and debtors under Mortgagor's Rights, advising such obligors and debtors of the fact that their respective agreements or obligations have been collaterally assigned and pledged to Mortgagee. In the event that Mortgagor should fail to provide such notices for any reason upon Mortgagee's request, Mortgagor agrees that Mortgagee may forward appropriate notices to such obligors and debtors either in Mortgagee's name or in Mortgagor's name.

**Protection of Rights.** Mortgagor will at all times protect and preserve all of Mortgagor's Rights.

**Notice of Change of Names.** Mortgagor will promptly notify Mortgagee of any change in Mortgagor's name, including any change to the assumed business names of Mortgagor. Mortgagor will also promptly notify Mortgagee of any change in Mortgagor's social security number or employer identification number. Mortgagor further agrees to notify Mortgagee in writing prior to any change in address or location of Mortgagor's principal office.



**EVENTS OF DEFAULT.** The following actions or inactions or both shall constitute Events of Default under this Mortgage:

**Default Under the Indebtedness.** Should Mortgagor default in the payment of principal or interest under the Indebtedness.

**Default Under the Loan Agreement.** Should an "Event of Default" as defined in the Loan Agreement occur.

**Default Under this Mortgage.** Should Mortgagor violate, or fail to comply fully with, any of the terms and conditions of this Mortgage.

**Default Under other Agreements.** Should Mortgagor violate, or fail to comply fully with, any of the terms and conditions of any Related Document which directly or indirectly secures repayment of any of the Indebtedness.

**Other Defaults.** Should Mortgagor or any guarantor violate, or fail to comply fully with, any of the terms and conditions of any other loan, extension of credit, security right, instrument, document, or agreement (such as a loan agreement) or obligation in favor of Mortgagee.

**Insolvency.** Should the suspension, failure or insolvency, however evidenced, of Mortgagor or any Guarantor occur or exist.

**Readjustment of Indebtedness.** Should proceedings for readjustment of indebtedness, reorganization, composition or extension under any insolvency law be brought by or against Mortgagor or any Guarantor.





**Assignment for Benefit of Creditors.** Should Mortgagor or any Guarantor file proceedings for a respite or make a general assignment for the benefit of creditors.

**Receivership.** Should a receiver of all or any part of Mortgagor's Property, or the property of any Guarantor, be applied for or appointed.

**Dissolution Proceedings.** Should proceedings for the dissolution or appointment of a liquidator of Mortgagor or any guarantor be commenced.

**Failure to Pay Additional Advances.** Should Mortgagor fail to pay any Additional Advance, together with interest thereon, as provided in this Mortgage, upon Mortgagee's demand.

**False Statement.** Should Mortgagor make or furnish any warranty, representation or statement to Mortgagee that is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter or should such false or misleading warranty, representation or statement be made or furnished on Mortgagor's behalf.

**OTHER DEFAULTS.** Mortgagor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Mortgagee and Mortgagor.

**MORTGAGEE'S RIGHTS UPON DEFAULT.** Should one or more Event of Default occur or exist under this Mortgage, as provided above, Mortgagee, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights and remedies provided by law:

**Acceleration; Foreclosure.** Mortgagee shall have the right, at its sole option, to accelerate the maturity and demand immediate payment in full of any and all of the Indebtedness. Mortgagee shall then have the right to commence appropriate foreclosure proceedings against the Property and against Mortgagor's Rights as provided in this Mortgage.

**Seizure and Sale of Property.** In the event that Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under this Mortgage, Mortgagee may cause the Property, or any part or parts thereof, to be enforced by executory or ordinary process, and to be immediately seized and sold, whether in term of court or in vacation, under ordinary or executory process, in accordance with applicable Louisiana law, to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying Mortgagor or placing Mortgagor in default, all of which are expressly waived.

**Confession of Judgment.** For purposes of foreclosure under Louisiana executory process procedures, Mortgagor confesses judgment and acknowledges to be indebted to Mortgagee, up to the full amount of the Indebtedness in principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges. Mortgagor further confesses judgment and acknowledges to be indebted unto and in favor of Mortgagee in the amount of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon. To the extent permitted under applicable Louisiana law, Mortgagor additionally waives: (i) the benefit of appraisal as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (ii) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (iii) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iv) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (v) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above. Mortgagor further agrees that any declaration of fact made by authentic act before a Notary and two witnesses by a person declaring that such facts are within his or her knowledge, shall constitute authentic evidence of such facts for purposes of foreclosure under applicable Louisiana law and for purposes of La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, to the extent applicable.



304383



**Keeper.** Should any or all of the Property be seized as an incident to an action for the recognition or enforcement of this Mortgage, by executory process, sequestration, attachment, writ of fieri facias or otherwise, Mortgagor hereby agrees that the court issuing any such order shall, if requested by Mortgagee, appoint Mortgagee, or any agent designated by Mortgagee or any person or entity named by Mortgagee at the time such seizure is requested, or any time thereafter, as Keeper of the Property as provided under La. R.S. 9:5136, *et seq.* Such a Keeper shall be entitled to reasonable compensation. Mortgagor agrees to pay the reasonable fees of such Keeper, which compensation to the Keeper shall also be secured by this Mortgage in the form of an Additional Advance as provided in this Mortgage.

**Declaration of Fact.** Should it become necessary for Mortgagee to foreclose under this Mortgage, all declarations of fact, which are made under an authentic act before a Notary Public in the presence of two witnesses, by a person declaring such facts to lie within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, where applicable.

**Separate Sale of Mortgagor's Rights Following Default.** Should one or more Event of Default occur or exist under this Mortgage, Mortgagee shall have the additional right, at its sole option, to separately sell the aforesaid Rights, or any part or parts thereof, at private or public sale, at such price or prices as Mortgagee may deem best, either for cash or for any other compensation; or on credit, or for future delivery, without the assumption of any credit risk. The sale of the aforesaid Rights may be without appraisement, the benefit of which is also expressly waived by Mortgagor. Mortgagee may exercise any other remedies with regard to Mortgagor's Rights as may be authorized under the Louisiana Commercial Laws (La. RS. 10:9-101, *et seq.*).

**Automatic Transfer of Rights.** In the event of foreclosure under this Mortgage, or other transfer of title or assignment of the Property, or any part or parts thereof, in lieu of payment of the Indebtedness, whether in whole or in part, all policies of insurance and other Rights applicable to the foreclosed upon or transferred Property shall automatically inure to the benefit of and shall pass to the purchaser(s) or transferee(s) thereof, subject to the rights of the purchaser(s) or transferee(s) to reject such insurance coverage and/or Rights at its or their sole option and election.

**Specific Performance.** Mortgagee may, in addition to or in lieu of the foregoing remedies, in Mortgagee's sole discretion, commence an appropriate action against Mortgagor seeking specific performance of any covenant contained in this Mortgage or in aid of the execution or enforcement of any power in this Mortgage granted.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Mortgagee's rights and remedies, whether evidenced by this Mortgage or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Mortgagee to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Mortgagor under this Mortgage, after Mortgagor's failure to perform, shall not affect Mortgagee's right to declare a default and exercise its remedies. Nothing under this Mortgage, or otherwise, shall be construed so as to limit or restrict the rights and remedies available to Mortgagee following an Event of Default, or in any way to limit or restrict the rights and ability of Mortgagee to proceed directly against Mortgagor and/or against any other co-maker, guarantor, surety or endorser of the Indebtedness, and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**MORTGAGEE'S RIGHT TO DIRECTLY COLLECT AND RECEIVE PROCEEDS AND PAYMENTS BEFORE OR AFTER DEFAULT.** Mortgagee shall have the right, at its sole option and election, at any time, whether or not one or more Event of Default then exist under this Mortgage, to directly collect and receive all proceeds and/or payments arising under or in any way accruing from Mortgagor's Rights, as such amounts become due and payable. In order to permit the foregoing, Mortgagor unconditionally agrees to deliver to Mortgagee, immediately following demand, any and all of Mortgagors records, ledger sheets, and other documentation, in the form requested by Mortgagee, with regard to Mortgagor's Rights and any and all proceeds and/or payments applicable thereto.



304383





Mortgagee shall have the further right, whether or not an Event of Default then exists under this Mortgage, where appropriate and within Mortgagee's sole discretion, to file suit, either in Mortgagee's own name or in the name of Mortgagor, to collect any and all proceeds and payments that may then and/or in the future be due and owing under and/or as a result of such rights. Where it is necessary for Mortgagee to attempt to collect any such proceeds and/or payments from the obligors therefor, Mortgagee may compromise, settle, extend, or renew for any period (whether or not longer than the original period) any obligation or indebtedness thereunder or evidenced thereby, or surrender, release, or exchange all or any part of said obligation or indebtedness, without affecting the liability of Mortgagor under this Mortgage or under the indebtedness. To that end, Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact, coupled with an interest and with full power of substitution, to take any and all such actions and any and all other actions permitted hereby, either in the name of Mortgagor or Mortgagee.

**PROTECTION OF MORTGAGEE'S SECURITY RIGHTS.** Mortgagor will be fully responsible for any losses that Mortgagee may suffer as a result of anyone other than Mortgagee asserting any rights or interest in or to the Property and/or Mortgagor's Rights collaterally assigned and pledged hereunder. Mortgagor agrees to appear in and to defend all actions or proceedings purporting to affect Mortgagee's security interests in any of the Property and/or Rights subject to this Mortgage and any of the rights and powers granted Mortgagee hereunder. In the event that Mortgagor fails to do what is required of it under this Mortgage, or if any action or proceeding is commenced naming Mortgagee as a party or affecting Mortgagee's security interests or the rights and powers granted under this Mortgage, then Mortgagee may, without releasing Mortgagor from any of its obligations under this Mortgage, do whatever Mortgagee believes to be necessary and proper within its sole discretion to protect the security of this Mortgage, including without limitation making Additional Advances on Mortgagor's behalf as provided herein. Should the reappraisal of the Property occur, whether to comply with appropriate regulatory requirements or otherwise, Mortgagor agrees to pay the costs of such appraisal or reappraisals or to reimburse Mortgagee for the costs thereof.



**INDEMNIFICATION OF MORTGAGE.** Mortgagor agrees to indemnify, to defend and to save and hold Mortgagee harmless from any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, Mortgagee's attorney's fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Mortgagee, its officers, directors, employees, and agents arising out of or in any manner occasioned by this Mortgage and the exercise of the rights and remedies granted Mortgagee hereunder. The foregoing indemnity provisions *shall survive the cancellation of this Mortgage as to all matters arising or accruing prior to such cancellation* and the foregoing indemnity shall survive in the event that Mortgagee elects to exercise any of the remedies as provided under this Mortgage following default hereunder.

**EXECUTION OF ADDITIONAL DOCUMENT.** *Mortgagor agrees to execute all additional documents,* instruments and agreements that Mortgagee may deem to be necessary and proper, within its sole discretion, in form and substance satisfactory to Mortgagee, to keep this Mortgage in effect, to better reflect the true intent of this Mortgage, and to consummate fully all of the transactions contemplated hereby and by any other agreement, instrument or document heretofore, now or at any time or times hereafter executed by Mortgagor and delivered to Mortgagee.

**INSPECTION OF PROPERTY.** Mortgagee and Mortgagee's designated representatives and agents shall have the right *at all reasonable times* to examine and inspect the Property wherever located.

**AUDITS.** Mortgagee and its agents may also periodically conduct audits of Mortgagor's books and records that in any way pertain to the Property, the foregoing Rights and any part or parts thereof.

**APPLICATION OF PAYMENTS.** Mortgagor agrees that all payments and other sums and amounts received by Mortgagee under the Indebtedness or under this Mortgage, shall be applied: first, to reimburse Mortgagee for its costs of collecting the same (including but not limited to, reimbursement of Mortgagee's reasonable attorney's fees); second, *to the repayment of interest on all Additional Advances that Mortgagee may have made on Mortgagor's behalf* pursuant to this Mortgage, third, to the payment of principal of all such Additional Advances; and finally, to the payment of principal and interest on the Indebtedness then outstanding, which may be applied in such order and priority, as Mortgagee may determine within its sole discretion.







**TAXATION.** In the event that there should be any change in law with regard to taxation of mortgages or the debts they secure, Mortgagor agrees to pay any taxes, assessments or charges that may be imposed upon Mortgagee as a result of this Mortgage.

**ADDITIONAL REPRESENTATIONS AND WARRANTIES.** If Mortgagor is not a natural person, it further represents, warrants and covenants that:

**Organization.** Mortgagor is a corporation duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Louisiana. Mortgagor is duly authorized to transact business in all other states in which Mortgagor is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Mortgagor is doing business. Specifically, Mortgagor is, and at all times shall be, duly qualified as a foreign corporation, partnership or company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Mortgagor has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Mortgagor maintains an office at the address set out above. Unless Mortgagor has designated otherwise in writing, the principal office is the office at which Mortgagor keeps its books and records, including its records concerning the collateral. Mortgagor will notify Mortgagee prior to any change in the location of Mortgagor's state of organization or any change in Mortgagor's name. Mortgagor shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Mortgagor and Mortgagor's business activities.



**Authorization.** Mortgagor's execution, delivery, and performance of this Mortgage and all the Related Documents have been duly authorized by all necessary action by Mortgagor and do not conflict with, result in a violation of, or constitute a default under (i) any provision of Mortgagor's articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Mortgagor or (ii) any law, governmental regulation, court decree, or order applicable to Mortgagor or to Mortgagor's properties.

**Consents and Approvals.** If notice to or the consent or approval of any governmental body or authority, or any third party (including without limitation, any other creditor of Mortgagor) is now or any time hereafter required in connection with the execution, delivery and performance by Mortgagor of this Mortgage, then (i) with respect to all currently applicable requirements, such notice has been given and consent or approval obtained by Mortgagor prior to the execution hereof and written evidence thereof has been concurrently herewith delivered to Mortgagee, and (ii) with respect to such requirements that shall at any time hereafter be imposed or become applicable, such notice will be given and such consent or approval will be obtained by Mortgagor prior to the time such failure to do so will constitute a violation of law or result in any breach, default or failure by Mortgagor under any contract or instrument, and written evidence thereof will at such time be delivered to Mortgagee.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** No amendment, modification, consent or waiver of any provision of this Mortgage, and no consent to any departure by Mortgagor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Mortgagee, and then shall be effective only as to the specific instance and for the specific purpose for which given.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.



**Effect of Waivers.** Any failure or delay on the part of the Mortgagee to exercise any of the rights and remedies granted under this Mortgage or under any other agreement or agreements by and between Mortgagor and Mortgagee, shall not have the effect of waiving any of Mortgagee's rights and remedies. Any partial exercise of any rights and remedies granted to Mortgagee shall furthermore not constitute a waiver of any of Mortgagee's other rights and remedies; it being Mortgagor's intent and agreement that all of Mortgagee's rights and remedies shall be cumulative in nature. Furthermore, any failure on the part of



Mortgagee at any time or times hereafter to require strict performance by Mortgagor of any of the provisions, warranties, terms and conditions contained herein or in any other agreement, document or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall not waive, affect, or diminish the rights of Mortgagee to thereafter demand strict compliance and performance therewith and with respect to all other provisions, warranties, terms and conditions contained herein or therein. None of the warranties, conditions, provisions and terms contained in this Mortgage or any other agreement, document, or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall be deemed to have been waived by any act or knowledge of Mortgagee, its agents, directors, officers or employees; but only by an instrument in writing specifying such waiver, signed by a duly authorized officer of Mortgagee and delivered to Mortgagor. A waiver or forbearance on the part of Mortgagee as to one Event of Default shall not constitute a waiver or forbearance as to any other or subsequent default.

**Successors and Assigns Bound; Solidary Liability.** Subject to the limitations set forth herein, on transfer of the Property, this Mortgage shall be binding upon and inure to the benefit of the parties, their heirs, representatives, successors and/or assigns.

**Governing Law.** This Mortgage will be governed by, construed and enforced in accordance with, federal law and the laws of the State of Louisiana. This Mortgage has been accepted by Mortgagee in the State of Louisiana.

**Severability.** If any provision of this Mortgage is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall, be fully severable. This Mortgage shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Mortgage shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Mortgage, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.



**WAIVER OF CERTIFICATES.** The parties to this Mortgage hereby waive the production of certificates of mortgage, conveyance, tax, paving, chattel mortgage, assignment of accounts, and all other certificates and relieve and release the Notary Public before whom this Mortgage is passed, from all responsibilities and liabilities in connection therewith.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Louisiana Commercial Laws (R.S. 10: 9-101 *et seq.*):

**Additional Advance.** The words "Additional Advance" mean any and all additional sums that Mortgagee may advance on Mortgagor's behalf as provided under this Mortgage.

**Advance.** The word "Advance" means a disbursement of loan funds made, or to be made, to Mortgagor or on Mortgagor's behalf on a line of credit or multiple advance basis under the terms and conditions of this Mortgage.

**Borrower.** The word "Borrower" means Jay Doyle Valentino and Kathryn Aguzin Valentino, and their successors and assigns.

**Encumbrance.** The word "Encumbrance" means individually, collectively and interchangeably any and all presently existing and/or future mortgages, liens, privileges and other contractual and/or statutory security interests and rights, of every nature and kind, whether in admiralty, at law, or in equity, that now and/or in the future may affect the Property or any part or parts thereof.



304383





**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 *et seq.* ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Rub. L. No, 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*, or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the default section of this Mortgage.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means and includes all amounts identified in the Indebtedness section of this Mortgage.

**Leases.** The word "Leases" shall mean any and all leases, subleases, licenses, concessions or grants of other possessory interests, now or hereafter in force, oral or written, covering or affecting the mortgaged Property, any part thereof or any interest therein, including any and all security therefore and guarantees thereof.

**Lender.** The word "Lender" means any individual, natural person, corporation, partnership or limited liability company who loans money, advances funds or extends credit to Mortgagor or entities associated with Mortgagor, presently or in the future.

**Mortgage.** The word "Mortgage" means this Multiple Indebtedness Mortgage as it may be amended, supplemented, restated or otherwise modified from time to time.

**Mortgagee.** The word "Mortgagee" mean First Bank and Trust, its representatives, successors and/or assigns, and any future holder or holders of the Indebtedness or any interest therein.

**Mortgagor.** The word "Mortgagor" means individually, collectively and interchangeably, Nantucket Bay Subdivision, L.L.C., as well as any and all persons and entities subsequently purchasing the mortgaged Property, with or without assumption of this Mortgage.

**Notes.** The word "Notes" shall mean the Notes given by Mortgagor to Mortgagee in evidence of its loans provided by Mortgagee.

**Property.** The word "Property" means all of Mortgagor's right, title and interest in and to all the Property as described in the "Property Description" section of this Mortgage.

**Real Property.** The words "Real Property" mean the immovable property, interests and real rights, as further described in this Mortgage.





**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" shall mean all of the rents, revenue, income, profits and proceeds derived and to be derived from the mortgaged Property or arising from the use of enjoyment of any portion thereof or from any Lease, including but not limited to liquidated damages following default under any such Lease, or payments applicable to a termination of a Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from damage to any part of the mortgaged Property, all of Mortgagor's rights to recover monetary amounts from any tenant in bankruptcy, together with any sums of money that may now or at any time hereafter be or become due and payable to Mortgagor by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and all future oil, gas, mineral and mining leases covering the mortgaged Property or any part thereof, and all proceeds and other amounts paid or owing to Mortgagor under or pursuant to any and all contracts and bonds relating to the construction or renovation of the mortgaged Property.

**Rights.** The word "Rights" means any and all of Mortgagor's additional rights and interests collaterally assigned and pledged to Mortgagee as provided under this Mortgage.

**THUS DONE AND SIGNED,** on the day, month and year first written above, in New Orleans, Louisiana, in the presence of the undersigned competent witnesses, who hereunto sign their names with Mortgagor and me, Notary, after reading of the whole.

WITNESSES:                                    Mortgagor:

                                              Nantucket Bay Subdivision, L.L.C.

Printed name: SUSAN M. PONDT

                                              By: _____
                                                  Christina Singleton, Manager

Printed name: FLORENCE M. CERVINI

                        _____
                        Notary Public

Notary's Printed Name: JOHN D. WOGAN

Notary's Notary or Bar Roll No.: 33668



JOHN D. WOGAN
Notary Public
State of Louisiana
Louisiana State Bar 10629
Commission is Issued for Life



Exhibit "A"

to Multiple Indebtedness Mortgage granted by

Nantucket Bay Subdivision, L.L.C.

to

Little Pine Island Corporation

Nantucket Bay Subdivision, L.L.C.'s ownership interest, lease and leaseback rights, servitude interests, riparian rights, and all other rights pertaining to all of the immovable property hereinafter described in Section I through Section VII of this Exhibit, less and except the property excepted from this description in Section VIII of this Exhibit.

### Section I

The following described property conveyed by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Special Warranty Deed and Assignment of Lease recorded in the records of Sabine Parish, Louisiana on March 12, 2004 as Instrument No. 386601 (the "S&S Deed"). The reference in the following description to "the attached survey" refers to a survey of Meyer, Meyer, LaCroix & Hixson, Inc. of land situated in Sections 34 and 35, T-8-N, R-13,W and a portion of Section 2, T-17-N, R-13-W attached to and recorded with the S&S Deed.

TRACT NO. 1

Beginning at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence N 89 deg. 51 min. 20 sec. E along the north line of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35 a distance of 109.75 feet to a 2" iron pipe found at the 175 foot msl elevation; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L24 | S 01 deg. 56 min. 56 sec. W | for 243.50 feet; |
| L25 | S 50 deg. 35 min. 29 sec. W | for 107.82 feet; |
| L26 | S 66 deg. 44 min. 48 sec. W | for 136.68 feet; |
| L27 | N 30 deg. 54 min. 44 sec. E | for 93.04 feet; |
| L28 | N 20 deg. 12 min. 29 sec. W | for 245.37 feet; |
| L29 | N 09 deg. 39 min. 52 sec. W | for 165.72 feet; |
| L30 | N 70 deg. 31 min. 55 sec. E | for 131.82 feet; |
| L31 | N 26 deg. 56 min. 15 sec. W | for 117.45 feet; |
| L32 | S 59 deg. 04 min. 30 sec. W | for 169.22 feet; |
| L33 | N 35 deg. 48 min. 48 sec. W | for 92.18 feet; |
| L34 | N 15 deg. 30 min. 38 sec. E | for 184.69 feet; |
| L35 | N 29 deg. 30 min. 42 sec. E | for 137.47 feet; |
| L36 | S 84 deg. 05 min. 36 sec. W | for 60.23 feet; |
| L37 | S 43 deg. 41 min. 48 sec. W | for 106.02 feet; |
| L38 | S 78 deg. 43 min. 48 sec. W | for 147.13 feet; |
| L39 | S 21 deg. 42 min. 36 sec. E | for 159.28 feet; |
| L40 | S 65 deg. 24 min. 49 sec. W | for 80.90 feet; |
| L41 | N 19 deg. 39 min. 32 sec. W | for 85.48 feet; |
| L42 | N 52 deg. 25 min. 37 sec. W | for 170.03 feet; |



Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 27

| L43 | N 27 deg. 44 min. 55 sec. W | for 122.88 feet; |
| L44 | S 60 deg. 08 min. 00 sec. E | for 177.78 feet; |
| L45 | N 33 deg. 27 min. 00 sec. W | for 114.37 feet; |
| L46 | N 33 deg. 00 min. 45 sec. E | for 57.60 feet; |
| L47 | N 52 deg. 24 min. 09 sec. E | for 99.36 feet; |
|  | N 89 deg. 51 min. 29 sec. E | for 396.81 feet; |
|  | S 89 deg. 56 min. 49 sec. E | for 97.00 feet to the point of beginning |

of this tract, containing 6.790 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

### TRACT NO. 2

Commencing at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence S 76 deg. 17 min. 52 sec. W for a distance of 346.27 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L15 | S 38 deg. 31 min. 02 sec. E | for 111.25 feet; |
| L16 | S 04 deg. 00 min. 52 sec. E | for 123.54 feet; |
| L17 | S 08 deg. 18 min. 46 sec. W | for 139.18 feet; |
| L18 | S 23 deg. 36 min. 50 sec. E | for 98.77 feet; |
| L19 | S 56 deg. 38 min. 20 sec. E | for 182.93 feet; |
| L20 | N 68 deg. 02 min. 11 sec. E | for 138.22 feet; |
| L21 | N 52 deg. 09 min. 54 sec. E | for 151.22 feet; |
| L22 | N 44 deg. 40 min. 44 sec. E | for 151.92 feet; |
| L23 | N 13 deg. 55 min. 49 sec. W | for 65.42 feet; |
| L2 | S 89 deg. 01 min. 40 sec. E | for 138.55 feet; |
| L3 | S 76 deg. 12 min. 18 sec. E | for 232.44 feet; |
| L4 | S 13 deg. 29 min. 42 sec. E | for 132.09 feet; |
| L5 | S 89 deg. 49 min. 30 sec. W | for 269.77 feet; |
| L6 | S 66 deg. 58 min. 25 sec. W | for 174.11 feet; |
| L7 | S 35 deg. 56 min. 23 sec. W | for 203.63 feet; |
| L8 | N 83 deg. 38 min. 45 sec. W | for 294.43 feet; |
| L9 | N 73 deg. 20 min. 49 sec. W | for 244.15 feet; |
| L10 | N 00 deg. 44 min. 41 sec. W | for 317.43 feet; |
| L11 | N 43 deg. 10 min. 33 sec. W | for 171.64 feet; |
| L12 | N 75 deg. 49 min. 14 sec. W | for 94.90 feet; |
| L13 | N 70 deg. 21 min. 54 sec. E | for 176.45 feet; |
| L14 | N 83 deg. 31 min. 07 sec. E | for 140.56 feet; to the point of |

beginning of this tract, containing 5.691 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

### TRACT NO. 3

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 25 min. 02 sec. W along the west line of the SW 1/4 of the SW 1/4 for a distance of 1185.58 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

|  | N 81 deg. 15 min. 50 sec. E | for 353.05 feet; |
| L63 | N 52 deg. 31 min. 51 sec. E | for 253.34 feet; |

Page 2-A





| L64 | N 03 deg. 38 min. 23 sec. W | for 298.09 feet; |
| L65 | N 49 deg. 59 min. 36 sec. E | for 241.55 feet; |
| L66 | N 26 deg. 14 min. 22 sec. W | for  83.42 feet; |
| L67 | N 08 deg. 40 min. 56 sec. E | for  91.83 feet; |
| L68 | N 34 deg. 25 min. 11 sec. W | for 112.75 feet; |
| L69 | N 30 deg. 57 min. 17 sec. W | for 101.35 feet; |
| L70 | N 52 deg. 03 min. 40 sec. W | for  61.43 feet; |
| L48 | S 76 deg. 21 min. 01 sec. W | for 130.01 feet; |
| L49 | S 56 deg. 09 min. 00 sec. E | for 136.37 feet; |
| L50 | S 61 deg. 53 min. 28 sec. E | for  82.85 feet; |
| L51 | S 20 deg. 55 min. 11 sec. E | for  93.61 feet; |
| L52 | S 72 deg. 46 min. 26 sec. W | for 176.88 feet; |
| L53 | S 81 deg. 06 min. 06 sec. W | for 388.35 feet; |
| L54 | N 89 deg. 19 min. 27 sec. E | for 191.22 feet; |
| L55 | S 52 deg. 28 min. 26 sec. E | for 156.44 feet; |
| L56 | S 15 deg. 45 min. 54 sec. W | for 111.43 feet; |
| L57 | S 69 deg. 37 min. 56 sec. E | for 162.76 feet; |
| L58 | S 74 deg. 20 min. 10 sec. W | for 316.39 feet; |
| L59 | S 36 deg. 21 min. 46 sec. W | for 167.18 feet; |
| L60 | S 36 deg. 10 min. 13 sec. W | for 205.46 feet; |
| L61 | S 72 deg. 12 min. 52 sec. E | for 232.51 feet; |
|  | N 81 deg. 15 min. 50 sec. E | for 102.81 feet to the point of |

beginning of this tract, containing 9.326 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

TRACT NO. 4

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 89 deg. 51 min. 29 sec. E along the north line of the SW 1/4 of the SW 1/4 for a distance of 523.21 feet to a 1/2" iron rod set at the southeast corner of the 1 acre tract lying south of the road in the SW corner of the NW 1/4 of the SW 1/4 of Section 35 acquired from Ruby Martinez Danner; thence N 60 deg. 48 min. 21 sec. W a distance of 278.86 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L71 | S 28 deg. 06 min. 24 sec. W | for 232.62 feet; |
| L72 | S 60 deg. 37 min. 29 sec. W | for 130.63 feet; |
| L73 | N 64 deg. 28 min. 00 sec. W | for 194.02 feet; |
| L74 | N 06 deg. 42 min. 10 sec. W | for  77.89 feet; |
| L75 | N 75 deg. 07 min. 24 sec. E | for 421.73 feet to the point of |

beginning of this tract, containing 1.316 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Page 3-A

<u>TRACT NO. 5</u>

Commencing at the southeast corner of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 00 deg. 16 min. 21 sec. W along the east line of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West for a distance of 658.72 feet to the northeast corner of the S1/2 of the NE 1/4 of the SE 1/4 of Section 34; thence S 50 deg. 11 min. 31 sec. W a distance of 562.55 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L167 | S 32 deg. 16 min. 39 sec. W | for 421.68 feet; |
| L168 | N 39 deg. 51 min. 21 sec. W | for 102.67 feet; |
| L169 | N 01 deg. 34 min. 50 sec. W | for 351.25 feet; |
| L170 | N 07 deg. 04 min. 53 sec. W | for 177.36 feet; |
| L171 | N 48 deg. 46 min. 46 sec. E | for 92.10 feet; |
| L172 | S 13 deg. 14 min. 46 sec. E | for 124.76 feet; |
| L173 | S 56 deg. 29 min. 07 sec. E | for 141.27 feet; |
| L174 | S 44 deg. 00 min. 27 sec. E | for 153.85 feet to the point of |

beginning of this tract, containing 2.491 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

### Section II

TRACT III:

That portion of the South Half of the Southwest Quarter of the Northwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana that lies South of Louisiana Highway 482, together with all leaseback rights thereto.

Being a portion of the same property acquired by DeLoutre Property Rentals, L.L.C. from Joe Nell Kimbrell Blakey and Nancy Kimbrell Kerce, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on May 9, 2004, as Instrument No. 375,939; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rental, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

### Section III

The West 198 yards of the West fifty-three (53) acres of the North half of the Southwest Quarter (N-1/2 of SW-1/4) of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana, less one acre more or less South of the road which crosses said land near the Southwest corner thereof, said tract containing approximately 17 acres, LESS 14.78 acres below the 175 foot contour sold to Sabine river Authority, together with all leaseback rights from Sabine River Authority relating to the foregoing described property and all other property and interest in property described in the acquisition documents specified in the next following paragraph.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Richard S. Ramsey and Mary R. Bush by Cash Deed recorded in the official records of Sabine Parish, Louisiana, on April 12, 2002, as Document No. 375527, and acquired by Nantucket Bay Subdivision from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine parish, LA, on November 30, 2009, as Instrument #419907 in Conveyance Book 649, page 908.



Section IV

TRACT NO. 1

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35 and marking the point of beginning;

Thence N 89 deg. 17 min. 56 sec. W along the South line of the NW 1/4 of the SW 1/4 for a distance of 97.00 feet to a 5/8" rebar set;  thence N 60 deg. 33 min. 55 sec. W 354.61 feet to a 5/8" rebar set; thence N 45 deg. 02 min. 13 sec. W 457.77 feet to a 5/8" rebar set; thence N 20 deg. 17 min. 29 sec. W 209.66 feet to a 5/8" rebar set; thence N 02 deg. 41 min. 33 sec. E 384.49 feet to a 5/8" rebar set; thence N 10 deg. 10 min. 10 sec. E 217.14 feet to a 5/8" rebar set on the South right-of-way line of Louisiana Highway No. 482;  thence S 78 deg. 31 min. 00 sec. E along said right-of-way line 331.67 feet to a concrete right-of-way marker found;  thence continuing S 78 deg. 31 min. 00 sec. E along said right-of-way line 701.04 feet to a concrete right-of-way marker found;  thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take Line;  thence S 74 deg. 08 min. 00 sec.  E along said right-of-way line 75.59 feet to a new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said new 175 foot contour line as follows:
S 23 deg 35 min 41 sec W 146.37 feet to a 5/8" rebar set;
S 15 deg 59 min 22 sec W 311.55 feet to a 5/8" rebar set;
S 23 deg 06 min 23 sec W 132.07 feet to a 5/8" rebar set;
S 32 deg 46 min 37 sec W  68.09 feet to a 5/8" rebar set;
S 64 deg 16 min 29 sec W 164.16 feet to a 5/8" rebar set;
S 83 deg 13 min 58 sec W 220.39 feet to a 5/8" rebar set;
N 09 deg 52 min 11 sec W 140.31 feet to a 5/8" rebar set;
N 00 deg 54 min 53 sec W 214.51 feet to a 5/8" rebar set;
N 23 deg 56 min 05 sec W 121.82 feet to a 5/8" rebar set;
N 63 deg 32 min 55 sec W 119.61 feet to a 5/8" rebar set;
N 78 deg 51 min 40 sec W 234.46 feet to a 5/8" rebar set;
S 81 deg 21 min 10 sec W  74.76 feet to a 5/8" rebar set;
S 48 deg 28 min 05 sec W  63.47 feet to a 5/8" rebar set;
S 14 deg 36 min 09 sec W 194.94 feet to a 5/8" rebar set;
S 12 deg 59 min 21 sec E 146.61 feet to a 5/8" rebar set;
S 43 deg 04 min 17 sec E 140.05 feet to a 5/8" rebar set;
S 66 deg 16 min 58 sec E 175.64 feet to a 5/8" rebar set;
S 35 deg 10 min 18 sec E 193.32 feet to a 5/8" rebar set;
S 73 deg 56 min 18 sec E 115.79 feet to a 5/8" rebar set;
S 86 deg 55 min 59 sec E 144.14 feet to a 5/8" rebar set;
N 87 deg 26 min 16 sec E 128.22 feet to a 5/8" rebar set;
S 35 deg 39 min 38 sec E 102.70 feet to a 5/8" rebar set;
S 40 deg 56 min 31 sec E 155.09 feet to a 5/8" rebar set;
S 01 deg 14 min 43 sec E  44.38 feet to a 5/8" rebar set;

S 32 deg 44 min 05 sec W  25.65 feet to a 5/8" rebar set;
S 63 deg 30 min 24 sec W  98.74 feet to a 5/8" rebar set on the South line of the NE 1/4 of the SW 1/4 of said Section 35; thence N 89 deg. 17 min. 56 sec. W (leaving said 175 foot contour line) along said forty line (also being the North line of the David Combs property, as per the survey by R. V. Leone, PLS, survey dated May 11, 1971) 223.99 feet to the point of beginning containing 18.334 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Less and except the following tract:



Page 5-A

TRACT NO. 4

Commencing at the point of beginning, being the Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence S 27 deg. 49 min. 17 sec. W along said line 149.31 feet to SRA point 383; thence S 59 deg. 14 min. 18 sec W along said take line 285.81 feet to SRA point 384; thence S 21 deg. 56 min. 54 sec. W along said line 88.45 feet to the new 175 contour line (new take line); thence S 83 deg. 13 min. 58 sec. W along said new 175 contour line 91.25 feet to a 5/8" rebar set; thence N 09 deg. 52 min. 11 sec. W along said new take line 140.31 feet to a 5/8" rebar set; thence N 00 deg. 54 min. 53 sec. W along said line 97.40 feet to the original take line; thence N 34 deg. 17 min. 36 sec. E along said original take line 108.97 feet to SRA point 390; thence N 17 deg. 24 min. 34 sec. E along said original take line 174.90 feet to SRA point 391; thence N 57 deg. 22 min. 56 sec. E along said original take line 198.91 feet to SRA point 392; thence N 20 deg. 35 min. 22 sec. W along said original take line 2.75 feet to the South right-of-way line of Louisiana Highway 482; thence S 78 deg. 31 min. 00 sec. E along said right-of-way line 47.98 feet to a concrete right-of-way marker; thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take line; thence S 11 deg. 09 min. 00 sec W along said take line 169.64 feet to the point of beginning containing 3.960 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Also less and except the following tract:

TRACT NO. 5

Commencing at the point of beginning, being the Sabine River Authority Angle Point No. 386 on the Toledo Bend Take Line; thence S 68 deg. 56 min. 33 sec. W along said line 122.92 feet to SRA point 387; thence N 63 deg. 45 min. 36 sec. W along said take line 157.88 feet to SRA point 388; thence N 08 deg. 15 min. 48 sec. W along said line 41.94 feet to the new 175 contour line (new take line), thence S 73 deg. 56 min. 18 sec. E along said new 175 contour line 10.94 feet to a 5/8" rebar set; thence S 86 deg. 55 min. 59 sec. E along said new take line 144.14 feet to a 5/8" rebar set; thence N 87 deg. 26 min. 16 sec. E along said line 50.55 feet to the original take line; thence S 44 deg. 22 min. 55 sec. E along said original take line 82.08 feet to the point of beginning containing 0.402 of an acre, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Page 6-A

Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 32

## TRACT NO. 3

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35, thence S 89 deg. 17 min. 56 sec. E along the South line of the NE 1/4 of the SW 1/4 for a distance of 223.99 feet to a 5/8" rebar set on the new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said 175 foot contour line as follows:
N 63 deg. 30 min. 24 sec. E 98.74 feet to a 5/8" rebar set;
N 32 deg. 44 min. 05 sec. E 25.65 feet to a 5/8" rebar set;
N 01 deg. 14 min. 43 sec. W 44.38 feet to a 5/8" rebar set;
N 40 deg. 56 min. 31 sec. W 155.09 feet to a 5/8" rebar set;
N 35 deg. 39 min. 38 sec. W 102.70 feet to a 5/8" rebar set;
S 87 deg. 26 min. 16 sec. W 77.67 feet to the original Toledo Bend Take Line for a point of beginning;

Thence continuing with said new 175 foot contour line as follows:
S 87 deg. 26 min. 16 sec. W 50.55 feet to a 5/8" rebar set;
N 86 deg. 55 min. 59 sec. W 144.14 feet to a 5/8" rebar set;
N 73 deg. 56 min. 18 sec. W 10.94 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 08 deg. 15 min. 48 sec. W 24.26 feet;

Thence N 00 deg. 13 min. 51 sec. E 306.22 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 34 deg. 17 min. 36 sec. E 106.00 feet to the new 175 foot contour line;

Thence with said new 175 foot contour line as follows:
S 00 deg. 54 min. 53 sec. E 97.40 feet to a 5/8" rebar set;
S 09 deg. 52 min. 11 sec. E 140.31 feet to a 5/8" rebar set;
N 83 deg. 13 min. 58 sec. E 91.25 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line as follows:
S 21 deg. 56 min. 54 sec. W 129.43 feet to Point No. 385;
S 44 deg. 22 min. 55 sec. E 113.84 feet to the point of beginning containing 1.004 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Sabine River Authority, State of Louisiana, by Correction Deed recorded in the official records of Sabine Parish, Louisiana, on November 25, 2002, as Instrument No. 378954 (the "Correction Deed"), and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908. The above described property is shown on a survey of the property made by Jerry L. Rugg, Registered Professional Land Surveyor, dated November 15, 2002, attached to and recorded with the Correction Deed.



Page 7-A

Section V

A 5.36 acre tract located in the North Half of the Southwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana and being more particularly described as follows:

Beginning at a 1/2 inch iron rod set at Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence South 27 degrees 49 minutes 17 seconds West, 149.91 feet to a 1/2 inch iron rod set at SRA 383; thence South 59 degrees 14 minutes 18 seconds West, 285.81 feet to 60d nail set at SRA 384; thence South 21 degrees 56 minutes 54 seconds West, 217.88 feet to a 1/2 inch iron rod set at SRA 385; thence South 44 degrees 22 minutes 55 seconds East, 195.92 feet to a 1/2 inch iron rod set at SRA 386; thence South 68 degrees 56 minutes 33 seconds West, 122.91 feet to a 1/2 inch iron rod set at SRA 387; thence North 63 degrees 45 minutes 36 seconds West, 157.88 feet to a 1/2 inch iron set at SRA 388; thence North 08 degrees 15 minutes 48 seconds West, 66.19 feet to a point in a pond; thence North 00 degrees 13 minutes 52 seconds East, 306.23 feet to a point in a pond; thence North 34 degrees 17 minutes 36 seconds East, 214.97 feet to a point in a pond; thence North 17 degrees 24 minutes 34 seconds East, 174.90 feet to a 1/2 inch iron rod set at SRA 391; thence North 57 degrees 22 minutes 56 seconds East, 198.91 feet to a 1/2 inch iron rod set at SRA 392; thence North 20 degrees 35 minutes 22 seconds West, 2.46 feet to a 1/2 inch iron rod set on the Southerly right of way of a Louisiana State Highway; thence South 78 degrees 31 minutes 10 seconds East, 47.73 feet along said right of way to a concrete monument; thence South 70 degrees 51 minutes 26 seconds East, 147.33 feet along said right of way to a 1/2 inch iron rod; thence 31.91 feet along the arc of a curve to the left having a central angle of 00 degrees 25 minutes 57 seconds, a radius of 4227.18 feet and chord bearing South 78 degrees 16 minutes 02 seconds East, 31.91 feet to a 1/2 inch iron rod set on the Toledo Bend Take Line; thence South 11 degrees 09 minutes 00 seconds West, 169.39 feet to the Point of Beginning and containing 5.36 acres.

AND

Any and all interest they may have in the East Half of the Northwest Quarter of the Southwest Quarter of Section 35, Township 8 North, Range 13, Sabine Parish, Louisiana.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Mildred Ann Sebren Moreau, and others, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on March 18, 2002 as Document No. 375112; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Contribution Deed filed in the official records of Sabine Parish, Louisiana, on May 28, 2004, as Instrument No. 387883 and by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Page 8-A



Section VI

All contractual rights granted by Sabine River Authority, State of Louisiana, to S&S Marina, L.L.C. in that certain Act of Cash Sale and Lease recorded in the official records of Sabine Parish, LA, on March 12, 2004 as Instrument #386600, including, but not limited to the following contractual rights to purchase additional property, set forth on page 6 of the Act of Cash Sale and Lease, providing as follows:

S&S Marina, L.L.C. and SABINE RIVER AUTHORITY, STATE OF LOUISIANA, hereby agree that upon complying with the terms and conditions of the SABINE RIVER AUTHORITY, STATE OF LOUISIANA's Shorline Enhancement Policy as it currently exists, S&S MARINA, L.L.C. will be allowed to do shoreline enhancement, and up on completion of said enhancement as approved by the Authority of all and/or any portion of the Leased Property, that the SABINE RIVER AUTHORITY, STATE OF LOUISIANA will sell and S&S MARINA, L.L.C., or its successor in title, will purchase the Leased Property at a price of $4,500.00 per acre, cash, recognizing that there must be a 50 foot wide strip of the Leased Property remaining between the new 172' msl elevation line and the property to be conveyed.

which rights were assigned by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Assignment of Contractual Rights recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Section VII

All servitude rights running in favor of Nantucket Bay Subdivision, L.L.C., or property owned by Nantucket Bay Subdivision, L.L.C., including, without limitation, the servitude created by Servitude Agreement between DeLoutre Property Rentals, L.L.C. and Nantucket Bay Subdivision, L.L.C., recorded in the official records of Sabine Parish, LA, on March 12, 2004, under Instrument No. 386602

That certain property consisting of Nantucket Cove road as reflected on Plat of Survey of Nantucket Bay Subdivision dated January 2, 2003 and filed under Registry Number 379395, Sabine Parish, Louisiana.

Page 9-A

Section VIII

A.    The property described in Section V is less and except the following described property conveyed by Nantucket Bay Subdivision, L.L.C. to Gulf States Underwriters of Louisiana, Inc., by Credit Sale with Vendor's Privileged Mortgage filed in the official records of Sabine Parish, Louisiana, on May 28, 2004 as Instrument No. 387884, and more particularly described as follows:

LOTS 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, AND 33 BEINGING ALL OF THE LOTS IN NANTUCKET BAY SUBDIVISION PER PLAT RECORDED ON JANUARY 2, 2003 UNDER REGISTRY NUMBER 379395 RECORDS OF SABINE PARISH, LOUISIANA; TOGETHER WITH NANTUCKET POINT ROAD AS DESCRIBED ON SAID PLAT

Together with all Sabine River Authority, State of Louisiana, Leaseback Rights fronting on the said thirty-three (33) lots.

B.    There is excepted from the property affected by this mortgage all of the minerals reserved by or conveyed to DeLoutre Property Rentals, L.L.C. in Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance book 649, page 908.

C.    There is excepted from the property affected by this mortgage the following property conveyed by DeLoutre Property Rentals, L.L.C. to Sabine River Authority, State of Louisiana, by Correction Deed recorded in the official records of Sabine Parish, Louisiana, on November 25, 2002 as Instrument No. 378954.

A 0.917 acre tract located in the Southwest quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana and being more particularly described as follows:

Beginning at a 2" iron pipe found at the Northeast corner of the Southwest quarter of the Southwest quarter of said Section 35;

Thence, South 00 degrees 04 minutes 42 seconds East, 658.92 feet to a 5/8" iron rod found at the Southwest corner of the Dave Combs tract;

Thence, North 89 degrees 51 minutes 20 seconds East, 109.83 feet to a 3/4" iron pipe;

Thence, South 01 degree 56 minutes 58 minutes West, 95.94 feet to a 1/2" iron rod;

Thence, North 85 degrees 04 minutes 08 seconds West, 13.25 feet to a 1/2" iron rod;

Thence, North 29 degrees 34 minutes 23 seconds West, 35.93 feet to a 1/2" iron rod;

Thence, North 63 degrees 28 minutes 07 seconds West, 140.39 feet to a 1/2" iron rod;

Page 10-A

Thence, North 00 degrees 04 minutes 42 seconds West, 152.59 feet to a 1/2" iron rod;

Thence, North 70 degrees 31 minutes 55 seconds East, 2.43 feet to a 1/2" iron rod.

Thence, North 26 degrees 56 minutes 15 seconds West, 5.07 feet to a 1/2" iron rod;

Thence, North 00 degrees 04 minutes 42 seconds West, 502.56 feet to a 1/2" iron rod;

Thence, South 89 degrees 56 minutes 49 seconds East, 50.00 feet to the point of beginning and containing 0.917 acre.

Page 11-A

# Exhibit C

Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 38



Exhibit "A"

to Multiple Indebtedness Mortgage granted by

Nantucket Bay Subdivision, L.L.C.

to

Little Pine Island Corporation

Nantucket Bay Subdivision, L.L.C.'s ownership interest, lease and leaseback rights, servitude interests, riparian rights, and all other rights pertaining to all of the immovable property hereinafter described in Section I through Section VII of this Exhibit, less and except the property excepted from this description in Section VIII of this Exhibit.

Section I

The following described property conveyed by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Special Warranty Deed and Assignment of Lease recorded in the records of Sabine Parish, Louisiana on March 12, 2004 as Instrument No. 386601 (the "S&S Deed"). The reference in the following description to "the attached survey" refers to a survey of Meyer, Meyer, LaCroix & Hixson, Inc. of land situated in Sections 34 and 35, T-8-N, R-13,W and a portion of Section 2, T-17-N, R-13-W attached to and recorded with the S&S Deed.

TRACT NO. 1

Beginning at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence N 89 deg. 51 min. 20 sec. E along the north line of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35 a distance of 109.75 feet to a 2" iron pipe found at the 175 foot msl elevation; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L24 | S 01 deg. 56 min. 56 sec. W | for 243.50 feet; |
| L25 | S 50 deg. 35 min. 29 sec. W | for 107.82 feet; |
| L26 | S 66 deg. 44 min. 48 sec. W | for 136.68 feet; |
| L27 | N 30 deg. 54 min. 44 sec. E | for 93.04 feet; |
| L28 | N 20 deg. 12 min. 29 sec. W | for 245.37 feet; |
| L29 | N 09 deg. 39 min. 52 sec. W | for 165.72 feet; |
| L30 | N 70 deg. 31 min. 55 sec. E | for 131.82 feet; |
| L31 | N 26 deg. 56 min. 15 sec. W | for 117.45 feet; |
| L32 | S 59 deg. 04 min. 30 sec. W | for 169.22 feet; |
| L33 | N 35 deg. 48 min. 48 sec. W | for 92.18 feet; |
| L34 | N 15 deg. 30 min. 38 sec. E | for 184.69 feet; |
| L35 | N 29 deg. 30 min. 42 sec. E | for 137.47 feet; |
| L36 | S 84 deg. 05 min. 36 sec. W | for 60.23 feet; |
| L37 | S 43 deg. 41 min. 48 sec. W | for 106.02 feet; |
| L38 | S 78 deg. 43 min. 48 sec. W | for 147.13 feet; |
| L39 | S 21 deg. 42 min. 36 sec. E | for 159.28 feet; |
| L40 | S 65 deg. 24 min. 49 sec. W | for 80.90 feet; |
| L41 | N 19 deg. 39 min. 32 sec. W | for 85.48 feet; |
| L42 | N 52 deg. 25 min. 37 sec. W | for 170.03 feet; |



Page 1–A





| | | |
|---|---|---|
| L43 | N 27 deg. 44 min. 55 sec. W | for 122.88 feet; |
| L44 | S 60 deg. 08 min. 00 sec. E | for 177.78 feet; |
| L45 | N 33 deg. 27 min. 00 sec. W | for 114.37 feet; |
| L46 | N 33 deg. 00 min. 45 sec. E | for 57.60 feet; |
| L47 | N 52 deg. 24 min. 09 sec. E | for 99.36 feet; |
| | N 89 deg. 51 min. 29 sec. E | for 396.81 feet; |
| | S 89 deg. 56 min. 49 sec. E | for 97.00 feet to the point of beginning |

of this tract, containing 6.790 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

### TRACT NO. 2

Commencing at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence S 76 deg. 17 min. 52 sec. W for a distance of 346.27 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L15 | S 38 deg. 31 min. 02 sec. E | for 111.25 feet; |
| L16 | S 04 deg. 00 min. 52 sec. E | for 123.54 feet; |
| L17 | S 08 deg. 18 min. 46 sec. W | for 139.18 feet; |
| L18 | S 23 deg. 36 min. 50 sec. E | for 98.77 feet; |
| L19 | S 56 deg. 38 min. 20 sec. E | for 182.93 feet; |
| L20 | N 68 deg. 02 min. 11 sec. E | for 138.22 feet; |
| L21 | N 52 deg. 09 min. 54 sec. E | for 151.22 feet; |
| L22 | N 44 deg. 40 min. 44 sec. E | for 151.92 feet; |
| L23 | N 13 deg. 55 min. 49 sec. W | for 65.42 feet; |
| L2 | S 89 deg. 01 min. 40 sec. E | for 138.55 feet; |
| L3 | S 76 deg. 12 min. 18 sec. E | for 232.44 feet; |
| L4 | S 13 deg. 29 min. 42 sec. E | for 132.09 feet; |
| L5 | S 89 deg. 49 min. 30 sec. W | for 269.77 feet; |
| L6 | S 66 deg. 58 min. 25 sec. W | for 174.11 feet; |
| L7 | S 35 deg. 56 min. 23 sec. W | for 203.63 feet; |
| L8 | N 83 deg. 38 min. 45 sec. W | for 294.43 feet; |
| L9 | N 73 deg. 20 min. 49 sec. W | for 244.15 feet; |
| L10 | N 00 deg. 44 min. 41 sec. W | for 317.43 feet; |
| L11 | N 43 deg. 10 min. 33 sec. W | for 171.64 feet; |
| L12 | N 75 deg. 49 min. 14 sec. W | for 94.90 feet; |
| L13 | N 70 deg. 21 min. 54 sec. E | for 176.45 feet; |
| L14 | N 83 deg. 31 min. 07 sec. E | for 140.56 feet; to the point of |

beginning of this tract, containing 5.691 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

### TRACT NO. 3

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 25 min. 02 sec. W along the west line of the SW 1/4 of the SW 1/4 for a distance of 1185.58 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| | N 81 deg. 15 min. 50 sec. E | for 353.05 feet; |
| L63 | N 52 deg. 31 min. 51 sec. E | for 253.34 feet; |

Page 2-A





| | | |
|---|---|---|
| L64 | N 03 deg. 38 min. 23 sec. W | for 298.09 feet; |
| L65 | N 49 deg. 59 min. 36 sec. E | for 241.55 feet; |
| L66 | N 26 deg. 14 min. 22 sec. W | for  83.42 feet; |
| L67 | N 08 deg. 40 min. 56 sec. E | for  91.83 feet; |
| L68 | N 34 deg. 25 min. 11 sec. W | for 112.75 feet; |
| L69 | N 30 deg. 57 min. 17 sec. W | for 101.35 feet; |
| L70 | N 52 deg. 03 min. 40 sec. W | for  61.43 feet; |
| L48 | S 76 deg. 21 min. 01 sec. W | for 130.01 feet; |
| L49 | S 56 deg. 09 min. 00 sec. E | for 136.37 feet; |
| L50 | S 61 deg. 53 min. 28 sec. E | for  82.85 feet; |
| L51 | S 20 deg. 55 min. 11 sec. W | for  93.61 feet; |
| L52 | S 72 deg. 46 min. 26 sec. W | for 176.88 feet; |
| L53 | S 81 deg. 06 min. 06 sec. W | for 388.35 feet; |
| L54 | N 89 deg. 19 min. 27 sec. E | for 191.22 feet; |
| L55 | S 52 deg. 28 min. 26 sec. E | for 156.44 feet; |
| L56 | S 15 deg. 45 min. 54 sec. W | for 111.43 feet; |
| L57 | S 69 deg. 37 min. 56 sec. W | for 162.76 feet; |
| L58 | S 74 deg. 20 min. 10 sec. W | for 316.39 feet; |
| L59 | S 36 deg. 21 min. 46 sec. W | for 167.18 feet; |
| L60 | S 36 deg. 10 min. 13 sec. W | for 205.46 feet; |
| L61 | S 72 deg. 12 min. 52 sec. E | for 232.51 feet; |
| | N 81 deg. 15 min. 50 sec. E | for 102.81 feet to the point of |

beginning of this tract, containing 9.326 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

### TRACT NO. 4

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 89 deg. 51 min. 29 sec. E along the north line of the  SW 1/4 of the SW 1/4 for a distance of 523.21 feet to a 1/2" iron rod set at the southeast corner of the 1 acre tract lying south of the road in the SW corner of the NW 1/4 of the SW 1/4 of Section 35 acquired from Ruby Martinez Danner; thence N 60 deg. 48 min. 21 sec. W a distance of 278.86 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L71 | S 28 deg. 06 min. 24 sec. W | for 232.62 feet; |
| L72 | S 60 deg. 37 min. 29 sec. W | for 130.63 feet; |
| L73 | N 64 deg. 28 min. 00 sec. W | for 194.02 feet; |
| L74 | N 06 deg. 42 min. 10 sec. W | for  77.89 feet; |
| L75 | N 75 deg. 07 min. 24 sec. E | for 421.73 feet to the point of |

beginning of this tract, containing 1.316 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Page  3-A



<u>TRACT NO. 5</u>

Commencing at the southeast corner of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 00 deg. 16 min. 21 sec. W along the east line of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West for a distance of 658.72 feet to the northeast corner of the S1/2 of the NE 1/4 of the SE 1/4 of Section 34; thence S 50 deg. 11 min. 31 sec. W a distance of 562.55 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L167 | S 32 deg. 16 min. 39 sec. W | for 421.68 feet; |
| L168 | N 39 deg. 51 min. 21 sec. W | for 102.67 feet; |
| L169 | N 01 deg. 34 min. 50 sec. W | for 351.25 feet; |
| L170 | N 07 deg. 04 min. 53 sec. W | for 177.36 feet; |
| L171 | N 48 deg. 46 min. 46 sec. E | for 92.10 feet; |
| L172 | S 13 deg. 14 min. 46 sec. E | for 124.76 feet; |
| L173 | S 56 deg. 29 min. 07 sec. E | for 141.27 feet; |
| L174 | S 44 deg. 00 min. 27 sec. E | for 153.85 feet to the point of |

beginning of this tract, containing 2.491 acres, more or less, and being subject to any rights-of-ways, easements or seivitudes of record or use;

Section II

TRACT III:

That portion of the South Half of the Southwest Quarter of the Northwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana that lies South of Louisiana Highway 482, together with all leaseback rights thereto.

Being a portion of the same property acquired by DeLoutre Property Rentals, L.L.C. from Joe Nell Kimbrell Blakey and Nancy Kimbrell Kerce, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on May 9, 2004, as Instrument No. 375,939; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rental, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Section III

The West 198 yards of the West fifty-three (53) acres of the North half of the Southwest Quarter (N-1/2 of SW-1/4) of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana, less one acre more or less South of the road which crosses said land near the Southwest corner thereof, said tract containing approximately 17 acres, LESS 14.78 acres below the 175 foot contour sold to Sabine river Authority, together with all leaseback rights from Sabine River Authority relating to the foregoing described property and all other property and interest in property described in the acquisition documents specified in the next following paragraph.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Richard S. Ramsey and Mary R. Bush by Cash Deed recorded in the official records of Sabine Parish, Louisiana, on April 12, 2002, as Document No. 375527, and acquired by Nantucket Bay Subdivision from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine parish, LA, on November 30, 2009, as Instrument #419907 in Conveyance Book 649, page 908.



Section IV

TRACT NO. 1

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35 and marking the point of beginning;

Thence N 89 deg. 17 min. 56 sec. W along the South line of the NW 1/4 of the SW 1/4 for a distance of 97.00 feet to a 5/8" rebar set;  thence N 60 deg. 33 min. 55 sec. W 354.61 feet to a 5/8" rebar set; thence N 45 deg. 02 min. 13 sec. W 457.77 feet to a 5/8" rebar set; thence N 20 deg. 17 min. 29 sec. W 209.66 feet to a 5/8" rebar set; thence N 02 deg. 41 min. 33 sec. E 384.49 feet to a 5/8" rebar set; thence N 10 deg. 10 min. 10 sec. E 217.14 feet to a 5/8" rebar set on the South right-of-way line of Louisiana Highway No. 482;  thence S 78 deg. 31 min. 00 sec. E along said right-of-way line 331.67 feet to a concrete right-of-way marker found;  thence continuing S 78 deg. 31 min. 00 sec. E along said right-of-way line 701.04 feet to a concrete right-of-way marker found;  thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take Line;  thence S 74 deg. 08 min. 00 sec. E along said right-of-way line 75.59 feet to a new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said new 175 foot contour line as follows:
S 23 deg 35 min 41 sec W 146.37 feet to a 5/8" rebar set;
S 15 deg 59 min 22 sec W 111.55 feet to a 5/8" rebar set;
S 23 deg 06 min 23 sec W 132.07 feet to a 5/8" rebar set;
S 32 deg 46 min 37 sec W  68.09 feet to a 5/8" rebar set;
S 64 deg 16 min 29 sec W 164.14 feet to a 5/8" rebar set;
S 83 deg 13 min 58 sec W 220.39 feet to a 5/8" rebar set;
N 09 deg 52 min 11 sec W 140.31 feet to a 5/8" rebar set;
N 00 deg 54 min 53 sec W 214.51 feet to a 5/8" rebar set;
N 23 deg 56 min 05 sec W 121.82 feet to a 5/8" rebar set;
N 63 deg 32 min 55 sec W 119.61 feet to a 5/8" rebar set;
N 78 deg 51 min 40 sec W 234.46 feet to a 5/8" rebar set;
S 81 deg 21 min 10 sec W  74.76 feet to a 5/8" rebar set;
S 48 deg 28 min 05 sec W  63.47 feet to a 5/8" rebar set;
S 14 deg 36 min 09 sec W 194.94 feet to a 5/8" rebar set;
S 12 deg 59 min 21 sec E 146.61 feet to a 5/8" rebar set;
S 43 deg 04 min 17 sec E 140.05 feet to a 5/8" rebar set;
S 66 deg 16 min 58 sec E 175.64 feet to a 5/8" rebar set;
S 35 deg 10 min 18 sec E 193.32 feet to a 5/8" rebar set;
S 73 deg 56 min 18 sec E 115.79 feet to a 5/8" rebar set;
S 86 deg 55 min 59 sec E 144.14 feet to a 5/8" rebar set;
N 87 deg 26 min 16 sec E 128.22 feet to a 5/8" rebar set;
S 35 deg 39 min 38 sec E 102.70 feet to a 5/8" rebar set;
S 40 deg 56 min 31 sec E 155.09 feet to a 5/8" rebar set;
S 01 deg 14 min 43 sec E  44.38 feet to a 5/8" rebar set;

S 32 deg 44 min 05 sec W  25.65 feet to a 5/8" rebar set;
S 63 deg 30 min 24 sec W  98.74 feet to a 5/8" rebar set on the South line of the NE 1/4 of the SW 1/4 of said Section 35; thence N 89 deg. 17 min. 56 sec. W (leaving said 175 foot contour line) along said forty line (also being the North line of the David Combs property, as per the survey by R. V. Leone, PLS, survey dated May 11, 1971) 223.99 feet to the point of beginning containing 18.334 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Less and except the following tract:



Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 43

### TRACT NO. 4

Commencing at the point of beginning, being the Sabine River
Authority Angle Point No. 382 on the Toledo Bend Take Line; thence
S 27 deg. 49 min. 17 sec. W along said line 149.91 feet to SRA
point 383; thence S 59 deg. 14 min. 13 sec W along said take line
285.81 feet to SRA point 384; thence S 21 deg. 56 min. 54 sec. W
along said line 88.45 feet to the new 175 contour line (new take
line); thence S 83 deg. 13 min. 58 sec. W along said new 175
contour line 91.25 feet to a 5/8" rebar set; thence N 09 deg. 52
min. 11 sec. W along said new take line 140.31 feet to a 5/8" rebar
set; thence N 00 deg. 54 min. 53 sec. W along said line 97.40 feet
to the original take line; thence N 34 deg. 17 min. 36 sec. E along
said original take line 108.97 feet to SRA point 390; thence N 17
deg. 24 min. 34 sec. E along said original take line 174.90 feet to
SRA point 391;   thence N 57 deg. 22 min. 56 sec. E along said
original take line 198.91 feet to SRA point 392; thence N 20 deg.
35 min. 22 sec. W along said original take line 2.75 feet to the
South right-of-way line of Louisiana Highway 482; thence S 78 deg.
31 min. 00 sec. E along said right-of-way line 47.98 feet to a
concrete right-of-way marker; thence S 70 deg. 51 min. 26 sec. E
along said right-of-way line 147.33 feet; thence southeasterly
along said right-of-way line, being an arc of a curve to the left
for a distance of 31.81 feet, curve having a central angle of 00
deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord
bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo
Bend Take Line; thence S 11 deg. 09 min. 00 sec W along said take
line 169.64 feet to the point of beginning containing 3.960 acres,
more or less, and being subject to any rights-of-ways, easements or
servitudes of record or use;

Also less and except the following tract:

### TRACT NO. 5

Commencing at the point of beginning, being the Sabine River
Authority Angle Point No. 386 on the Toledo Bend Take Line; thence
S 68 deg. 56 min. 33 sec. W along said line 122.92 feet to SRA
point 387; thence N 63 deg. 45 min. 36 sec. W along said take line
157.88 feet to SRA point 388; thence N 08 deg. 15 min. 48 sec. W
along said line 41.94 feet to the new 175 contour line (new take
line); thence S 73 deg. 56 min. 18 sec. E along said new 175
contour line 10.94 feet to a 5/8" rebar set; thence S 86 deg. 55
min. 59 sec. E along said new take line 144.14 feet to a 5/8" rebar
set; thence N 87 deg. 26 min. 16 sec. E along said line 50.55 feet
to the original take line; thence S 44 deg. 22 min. 55 sec. E along
said original take line 82.08 feet to the point of beginning
containing 0.402 of an acre, more or less, and being subject to any
rights-of-ways, easements or servitudes of record or use.





## TRACT NO. 3

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35, thence S 89 deg. 17 min. 56 sec. E along the South line of the NE 1/4 of the SW 1/4 for a distance of 223.99 feet to a 5/8" rebar set on the new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said 175 foot contour line as follows:

N 63 deg. 30 min. 24 sec. E  98.74 feet to a 5/8" rebar set;
N 32 deg. 44 min. 05 sec. E  25.65 feet to a 5/8" rebar set;
N 01 deg. 14 min. 43 sec. W  44.38 feet to a 5/8" rebar set;
N 40 deg. 56 min. 31 sec. W 155.09 feet to a 5/8" rebar set;
N 35 deg. 39 min. 38 sec. W 102.70 feet to a 5/8" rebar set;
S 87 deg. 26 min. 16 sec. W  77.67 feet to the original Toledo Bend Take Line for a point of beginning.

Thence continuing with said new 175 foot contour line as follows:

S 87 deg. 26 min. 16 sec. W  50.55 feet to a 5/8" rebar set;
N 86 deg. 55 min. 59 sec. W 144.14 feet to a 5/8" rebar set;
N 73 deg. 56 min. 18 sec. W  10.94 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 08 deg. 15 min. 48 sec. W  24.26 feet;

Thence N 00 deg. 13 min. 51 sec. E 306.22 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 34 deg. 17 min. 36 sec. E 106.00 feet to the new 175 foot contour line;

Thence with said new 175 foot contour line as follows:

S 00 deg. 54 min. 53 sec. E  97.40 feet to a 5/8" rebar set;
S 09 deg. 52 min. 11 sec. E 140.31 feet to a 5/8" rebar set;
N 83 deg. 13 min. 58 sec. E  91.25 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line as follows:

S 21 deg. 56 min. 54 sec. W 129.43 feet to Point No. 385;
S 44 deg. 22 min. 55 sec. E 113.84 feet to the point of beginning containing 1.004 Acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Sabine River Authority, State of Louisiana, by Correction Deed recorded in the official records of Sabine Parish, Louisiana, on November 25, 2002, as Instrument No. 378954 (the "Correction Deed"), and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908. The above described property is shown on a survey of the property made by Jerry L. Rugg, Registered Professional Land Surveyor, dated November 15, 2002, attached to and recorded with the Correction Deed.

Page 7-A





Section V

A 5.36 acre tract located in the North Half of the Southwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana and being more particularly described as follows:

Beginning at a 1/2 inch iron rod set at Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence South 27 degrees 49 minutes 17 seconds West, 149.91 feet to a 1/2 inch iron rod set at SRA 383; thence South 59 degrees 14 minutes 18 seconds West, 285.81 feet to 60d nail set at SRA 384; thence South 21 degrees 56 minutes 54 seconds West, 217.88 feet to a 1/2 inch iron rod set at SRA 385; thence South 44 degrees 22 minutes 55 seconds East, 195.92 feet to a 1/2 inch iron rod set at SRA 386; thence South 68 degrees 56 minutes 33 seconds West, 122.91 feet to a 1/2 inch iron rod set at SRA 387; thence North 63 degrees 45 minutes 36 seconds West, 157.88 feet to a 1/2 inch iron set at SRA 388; thence North 08 degrees 15 minutes 48 seconds West, 66.19 feet to a point in a pond; thence North 00 degrees 13 minutes 52 seconds East, 306.23 feet to a point in a pond; thence North 34 degrees 17 minutes 36 seconds East, 214.97 feet to a point in a pond; thence North 17 degrees 24 minutes 34 seconds East, 174.90 feet to a 1/2 inch iron rod set at SRA 391; thence North 57 degrees 22 minutes 56 seconds East, 198.91 feet to a 1/2 inch iron rod set at SRA 392; thence North 20 degrees 35 minutes 22 seconds West, 2.46 feet to a 1/2 inch iron rod set on the Southerly right of way of a Louisiana State Highway; thence South 78 degrees 31 minutes 10 seconds East, 47.73 feet along said right of way to a concrete monument; thence South 70 degrees 51 minutes 26 seconds East, 147.33 feet along said right of way to a 1/2 inch iron rod; thence 31.91 feet along the arc of a curve to the left having a central angle of 00 degrees 25 minutes 57 seconds, a radius of 4227.18 feet and chord bearing South 78 degrees 16 minutes 02 seconds East, 31.91 feet to a 1/2 inch iron rod set on the Toledo Bend Take Line; thence South 11 degrees 09 minutes 00 seconds West, 169.39 feet to the Point of Beginning and containing 5.36 acres.

AND

Any and all interest they may have in the East Half of the Northwest Quarter of the Southwest Quarter of Section 35, Township 8 North, Range 13, Sabine Parish, Louisiana.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Mildred Ann Sebren Moreau, and others, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on March 18, 2002 as Document No. 375112; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Contribution Deed filed in the official records of Sabine Parish, Louisiana, on May 28, 2004, as Instrument No. 387883 and by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Page 8-A



### Section VI

All contractual rights granted by Sabine River Authority, State of Louisiana, to S&S Marina, L.L.C. in that certain Act of Cash Sale and Lease recorded in the official records of Sabine Parish, LA, on March 12, 2004 as Instrument #386600, including, but not limited to the following contractual rights to purchase additional property, set forth on page 6 of the Act of Cash Sale and Lease, providing as follows:

> S&S Marina, L.L.C. and SABINE RIVER AUTHORITY, STATE OF LOUISIANA, hereby agree that upon complying with the terms and conditions of the SABINE RIVER AUTHORITY, STATE OF LOUISIANA's Shorline Enhancement Policy as it currently exists, S&S MARINA, L.L.C. will be allowed to do shoreline enhancement, and up on completion of said enhancement as approved by the Authority of all and/or any portion of the Leased Property, that the SABINE RIVER AUTHORITY, STATE OF LOUISIANA will sell and S&S MARINA, L.L.C., or its successor in title, will purchase the Leased Property at a price of $4,500.00 per acre, cash, recognizing that there must be a 50 foot wide strip of the Leased Property remaining between the new 172' msl elevation line and the property to be conveyed.

which rights were assigned by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Assignment of Contractual Rights recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

### Section VII

All servitude rights running in favor of Nantucket Bay Subdivision, L.L.C., or property owned by Nantucket Bay Subdivision, L.L.C., including, without limitation, the servitude created by Servitude Agreement between DeLoutre Property Rentals, L.L.C. and Nantucket Bay Subdivision, L.L.C., recorded in the official records of Sabine Parish, LA, on March 12, 2004, under Instrument No. 386602

That certain property consisting of Nantucket Cove road as reflected on Plat of Survey of Nantucket Bay Subdivision dated January 2, 2003 and filed under Registry Number 379395, Sabine Parish, Louisiana.

Page 9-A



Section VIII

A.     The property described in Section V is less and except the following described property conveyed by Nantucket Bay Subdivision, L.L.C. to Gulf States Underwriters of Louisiana, Inc., by Credit Sale with Vendor's Privileged Mortgage filed in the official records of Sabine Parish, Louisiana, on May 28, 2004 as Instrument No. 387884, and more particularly described as follows:

LOTS 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, AND 33 BEINGING ALL OF THE LOTS IN NANTUCKET BAY SUBDIVISION PER PLAT RECORDED ON JANUARY 2, 2003 UNDER REGISTRY NUMBER 379395 RECORDS OF SABINE PARISH, LOUISIANA; TOGETHER WITH NANTUCKET POINT ROAD AS DESCRIBED ON SAID PLAT

Together with all Sabine River Authority, State of Louisiana, Leaseback Rights fronting on the said thirty-three (33) lots.

B.     There is excepted from the property affected by this mortgage all of the minerals reserved by or conveyed to DeLoutre Property Rentals, L.L.C. in Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance book 649, page 908.

C.     There is excepted from the property affected by this mortgage the following property conveyed by DeLoutre Property Rentals, L.L.C. to Sabine River Authority, State of Louisiana, by Correction Deed recorded in the official records of Sabine Parish, Louisiana, on November 25, 2002 as Instrument No. 378954.

A 0.917 acre tract located in the Southwest quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana and being more particularly described as follows:

Beginning at a 2" iron pipe found at the Northeast corner of the Southwest quarter of the Southwest quarter of said Section 35;

Thence, South 00 degrees 04 minutes 42 seconds East, 658.92 feet to a 5/8" iron rod found at the Southwest corner of the Dave Combs tract;

Thence, North 89 degrees 51 minutes 20 seconds East, 109.83 feet to a 3/4" iron pipe;

Thence, South 01 degree 56 minutes 58 minutes West, 95.94 feet to a 1/2" iron rod;

Thence, North 85 degrees 04 minutes 08 seconds West, 13.25 feet to a 1/2" iron rod;

Thence, North 29 degrees 34 minutes 23 seconds West, 35.93 feet to a 1/2" iron rod;

Thence, North 63 degrees 28 minutes 07 seconds West, 140.39 feet to a 1/2" iron rod;

Page 10-A



Thence, North 00 degrees 04 minutes 42 seconds West, 152.59 feet to a 1/2" iron rod;

Thence, North 70 degrees 31 minutes 55 seconds East, 2.43 feet to a 1/2" iron rod.

Thence, North 26 degrees 56 minutes 15 seconds West, 5.07 feet to a 1/2" iron rod;

Thence, North 00 degrees 04 minutes 42 seconds West, 502.56 feet to a 1/2" iron rod;

Thence, South 89 degrees 56 minutes 49 seconds East, 50.00 feet to the point of beginning and containing 0.917 acre.

Page 11-A

# Exhibit 2

11TH JUDICIAL DISTRICT COURT FOR THE PARISH OF SABINE
STATE OF LOUISIANA

DOCKET NO: _____                                    DIV. "___"

**LITTLE PINE ISLAND CORPORATION**

**VERSUS**

**NANTUCKET BAY SUBDIVISION, LLC and CAPITOL PROPERTIES, LLC**

FILED: _____          _____
                                              **DEPUTY CLERK**

## PETITION TO COLLECT SUMS DUE ON PROMISSORY NOTES, A GUARANTY AGREEMENT AND TO RECOGNIZE AND ENFORCE A MORTGAGE

NOW INTO COURT, though undersigned counsel, comes plaintiff, Little Pine Island Corporation, who files this *Petition to Collect Sums Due on Promissory Notes, a Guaranty Agreement and to Recognize and Enforce a Mortgage* (the "Petition") and states as follows:

**PARTIES**

1.

Plaintiff, Little Pine Island Corporation ("Little Pine"), is a corporation organized under the laws of the State of Louisiana with both its domicile and principal place of business located in the Parish of Orleans, State of Louisiana.

2.

Defendant, Capitol Properties, LLC ("Capitol"), is a Louisiana limited liability company with both its domicile and principal place of business located in the Parish of Sabine, State of Louisiana.

3.

Defendant, Nantucket Bay Subdivision, LLC ("Nantucket"), is a Louisiana limited liability company with both its domicile and principal place of business located in the Parish of Sabine, State of Louisiana.

**VENUE**

4.

Venue for this proceeding is proper in Sabine Parish, Louisiana pursuant to Article 42(2) of the Louisiana Code of Civil Procedure.

1

### THE MASTER LOAN AGREEMENT

5.

On October 27, 2009, Little Pine, as lender, Capitol, as borrower, and Nantucket as guarantor, entered into a Loan Agreement (the "Loan Agreement"). A copy of the Loan Agreement is attached hereto as **Exhibit 1**[1].

6.

Pursuant to the Loan Agreement, Little Pine agreed to lend Capitol up to $900,000.00.

7.

Pursuant to the Loan Agreement, Nantucket guaranteed "payment and performance of all the obligations of Borrower under the Loan Documents, and the obligations of Guarantor thereon shall be joint, several, and solidary, with Borrower."

### THE PROMISSORY NOTES

8.

Little Pine made three advances pursuant to the terms of the Loan Agreement. The advances were memorialized via three separate promissory notes.

**A.    Note 1**

9.

Little Pine is the holder, for value, of that certain promissory note ("Note 1") dated December 17, 2009, in the original principal amount of $100,000 by Capitol. A copy of Note 1 is attached hereto, made part hereof, and identified as **Exhibit 2**[2].

10.

The Note also provides for attorneys' fees for collecting the amounts due on Note 1.

---

[1] The original Master Loan Agreement was attached to the *Verified Petition to Collect Sums Due on Promissory Notes and Guarantees and for Declaratory Relief as to Extent, Validity, and Enforceability of Mortgage*, filed in Civil District Court, Parish of Orleans, under Case No. 2014-07139, and subsequently transferred to this Court under Case No. 66609.

[2] The original Note 1 was attached to the *Verified Petition to Collect Sums Due on Promissory Notes and Guarantees and for Declaratory Relief as to Extent, Validity, and Enforceability of Mortgage*, filed in Civil District Court, Parish of Orleans, under Case No. 2014-07139, and subsequently transferred to this Court under Case No. 66609.

11.

The principal amount of Note 1 matured on October 27, 2012, making the entire amount of the Note due and exigible. To date, Little Pine has not received payment on Note 1. Thus, both Capitol and Nantucket are in default of their respective obligations under the Loan Agreement and Note 1.

**B.      Note 2**

12.

Little Pine is the holder, for value, of that certain promissory note ("Note 2") dated October 27, 2009, made by Capitol, in the original principal amount of $375,000.00, with interest accruing at the rate of 3% per annum until paid. A copy of Note 2 is attached hereto, made part hereof, and identified as **Exhibit 3**[3].

13.

The Note also provides for attorneys' fees for collecting the amounts due on Note 2.

14.

The principal amount of the Note 2 matured on October 27, 2012, making the entire amount of the Note due and exigible. To date, Little Pine has not received payment on Note 2. Thus, both Capitol and Nantucket are in default of their respective obligations under the Loan Agreement and Note 2.

**C.      Note 3**

15.

Little Pine is the holder, for value, of that certain promissory note ("Note 3") (Note 1, Note 2, and Note 3, shall be collectively referred to as the "Notes"), made by Capitol dated October 27, 2009, in the original principal amount of $180,000.00, with interest accruing at the rate of 3% per annum until paid. A copy of Note 3 is attached hereto, made part hereof, and identified as **Exhibit 4**[4].

---

[3] The original Note 2 was attached to the *Verified Petition to Collect Sums Due on Promissory Notes and Guarantees and for Declaratory Relief as to Extent, Validity, and Enforceability of Mortgage*, filed in Civil District Court, Parish of Orleans, under Case No. 2014-07139, and subsequently transferred to this Court under Case No. 66609.

[4] The original Note 3 was attached to the *Verified Petition to Collect Sums Due on Promissory Notes and Guarantees and for Declaratory Relief as to Extent, Validity, and Enforceability of Mortgage*, filed in Civil District

{N2612430.3} **Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 53**

16.

The Note also provides for attorneys' fees for collecting the amounts due on Note 3.

17.

The principal amount of the Note 3 matured on October 27, 2012, making the entire amount of the Note due and exigible. To date, Little Pine has not received payment on Note 3. Thus, both Capitol and Nantucket are in default of their respective obligations under the Loan Agreement and Note 3.

## THE MULTIPLE INDEBTEDNESS MORTGAGE, THE INDEBTEDNESS, AND THE MORTGAGED PROPERTY

18.

Little Pine is the "Mortgagee" under a Multiple Indebtedness Mortgage dated October 27, 2009 (the "MIM"), by Nantucket, through its manager Christina Singleton, as "Mortgagor." The MIM was granted to secure the prompt and punctual payment and satisfaction of all present and future obligations, including but not limited to, all obligations of Mortgagor as guarantor of the obligations of Capitol and all principal, interest, costs, expenses, attorneys' fees, and all other fees and charges that Mortgagee may make on behalf of Mortgagor, as provided in the MIM, up to a maximum amount of $1,250,000.00 (collectively, the "Indebtedness").    The MIM was passed before a notary public and two witnesses, and was recorded in the public records of Sabine Parish, Louisiana.  A copy of the MIM is attached hereto and made a part hereof as **Exhibit 5**.

19.

Since the Defendants have defaulted on the Notes, an event of default has occurred under the MIM, which entitles Little Pine to assert the rights and remedies under the MIM as described below.

20.

In the MIM, in order to secure the prompt and punctual payment and satisfaction of the Indebtedness, the Mortgagor specifically mortgaged, affected and hypothecated unto and in favor of the Mortgagee, any and all of the Mortgagor's present and future rights, title and interest in

Court, Parish of Orleans, under Case No. 2014-07139, and subsequently transferred to this Court under Case No. 66609.

4

and to the property description of the MIM. A copy of the property description is attached hereto and made a part hereof as **Exhibit 6** and will be referred to as the "Mortgaged Property."

21.

Upon default, Little Pine is entitled to the seizure and sale of the Mortgaged Property and hereby requests judicial recognition of the same.

22.

In the MIM, the Mortgagor confessed judgment on the Indebtedness and agreed that, in the event the Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under the MIM, the Mortgagee may cause the Mortgaged Property to be immediately seized and sold, under ordinary or executory process in accordance with applicable Louisiana law to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying the Mortgagor or placing the Mortgagor in default.

23.

In the MIM, the Mortgagor also expressly waived the following:  (a) the benefit of appraisement, as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws conferring the same; (b) the demand and three-day delay accorded by Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (c) the notice of seizure required by Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (d) the three-day delay provided by Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (e) the benefit of the other provisions of Articles 2331, 2722, and 2723  of the Louisiana Code of Civil Procedure.

In the MIM, the Mortgagor further agreed that all reasonable costs, expenses, and liabilities incurred by the Mortgagee in connection with managing, operating, and maintaining the Mortgaged Property shall constitute a demand obligation owed by the Mortgagor to the Mortgagee, and that all such costs, expenses, and liabilities shall constitute a portion of the Indebtedness secured by the MIM.

## RELIEF SOUGHT

24.

Based on the foregoing, Little Pine is entitled to a judgment against Capitol and Nantucket, jointly, severally, and solidarily, comprised of the following:

**Note 1:**

    (a)   Principal in the amount of $100,000;

    (b)   Legal interest from the time the payment on Note 1 became due until paid;

    (c)   Attorney's fees incurred recovering the sums owed; and,

    (d)   The costs of these proceedings.

**Note 2:**

    (a)   Principal in the amount of $375,000;

    (b)   Accrued interest in the amount of $60,256.85;

    (c)   Interest after February 5, 2015, will continue to accrue on Note 2 at the per diem rate of $30.82, until paid;

    (d)   Attorney's fees incurred recovering the sums owed; and,

    (e)   The costs of these proceedings.

**Note 3:**

    (a)   Principal amount of $180,000;

    (b)   Accrued interest in the amount of $28,390.68;

    (c)   After February 5,2015, interest will continue to accrue on Note 3 at the per diem rate of $14.79, until paid;

    (d)   Attorney's fees incurred recovering the sums owed; and,

    (e)   The costs of these proceedings.

25.

Little Pine also seeks a judgment recognizing the validity and perfection of the MIM, and security interest as a first-ranked lien and security interest on the Mortgaged Property, to secure the payment of the judgment, up to the maximum amount permitted by law.

WHEREFORE, *Little Pine*, prays that its Petition be found sufficient and the Court render a judgment in favor of Little Pine and against Capitol and Nantucket, jointly, severally, and solidarily, in the following amounts:

6

**Note 1:**

    (a)   Principal in the amount of $100,000;

    (b)   Legal interest from the time the payment on Note 1 became due until paid;

    (c)   Attorney's fees incurred recovering the sums owed; and,

    (d)   The costs of these proceedings.

**Note 2:**

    (a)   Principal in the amount of $375,000;

    (b)   Accrued interest in the amount of $60,256.85;

    (c)   After February 5 ,2015, interest will continue to accrue on Note 2 at the per diem rate of $30.82, until paid;

    (d)   Attorney's fees incurred recovering the sums owed; and,

    (e)   The costs of these proceedings.

**Note 3:**

    (a)   Principal amount of $180,000;

    (b)   Accrued interest in the amount of $28,390.68;

    (c)   After February 5, 2015, interest will continue to accrue on Note 3 at the per diem rate of $14.79, until paid;

    (d)   Attorney's fees incurred recovering the sums owed; and,

    (e)   The costs of these proceedings.

Little Pine further prays for a judgment recognizing the validity and perfection of the MIM and security interest as a first-ranked lien and security interest on the Mortgaged Property, to secure the payment of the judgment on the Notes, up to the maximum amount permitted by law. Finally, Little Pine prays for all other legal and equitable relief to which it may be entitled.

Respectfully submitted,

*Laura Ashley*

R. PATRICK VANCE (LA #13008)
LAURA F. ASHLEY (LA #32820)
TYLER J. RENCH (LA #34049)
Jones Walker LLP
201 St. Charles Avenue,  Suite 5100
New Orleans, Louisiana 70170
Telephone: (504) 582-8000
Facsimile:  (504) 589-8118
pvance@joneswalker.com
lashley@joneswalker.com
trench@joneswalker.com

7

**PLEASE SERVE:**

Service instructions will be provided shortly

# Exhibit 1





<u>Loan Agreement</u>

This Loan Agreement is made and entered into on and as of this 27th day of October, 2009, between Little Pine Island Corporation, a Louisiana corporation ("Lender"), Capitol Properties, L.L.C. ("Borrower") and Nantucket Bay Subdivision, L.L.C., a Louisiana limited liability company ("Guarantor")

Recitals:

A.     Borrower is the owner of 100% of the membership interest and 100% of the equity interest in Guarantor, and Guarantor is the owner of certain property located in Sabine Parish, LA, described on Exhibit A annexed hereto and made a part hereof;

B.     Borrower requires the funds, and availability of funds, provided for in this Agreement and Lender is willing to make the funds available, and to lend the funds in accordance with the provisions of this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by both parties, Borrower, Guarantor and Lender agree as follows:

1.     <u>Definitions</u>. Capitalized terms used in this Agreement have the meanings given to them below in this Section 1:

"Agreement" means this Loan Agreement, as amended from time to time hereafter.

"Closing Conditions" means the conditions to borrowing stated in Section 3 of this Agreement.

"Loan" means the multiple advance Loan described in Section 1 of this Agreement.

"Loan Documents" means this Agreement, the Mortgage and the Notes.

"Maturity Date" means the date that is three years after the date of this Agreement, or on such earlier date as may be provided in this Agreement.  The Maturity Date may be extended in accordance with the provisions of Section 2(h) of this Agreement.

"Mortgage" means that certain Multiple Indebtedness Mortgage and Security Agreement granted by Guarantor to Lender on the date hereof, affecting the Property and other property described in the Mortgage.

"Note" means a promissory note issued by Borrower to Lender pursuant to this Agreement, substantially in the form annexed hereto as Exhibit A.

"Notes" means, at any given time, all of the promissory notes issued and outstanding pursuant to this Agreement.

"Organizational Documents" shall mean, collectively, with respect to any limited liability company, (i) the Articles of Organization and Operating Agreement of such limited liability




company and all amendments thereto, and all documents evidencing appointment of the manager of such limited liability company, and the names of all of the members of such limited liability company.

"Property" means the real property described on Exhibit B annexed hereto and made a part hereof.

"Subdivision" means Islands on the Bend Subdivision, as shown on that certain subdivision plan prepared by John G. Maroney, Registered Professional Land Surveyor, in September 2006, as said plan may be modified or replaced from time to time with the prior written approval of Lender.

2.      The Loan.  Subject to the terms and conditions of this Agreement, Lender agrees to lend to Borrowers the sum of up to $900,000, to be disbursed upon satisfaction of the Closing Conditions, as follows:

(a)      Lender has on the date of this Agreement advanced to Borrowers the sum of $375,000, which advance is represented by a Note in said amount dated the date of this Agreement.

(b)      Subject to satisfaction of the Closing Conditions, at various times on or before October 27, 2010, Borrowers shall be entitled to borrow from Lender additional funds pursuant to this Agreement, aggregating up to a total of $900,000 in principal amount (including the funds advanced on this date as described in paragraph (a), above), upon three days written notice to Lender, or such shorter time as may be agreed to by Lender.

(c)      All outstanding principal, interest, and any other amounts due by Borrower to Lender shall be due and payable in full on the Maturity Date, or on such earlier date as may be provided in the Loan Documents.

(d)      Upon the closing of the sale of any lot in the Subdivision prior to the Maturity Date, twenty-five percent (25%) of the sale price shall be paid to Lender for application against the Principal of the Loan.  Contemporaneously with receipt of the principal payment provided for in this paragraph, Lender shall grant a partial release of the Mortgage affecting the lot or lots to be sold at the closing of the sale of such lot.  Borrower also agrees that upon receipt of any payment due Borrower for the sale of Borrower's interest in Nantucket Plaza, L.L.C. and/or the sale of any property owned by Nantucket Plaza, L.L.C., shall be paid over to Lender for application against the interest and principal due on the Loan provided that the amount of the payment is limited to Borrower's 66-2/3% interest only.  No payment shall be required in connection with a partial release if (i) the release is agreed to in writing by Lender, (ii) the release is required to transfer title to waterways to the State of Louisiana, or roadways to the State of Louisiana or an agency or political subdivision thereof.

(e)      Interest shall accrue on outstanding principal amount of the Loan at the rate of three percent (3.00%) per year until the Loan is paid in full.

-2-







 

 (f)    Borrower may prepay all of any part of the Loan at any time without penalty. Unless otherwise agreed to in writing between Borrower and Lender, Borrower shall not be entitled to re-borrow any prepaid principal.

(g)    The Maturity Date may be extended, at the option of the Borrower, for an additional two years after the third anniversary of the date of this Agreement, provided that at the time of such renewal, all warranties and representations set forth herein are and remain true and correct, Borrower is in full compliance with all covenants set forth herein, and all accrued interest, fees and costs and other amounts due as of the initial Maturity Date (other than outstanding principal not required to be paid prior to the initial Maturity Date), have been paid to Lender in full.

(h)    Notwithstanding any other provision of this Agreement, the entire amount of the Loan, all Notes, and all other amounts due under this Agreement shall be immediately due and payable, and all further rights to borrow funds hereunder shall terminate, at the option of Lender if the Property or any membership interest of Borrower or Guarantor should be seized or constrained by legal process, or if Borrower or Guarantor should be placed in bankruptcy, reorganization or similar proceeding for the benefit of its creditors.

3.    Conditions Precedent. The obligation of the Lender to make Loans is subject to the satisfaction of each the following conditions:

(a)    The Lenders shall have received all of the following documents, all of which shall be in full force and effect on the date of each advance of the Loan:

(i)    the executed original of this Credit Agreement;

(ii)    the executed originals of the Mortgage;

(iii)    copy, certified by the Secretary of State of Louisiana, of the Articles of Organization of Borrower and Guarantor, accompanied by a certificate of the Secretary of State as to the good standing of each of the Borrower and the Guarantor, as of the date of this Agreement;

(iv)    copy, certified by the Manager or certifying official of each of the Borrower and the Guarantor, of such entity's Operating Agreement and any amendments thereto; and

(v)    financial statement of the Borrower and the Guarantor in form and substance acceptable to Lender (if requested by Lender).

(b)    Upon each advance of the Loan (other than the original advance specified in Section 2(a) hereof), the Borrowers shall deliver to the Lender the following additional documents:

(i)    a Note in the principal amount of the advance of the Loan; and



795596.5






(ii)     certificate of the manager of Borrower and Guarantor that Borrower and Guarantor are in compliance with all covenants in this Agreement, the Notes and the Mortgages, and that all representations and warranties are true and correct on the date of the advance of the Loan

4.     <u>Representations and Warranties of Borrower</u>.  Borrower represents and warrants that the following facts shall be true and correct at all times while any part of the Loan shall be outstanding:

(a)     Borrower and Guarantor are limited liability companies duly organized and existing, and in good standing, under the laws of Louisiana;

(b)     The Organizational Documents of Borrower and Guarantor, provided to Lender on the date of this Agreement, are in full force and effect and have not been modified or amended;

(c)     Borrower is the sole member and 100% owner of all equity and rights in Guarantor.

(d)     Christina Singleton is the sole member and 100% owner of all equity and rights in Borrower.

(e)     Borrower and Guarantor are in full compliance with all of the terms and conditions of this Agreement, the Mortgages and the Notes;

(f)     This Agreement, the Mortgages and the Notes (i) have been duly authorized, executed and delivered by Borrower and Guarantor to Lender, (ii) do not violate the terms of any law, regulation or judicial or administrative order or decision applicable to Borrower or Guarantor, and (iii) are not prohibited by, and do not violate the terms of any agreement or contract to which Borrower or Guarantor is a party or by which Borrower or Guarantor is bound;

(g)     Neither Borrower nor Guarantor is in default under the terms of any agreement or contract to which Borrower is a party or by which Borrower or Guarantor is bound;

(h)     Guarantor is the sole owner of the Property described in the Mortgage granted to the Lender pursuant to this Agreement, and such Property is not subject to any mortgages, liens, leases or encumbrances, recorded or unrecorded, other than the Mortgages, leases running in favor of the Guarantor, or those which have been previously approved in writing by Lender.

(i)     all property taxes and assessments affecting the Property have been fully paid on or before their due date;

(j)     Neither Borrower nor Guarantor, nor any of the Property, is in violation of or subject to any existing, pending, or threatened investigation or inquiry by any governmental authority regarding or subject to any remedial obligations under any applicable legal requirements pertaining to health or the environment (hereinafter sometimes collectively called "Applicable Environmental Laws"), including without limitation any applicable laws or regulations relating to Borrower or Guarantor, or any predecessor owner's, operator's or lessor's





-4-






operations on or about or using any such Property (including, without limitation, any collateral for the Loan), the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 (as amended, hereinafter called "CERCLA"), the Resource Conservation and Recovery Act of 1976, as amended by the Used Oil Recycling Act of 1980, the Solid Waste Disposal Act Amendments of 1980, and the Hazardous and Solid Waste Amendments of 1984 (as amended, hereinafter called "RCRA"), Louisiana Environmental Quality Act (La. R.S. 30:1051 et seq.), and the Oil Pollution Act of 1990, as amended ("OPA 90").

(k)     The Mortgage constitutes a first priority mortgage lien and security interest in the Property and in all other collateral therein described.

5.     Covenants.  So long as any amount shall be due to Lender under this Agreement , the Notes or the Mortgages, the Borrower and Guarantor covenant and agree with Lender as follows:

(a)     Lender shall have the full right at any time upon giving notice to Borrower, to inspect the Property and the books and records of Borrower and Guarantor.

(b)     If and when Guarantor commences operation of the Subdivision, Borrower and Guarantor shall cause the Subdivision to be formed and recognized by and in compliance with, all Federal, State, Parish and local applicable laws to the Subdivision, to the Property, and to the sale of lots from the Subdivision or the Property.  Lender acknowledges that the Subdivision documents have not been filed, and the Subdivision has not been completed of record.

(c)     Except as otherwise provided in this Loan Agreement, no Property of of Guarantor shall in any manner be encumbered, sold, transferred or conveyed without the prior written consent of the Lender, except that upon completion of the Subdivision, Guarantor may sell lots and improvements in the Subdivision at prices at or above fair market value.

(d)     Neither Borrower nor Guarantor shall, in any single transaction or series of transactions:

(i)     wind up its affairs, liquidate or dissolve;

(ii)     be a party to any merger, or;

(iii)    change or amend its structure as a Louisiana entity, amend its Organizational Documents, or change its domicile, principal place of business, registered office, state of organization or taxpayer identification number; or

(e)     Borrower shall at all times be the sole member of Guarantor, its membership interest in Guarantor shall not be subject to any lien, encumbrance, or rights in favor of any other person or entity, and Christina Singleton shall at all times be the sole member of Borrower and Guarantor.





795596.5



(f)     Borrower shall immediately give notice to Lender (i) of any default under this Agreement, the Notes or the Mortgage, (ii) if any representation or warranty in this Agreement should not be true and correct, or (iii) if Borrower or Guarantor shall not be in compliance with any covenant or agreement in this Agreement.

(g)     Borrower may not assign the Loan Documents, or any rights thereunder, to any other person or entity without the prior written consent of Lender, which consent may be granted or withheld in the sole discretion of Lender.

(h)     Borrower shall pay all fees and expenses reasonably incurred by Lender in the negotiation of this Agreement and the other Loan Documents, the administration of this Agreement, and the enforcement of this Agreement by Lender.

6.     Guaranty.



Guarantor hereby guarantees payment and performance of all of the obligations of Borrower under the Loan Documents, and the obligation of Guarantor thereon shall be joint, several and solidary with Borrower. No consent of Guarantor shall be required for any advance of the Loan or for any modification of any of the Loan Documents, or waiver or extension of any provision thereof, and Guarantor shall remain bound on the Loan Documents notwithstanding the occurrence of any such events. Guarantor acknowledges that the transactions contemplated by this Agreement and the execution, delivery and performance thereof, are to the advantage of Guarantor, and Guarantor acknowledges that it has received full consideration for the undertaking of its obligations hereunder. Borrower hereby guarantees the payment and performance of all of the obligations of Guarantor hereunder, which obligation of Borrower shall be joint, several and solidary with Guarantor.

7.     Defaults and Remedies.

(a)     a default shall occur if, at anytime, (i) Borrower fail to pay any amount due to Lender under this Agreement, or (ii) any representation or warranty herein shall not be true and correct, or (iii) Borrower or Guarantor shall not be in compliance with the terms and provisions of this Agreement, the Notes or the Mortgage, or (iv) Borrower or Guarantor shall be placed in bankruptcy, reorganization, liquidation or any similar action for the benefit of creditors of such Borrower or Guarantor, or other parties claiming an interest in the ownership or assets of such Borrower or Guarantor.

(b)     Should a default occur under this Agreement, Lender shall be entitled to exercise all remedies available to it under the terms of this Agreement, the Mortgages, the Notes, or under the law. On and after the occurrence of a default, all amounts due by Borrower and Guarantor to Lender under the Notes, the Mortgage and this Agreement shall accelerate and shall be immediately due and payable in full, and neither the Borrower nor any other party shall have the right to borrow any additional funds from Lender under the provisions of this Agreement.

8.     Notice.   Any notices required or permitted under this Agreement, the Mortgages or the Notes, shall be given by certified United States Postal Service mail, return receipt requested, addressed as follows:



-6-

If to Borrower or Guarantor:

  Capitol Properties, L.L.C.
  Nantucket Bay Subdivision, L.L.C.
  Attention: Christina Singleton, Manager
  1039 Lakeshore Boulevard
  Slidell, LA 70461

If to Lender:

  Little Pine Island Corporation
  Attention:  John J. Cummings, III, President
  416 Gravier Street
  New Orleans, LA  70130

with a copy to:

  John D. Wogan
  Liskow & Lewis
  701 Poydras St., Suite 5000
  New Orleans, LA  70139-5099

Any party may change the address for notice by giving notice to the other party.  Any new address must be a street address recognized by the United States Postal Service within the United States.

  9.  <u>General</u>

   (a)  This Agreement, the Mortgages and the Notes, and all related amendments, supplements, waivers and consents shall be deemed to be contracts under the internal laws of the State of Louisiana and of the United States of America, without regard to principles of conflicts of laws, and for all purposes shall be construed and enforced in accordance with such laws.

   (b)  The Loan Documents set forth the entire agreement and understanding among the Borrower and the Lender relating to the subject matter hereof and supersedes all prior proposals, agreements and understandings relating to such subject matter. No oral agreement or representation shall be admitted to vary the terms of the Loan Documents. None of the Loan Documents may be modified or amended except by instrument in writing, duly authorized, executed and delivered by the parties hereto.

   (c)  This Agreement may be signed in counterpart originals, which, taken together, shall constitute a single contract and agreement between the parties.

[Signatures on following page]

THUS DONE AND SIGNED at New Orleans, Orleans Parish, Louisiana, as of the date first above written.

Witnesses:

Capitol Properties, L.L.C.

Print Name: Julie H. Galliano

By: _____
Christina Singleton, Manager

Print Name: Susan M. Purdt

Witnesses:

Nantucket Bay Subdivision, L.L.C.

Print Name: Julie H. Galliano

By: _____
Christina Singleton, Manager

Print Name: Susan M. Purdt

Witnesses:

Little Pine Island Corporation

Print Name: Julie H. Galliano

By: _____
John J. Cummings, III, President

Print Name: Susan M. Purdt

# Exhibit 2

## PROMISSORY NOTE

$100,000.00                                                                    December 17, 2009

For value received, Capitol Properties, L.L.C. ( "Borrower") promises to pay to the order of Little Pine Island Corporation ("Lender") at 416 Gravier Street, New Orleans, LA 70130, the sum of One Hundred Thousand and 00/100 ($100,000.00) Dollars, without interest. This note shall be payable in full on the Maturity Date established in that certain Loan Agreement, dated October 27, 2009, between Borrowers and Lender (the "Loan Agreement").

Borrower waives presentment for payment, demand, notice of dishonor, protest, pleas of discussion and division and Borrower is bound jointly, severally and solidarily with any and all other makers, endorsers and guarantors for the full and timely payment of this note in accordance with its terms.

Borrower agrees to the following terms and conditions:

1.      This note is issued pursuant and subject to the Loan Agreement as amended from time to time and is subject to the terms and conditions of the Loan Agreement, and is secured by a Guaranty and Mortgage, as provided in the Loan Agreement.

2.      If any event of default occurs shall occur and be continuing under the Loan Agreement, then at the option of the Lender, the entire remaining balance of principal and interest due on this note and all other obligations and liabilities, direct or contingent, of Borrower to Lender.

3.      Borrower agrees to pay the fees of any attorney-at-law employed by Lender to recover sums owed or to protect the Lender's interests with regard to this note and such attorneys' fees are secured by collateral furnished for the payment hereof.

4.      The provisions of this note may not be waived or modified except in writing, signed by Lender. No failure or delay of Lender in exercising its rights shall be construed as a waiver.

5.      This note shall be deemed to be a contract under the internal laws of the State of Louisiana and of the United States of America, without regard to principles of conflicts of laws, and for all purposes shall be construed and enforced in accordance with such laws.

Capitol Properties, L.L.C.

By: _____
        Christina Singleton, Manager

# Exhibit 3

## PROMISSORY NOTE

$375,000.00                                                               October _27, 2009

For value received, Capitol Properties, L.L.C. ( "Borrower") promise to pay to the order of Little Pine Island Corporation,("Lender") at 416 Gravier Street, New Orleans, LA 70130, the sum of Three Hundred Seventy-five Thousand and 00/100 ($375,000.00) Dollars, plus interest at the rate of three percent (3.00%) per year from date until paid, all interest and principal payable in full on the Maturity Date established in that certain Loan Agreement, dated October 27, 2009, between Borrowers and Lender (the "Loan Agreement").

Borrower waives presentment for payment, demand, notice of dishonor, protest, pleas of discussion and division and Borrower is bound jointly, severally and solidarily with any and all other makers, endorsers and guarantors for the full and timely payment of this note in accordance with its terms.

Borrower agrees to the following terms and conditions:

1.      This note is issued pursuant and subject to the Loan Agreement as amended from time to time and is subject to the terms and conditions of the Loan Agreement, and is secured by a Guaranty and Mortgage, as provided in the Loan Agreement.

2.      If any event of default occurs shall occur and be continuing under the Loan Agreement, then at the option of the Lender, the entire remaining balance of principal and interest due on this note and all other obligations and liabilities, direct or contingent, of Borrower to Lender.

3.      Borrower agrees to pay the fees of any attorney-at-law employed by Lender to recover sums owed or to protect the Lender's interests with regard to this note and such attorneys' fees are secured by collateral furnished for the payment hereof.

4.      The provisions of this note may not be waived or modified except in writing, signed by Lender. No failure or delay of Lender in exercising its rights shall be construed as a waiver.

5.      This note shall be deemed to be a contract under the internal laws of the State of Louisiana and of the United States of America, without regard to principles of conflicts of laws, and for all purposes shall be construed and enforced in accordance with such laws.

Capitol Properties, L.L.C.

By:_____

Christina Singleton, Manager

# Exhibit 4

# PROMISSORY NOTE

$180,000.00                                                                                    December 2, 2009

For value received, Capitol Properties, L.L.C. ( "Borrower") promises to pay to the order of Little Pine Island Corporation ("Lender") at 416 Gravier Street, New Orleans, LA 70130, the sum of One Hundred Eighty Thousand and 00/100 ($180,000.00) Dollars, plus interest at the rate of three percent (3.00%) per year from date until paid, all interest and principal payable in full on the Maturity Date established in that certain Loan Agreement, dated October 27, 2009, between Borrowers and Lender (the "Loan Agreement").

Borrower waives presentment for payment, demand, notice of dishonor, protest, pleas of discussion and division and Borrower is bound jointly, severally and solidarily with any and all other makers, endorsers and guarantors for the full and timely payment of this note in accordance with its terms.

Borrower agrees to the following terms and conditions:

1.      This note is issued pursuant and subject to the Loan Agreement as amended from time to time and is subject to the terms and conditions of the Loan Agreement, and is secured by a Guaranty and Mortgage, as provided in the Loan Agreement.

2.      If any event of default occurs shall occur and be continuing under the Loan Agreement, then at the option of the Lender, the entire remaining balance of principal and interest due on this note and all other obligations and liabilities, direct or contingent, of Borrower to Lender.

3.      Borrower agrees to pay the fees of any attorney-at-law employed by Lender to recover sums owed or to protect the Lender's interests with regard to this note and such attorneys' fees are secured by collateral furnished for the payment hereof.

4.      The provisions of this note may not be waived or modified except in writing, signed by Lender.  No failure or delay of Lender in exercising its rights shall be construed as a waiver.

5.      This note shall be deemed to be a contract under the internal laws of the State of Louisiana and of the United States of America, without regard to principles of conflicts of laws, and for all purposes shall be construed and enforced in accordance with such laws.

Capitol Properties, L.L.C.

By: _____
                Christina Singleton, Manager

<u>Certificate of Borrower and Guarantor</u>

Pursuant to Section 3(b)(ii) of that certain Loan Agreement dated October 27, 2009 (the "Loan Agreement") among Little Pine Island Corporation, a Louisiana corporation ("Lender"), Capitol Properties, L.L.C. ("Borrower") and Nantucket Bay Subdivision, L.L.C., a Louisiana limited liability company ("Guarantor"), Borrower and Guarantor, appearing through their duly authorized Manager, certify to Lender as follows:

Borrower and Guarantor are in compliance with all covenants in the Loan Agreement, the Notes and the Mortgage, and all representations and warranties set forth in the Loan Agreement are true and correct on the date of this certificate.

This certificate is given in connection with a loan advance in the amount of $180,000 made under the terms of the Loan Agreement on this date. The terms "Notes" and "Mortgage", as used in this certificate, have the meanings given to them in the Loan Agreement.

Certified on this 2nd day of December, 2009.

Capitol Properties, L.L.C.

By: _____
     Christina Singleton, Manager

Nantucket Bay Subdivision, L.L.C.

By: _____
     Christina Singleton, Manager

# Exhibit 5

 

Sabine Parish
Book 404 Pg 421

# MULTIPLE INDEBTEDNESS MORTGAGE



By:    Nantucket Bay Subdivision, L.L.C.

To:    Little Pine Island Corporation, and any future
       holder or holders

United States of America

State of Louisiana

Parish of Orleans

BE IT KNOWN, that on this 27th day of October, 2009,

BEFORE ME, the undersigned Notary Public, and in the presence of the undersigned competent witnesses,

PERSONALLY APPEARED:

Nantucket Bay Subdivision, L.L.C., a Louisiana limited liability company, having a mailing address of 1039 Lakeshore Blvd., Slidell, LA 70461

(hereinafter collectively referred to as "Mortgagor"),

who declared that Mortgagor grants this Multiple Indebtedness Mortgage in favor of **Little Pine Island Corporation**, a Louisiana corporation, having a mailing address of 416 Gravier Street, New Orleans, LA 70130 (hereinafter referred to as "**Mortgagee**" or "**Lender**"), and any future holder or holders of the Indebtedness, under the following:

## TERMS AND CONDITIONS:



**INDEBTEDNESS.** The word "Indebtedness" as used in this Mortgage means individually, collectively and interchangeably any and all indebtedness, obligations and present and future obligations of Mortgagor to Mortgagee including that evidenced by the Notes, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges, together with all other indebtedness, obligations, costs and expenses for which the Mortgagor is responsible under this mortgage. Without limiting the foregoing, the term "Indebtedness" shall include all obligations of Mortgagor as guarantor of the obligations of Capitol Properties, L.L.C. to Lender. In addition, the word "Indebtedness" also includes any and all other loans, extensions of credit, obligations, debts and liabilities, plus interest thereon, of Mortgagor, that may now or in the future be owed to or incurred in favor of Mortgagee, as well as all claims by Mortgagee against Mortgagor, whether existing now or later, whether they are voluntary or involuntary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether Mortgagor may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges; *whether Mortgagor may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations; and whether such Indebtedness may be or hereafter may become void or otherwise unenforceable. Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness that may be outstanding at any time and from time to time that this Mortgage secures shall be One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00).*

**GRANTING OF MORTGAGE.** And now, in order to secure the prompt and punctual payment and satisfaction of the Indebtedness, in principal, *interest, costs, expenses, attorneys' fees and other fees and charges, and additionally to secure repayment of any and all Additional Advances that Mortgagee may make on behalf of Mortgagor as provided in this Mortgage, together with interest thereon, Mortgagor does by these presents specifically mortgage, affect and hypothecate unto and in favor of Mortgagee, or any future holder or holders of the Indebtedness, any and*



796503



all of Mortgagor's present and future rights, title and interest in and to the following described Property located in Sabine Parish, Louisiana (the "Property"):

The Property is specifically described as follows:

See Exhibit "A" or other description document which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

Together with any and all present and future buildings, constructions, component parts, improvements, attachments, appurtenances, fixtures, rights, ways, privileges, advantages, batture, and batture rights, servitudes and easements of every type and description, now and/or in the future relating to the Property, and any and all items and fixtures attached to and/or forming integral or component parts of the Property in accordance with the Louisiana Civil Code.

**MORTGAGE SECURING FUTURE INDEBTEDNESS.** This Mortgage has been executed by Mortgagor pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing Mortgagor's Indebtedness that may now be existing or that may arise in the future as provided herein, with the preferences and priorities provided under applicable Louisiana law, However, nothing under this Mortgage shall be construed as limiting the duration of this Mortgage or the purpose or purposes for which Mortgagor's Indebtedness may be requested or extended. Mortgagor's additional loans will automatically be secured by this Mortgage without the necessity that Mortgagor agrees or consents to such a result at the time additional Indebtedness is incurred under the Construction Contract.

**COLLATERAL ASSIGNMENT OF LEASES AND RENTS.** In order to further secure the full and punctual payment and performance of the Indebtedness up to a maximum of $50,000,000.00, the Mortgagor hereby pledges, pawns, conveys, assigns and transfers unto the Mortgagee, the Leases and the Rents. The assignment of Leases and Rents in this Article is, and is intended to be, an assignment from the Mortgagor to the Mortgagee made in accordance with and to the fullest extent permitted by La. R.S. 9:4401. Mortgagee has not heretofore assigned the Rents. Mortgagor covenants with Mortgagee to observe and perform all the obligations imposed upon the lessor under any of the Leases and not to do or permit to be done anything to impair the security thereof; not to collect any of the rents, income and profits arising or accruing under the Leases or from the mortgaged Property more than one (1) month in advance of the time when the same shall become due; not to execute any other assignment of lessor's interest in the Leases or assignment of rents arising or accruing from the Leases or from the mortgaged Property; at Mortgagee's request, to assign and transfer to Mortgagee any and all subsequent Leases upon all or any part of the mortgaged Property; and to execute and deliver at the request of Mortgagee all such further assurances and assignments as Mortgagee shall from time to time reasonably require. So long as no Event of Default has occurred and is continuing, Mortgagor shall have the right and license to collect at the time of, but not more than one (1) month prior to, the date provided for the payment thereof, all rents, income and profits arising under the Leases or from the mortgaged Property and to retain, use and enjoy the same.

Without limiting any further term hereof, upon the occurrence of an Event of Default, Mortgagee may at its option during the continuation of such Event of Default, without regard to the adequacy of the security for the said principal sum, interest and indebtedness secured hereby and by the Mortgage, either by a representative or by agent, with or without bringing any action or proceeding, or by a receiver or a keeper appointed by a court, take possession of the mortgaged Property and have, hold, manage, lease and operate the same on such terms and for such period of time as Mortgagee may deem proper and either with or without taking possession of the mortgaged Property in its own name, demand, sue for or otherwise collect and receive all rents, income and profits, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may seem proper to Mortgagee and to apply such rents, income and profits to the payment of: (a) all expenses of managing the mortgaged Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees as Mortgagee may deem necessary or desirable and all expenses of operating and maintaining the mortgaged Property, including, without being limited thereto, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for all insurance which Mortgagee may deem necessary or desirable and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the mortgaged Property; and (b) the principal sum, interest and indebtedness secured hereby and by the Mortgage, together with all costs and attorneys' fees, in such order of



796503






priority as to any of the items mentioned in this Paragraph as Mortgagee in its sole discretion may determine, any statute, law, custom or use. The exercise by Mortgagee of the option granted hereby and the collection of the rents, income and profits and the application thereof as herein provided shall not be considered a waiver of any Event of Default.

Prior to any foreclosure proceeding under this Mortgage, Mortgagee shall not be liable for any loss sustained by Mortgagor resulting from Mortgagee's failure to let the mortgaged Property during the continuance of an Event of Default or from any other act or omission of Mortgagee in managing the mortgaged Property. Nor shall Mortgagee be obligated to perform or discharge nor does Mortgagee hereby undertake to perform or discharge any obligation, duty or liability under any of the Leases or under or by reason of this Assignment, and Mortgagor shall, and does hereby agree, to indemnify Mortgagee for, and to hold Mortgagee harmless from, any and all liability, loss or damage which may or might be incurred under the Leases or under or by reason of this assignment and from any and all claims and demands whatsoever which may be asserted against Mortgagee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases. Should Mortgagee incur any such liability under the Leases or under or by reason of this assignment or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured hereby and Mortgagor shall reimburse Mortgagee therefor immediately upon demand and upon the failure of Mortgagor so to do, Mortgagee may, at its option, during the continuation of such condition declare all sums secured hereby and by the Mortgage immediately due and payable. And it is further understood that this Assignment shall not operate to place responsibility for the control, care, management or repair of the mortgaged Property upon Mortgagee, nor for the carrying out of any of the terms and conditions of the Leases; nor shall it operate to make Mortgagee responsible or liable for any waste committed on the mortgaged Property by the tenants or any other parties, or for any dangerous or defective condition of the mortgaged Property, or for any negligence in the management, upkeep, repair or control of the mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Mortgagor hereby authorizes and directs the lessees named in the Leases or any other or future lessees or occupants of the mortgaged Property described herein upon receipt from Mortgagee of written notice to the effect that Mortgagee is then the holder of the Notes and this Mortgage and that a default exists thereunder to pay over to Mortgagee all rents, income and profits arising or accruing under the Leases or from the mortgaged Property described therein or in said Notes and this Mortgage and to continue so to do until otherwise notified by Mortgagee.



**DURATION OF MORTGAGE.** This Mortgage will remain in effect until (i) all of the Indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness; and (ii) Mortgagor cancels this Mortgage by filing a written cancellation Instrument signed by Mortgagee. When all of the indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness, Mortgagor may request Mortgagee to sign such a written cancellation instrument by writing Mortgagee at the above address or at such other address as Mortgagee may advise. Mortgagee may delay providing Mortgagor with such a mortgage cancellation instrument for a period of sixty (60) days following receipt of Mortgagor's written request, or such longer time as may be necessary for Mortgagee to verify that all conditions, precedent for mortgage cancellation have been satisfied.

**PROHIBITIONS REGARDING PROPERTY.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign or pledge the Property or do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**REPRESENTATIONS AND WARRANTIES CONCERNING THE PROPERTY.** Except as previously disclosed to Mortgagee in writing, Mortgagor represents and warrants that: (i) Mortgagor is and will continue to be the lawful owner of the Property; (ii) Mortgagor has the right to mortgage the Property to Mortgagee; (iii) as of the time this Mortgage is recorded, there are no encumbrances affecting the Property; (iv) the security rights and interest granted under this Mortgage will at no time become subordinate or junior to any security rights, interests, liens, or claims of, or in favor of, any person, firm, corporation, or other entity; and (v) this Mortgage is binding upon Mortgagor, as well as, Mortgagor's heirs, successors, legatees, administrators, executors, representatives and warranties, and all other representations and warranties contained in this Mortgage, are and will be continuing in







nature and will remain in full force and effect until such time as this Mortgage is cancelled in the manner provided above.

**INSURANCE PROVISIONS.** The following insurance provisions are a part of this Mortgage:

**Required Insurance.** So long as this Mortgage remains in effect, Mortgagor shall, at its sole cost, keep and/or cause others, at their expense, to keep the Property constantly insured against loss by fire, by hazards included within the term "extended coverage," and by such other hazards (including flood insurance, where applicable) as may be required by Mortgagee. Such insurance shall be in an amount not less than the full replacement value of the Property, or such other amount or amounts as Mortgagee may require or approve in writing. Mortgagor shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Mortgagor and Mortgagee as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, occupancy, possession, operation and condition of the Property, and further containing a broad form contractual liability endorsement covering Mortgagor's obligations to indemnify Mortgagee as provided hereunder. Should the Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Mortgagor agrees to obtain and maintain Federal Flood Insurance, if available, in the amount of the full unpaid principal balance of the loan and any prior liens on the Property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Mortgagee, and to maintain such insurance for the term of the loan.

**Insurance Companies and Policies.** Mortgagor may purchase such insurance from any insurance company or broker that is acceptable to Mortgagee, provided that such approval may not be unreasonably withheld. All such insurance policies, including renewals and replacements, must also be in form and substance acceptable to Mortgagee, and must additionally contain a lender's loss payee endorsement in favor of Mortgagee, providing in part that (i) all proceeds and returned premiums under such policies of insurance will be paid directly to Mortgagee, and (ii) no act or omission on the part of Mortgagor, or any of its directors, officers, agents, employees or representatives, nor breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Mortgagee. Such policies of insurance must also contain a provision prohibiting cancellation, nonrenewal, or the alteration of such insurance without at least thirty (30) days prior written notice to Mortgagee of such intended cancellation, renewal or alteration. Mortgagor agrees to provide Mortgagee with originals or certified copies of such policies of insurance. Mortgagor further agrees to promptly furnish Mortgagee with copies of all renewal notices and, if requested by Mortgagee, with copies of receipts for paid premiums. Mortgagor shall provide Mortgagee with originals or certified copies of all renewal or replacement policies of insurance no later than fifteen (15) days before any such existing policy or policies should expire. If Mortgagor's insurance policies and renewals are held by another person, Mortgagor agrees to supply original or certified copies of the same to Mortgagee within the time periods required above.

**Property Losses and Claims.** Mortgagor agrees to immediately notify Mortgagee in writing of any material casualty to or accident involving the Property, whether or not such casualty or loss is covered by insurance. Mortgagor further agrees to promptly notify Mortgagor's insurance company and to submit an appropriate claim and proof of claim to the insurance company in the event that any of the Property is lost, damaged, or destroyed as a result of an insured hazard. Mortgagee may submit such a claim and proof of claim to the insurance company on Mortgagor's behalf, should Mortgagor fail to do so promptly for any reason. Mortgagor hereby irrevocably appoints Mortgagee as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance and to endorse the name of Mortgagor on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more Events of Default exist under this Mortgage, Mortgagee will not settle or adjust any such claim without the prior approval of Mortgagor (which approval shall not be unreasonably withheld).

**Insurance Proceeds.** Mortgagee shall have the right to directly receive the proceeds of all insurance protecting the Property. In the event that Mortgagor should receive any such insurance proceeds, Mortgagor agrees to immediately turn over and to pay such proceeds directly to Mortgagee. All insurance

796503






proceeds may be applied, at Mortgagee's sole option and discretion, and in such a manner as Mortgagee may determine (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or fees necessarily paid or incurred by Mortgagee in this connection), for the purpose of: (i) repairing or restoring the lost, damaged or destroyed Property; or (ii) reducing the then outstanding balance of the Indebtedness and any Additional Advances that Mortgagee may have made on Mortgagor's behalf, together with interest thereon. Mortgagee's receipt of such insurance proceeds and the application of such proceeds as provided herein shall not, however, affect the lien of this Mortgage. Nothing under this section shall be deemed to excuse Mortgagor from its obligations to promptly repair, replace or restore any "loss or damaged Property, whether or not the same may be covered by insurance, and whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Mortgagee. Furthermore, unless otherwise confirmed by Mortgagee in writing, the application or release of any insurance proceeds by Mortgagee shall not be deemed to cure or waive any Event of Default under this Mortgage.

**TAXES AND LIENS.** Mortgagor shall promptly pay or cause to be paid when due, all taxes, local and special assessments, and governmental and other charges, as well as all public and/or private utility charges, of every type and description, that may from time to time be imposed, assessed and levied against the mortgaged Property or against Mortgagor.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Mortgagor agrees that Mortgagor's possession and use of the Property shall be governed by the following provisions.

**Use of Property.** Mortgagor shall not use the Property and shall not permit others to use the Property, for any purpose or purposes other than those previously disclosed to Mortgagee in writing, and in no event shall any of the Property be used in any manner that would damage, depreciate, or diminish its value, or that may result in a cancellation or termination of insurance coverage. Mortgagor additionally agrees not to do or to suffer to be done anything which may increase the risk of fire or other hazard to the Property or any part or parts thereof. Mortgagor shall not permit the Property, or any portion thereof, to be used by the public and others as may make possible a claim or claims of adverse usage, easement, servitude, right of way or habitation, or adverse possession by the public and others, or any implied, tacit or other dedication of the Property.

**Compliance with Applicable Laws and Regulations.** Mortgagor shall observe and abide by, and shall cause others to observe and abide by, all present and future laws, ordinances, orders, rules, regulations, restrictions, and requirements of all federal, state and municipal governments, courts, departments, commissions, boards, agencies, and officers, affecting the Property and its use.

Mortgagor shall further promptly perform and observe, and shall cause others to promptly perform and observe, all the terms, covenants and conditions of any requirements, instruments and agreements affecting the Property, non-compliance with which may adversely affect the priority of this Mortgage, or which may impose any duty or obligation upon Mortgagor, or upon any lessee or other occupant of the Property. Mortgagor shall further do and cause to be done all things necessary to preserve intact and unimpaired any and all easements, servitudes, appurtenances and other interests and rights in favor of, or constituting any portion of, the Property.

**Compliance With Environmental Laws.** Mortgagor represents and warrants to Mortgagee that: (i) During the period of Mortgagor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (ii) Mortgagor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Mortgagee in writing, (a) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (iii) except as previously disclosed to and acknowledged by Mortgagee in writing, (a) neither Mortgagor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on,



796503





under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Mortgagor authorizes Mortgagee and its agents to enter upon the Property to make such inspections and tests, at Mortgagor's expense, as Mortgagee may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Mortgagee shall be for Mortgagee's purposes only and shall not be construed to create any responsibility or liability on the part of Mortgagee to Mortgagor or to any other person. The representations and warranties contained herein are based on Mortgagor's due diligence in investigating the Property for Hazardous Substance.

Mortgagor hereby (i) releases and waives any future claims against Mortgagee for indemnity or contribution in the event Mortgagor becomes liable for cleanup or other costs under any such laws; and (ii) agrees to indemnify and hold harmless Mortgagee against any and all claims, losses, liabilities, damages, penalties, and expenses which Mortgagee may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Mortgagor's ownership or interest in the Property, whether or not the same was or should have been known to Mortgagor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Mortgagee's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**ERISA.** Mortgagor represents and warrants to Lender that the granting of this Mortgage and the consummation of any loan or loans or other transactions contemplated or secured thereby will not violate the provisions of, and will not constitute a prohibited transaction under the ERISA.

**Alterations.** Mortgagor shall not, without the prior written consent of Mortgagee, demolish, remove, construct, restore, add to or alter any building(s) or other improvements to or upon the Property, or any part or parts thereof, or consent to, or permit any such demolition, removal, construction, restoration, addition or alteration. Mortgagor shall further not, without the prior written consent of Mortgagee, remove or permit the removal of any present or future fixtures and other property forming part of the Property, except as contemplated by the Construction Contract and any other construction contract hereafter entered into by Mortgagor to complete the project contemplated by Construction Contract. Mortgagee may condition its consent to permit Mortgagor to demolish or to remove such improvements, fixtures and/or other property upon Mortgagor's agreement to replace the same with new improvements and/or fixtures of at least equal value then satisfactory to Mortgagee.

**Abandonment of Property.** Mortgagor shall not, nor shall Mortgagor permit others to, abandon, commit waste, or destroy the Property, or any part or parts thereof.

**Repairs and Maintenance.** Mortgagor shall keep and maintain, and/or cause others to keep and maintain, the Property and the sidewalks and curbs adjoining the Property, in good order, repair and condition. Mortgagor shall further make and/or cause all necessary repairs to be made to the Property (including the repair and restoration of any portion of the Property that may have been damaged, lost or destroyed).

**ENCUMBRANCES.** The following provisions relating to Encumbrances on the Property are a part of this Mortgage:

**Prior Encumbrances.** To the extent applicable, Mortgagor shall fully and timely perform any and all of Mortgagor's obligations under any prior Encumbrances affecting the Property. Without limiting the foregoing, Mortgagor shall not commit or permit to exist any breach of or default under any such prior Encumbrances. Mortgagor shall further promptly notify Mortgagee in writing upon the occurrence of any event or circumstances that would, or that might, result in a breach of or default under any such prior Encumbrance. Mortgagor shall further not modify or extend any of the terms of any prior Encumbrance or any indebtedness secured thereby.



**Future Encumbrances.** Mortgagor shall not, without the prior written consent of Mortgagee, grant any Encumbrance that may affect the mortgaged Property, or any part or parts thereof, nor shall Mortgagor

 



permit or consent to any Encumbrance attaching to or being filed against any of the mortgaged Property in favor of anyone other than Mortgagee. Mortgagor shall further promptly pay when due all statements and charges of mechanics, materialsmen, laborers and others incurred in connection with the alteration, improvement, repair and maintenance of the mortgaged Property, or otherwise furnish appropriate security or bond, so that no future Encumbrance may ever attach to or be filed against the Property or any of Mortgagor's Rights.

Notice of Encumbrances. Mortgagor shall immediately notify Mortgagee in writing upon the filing of any attachment, lien, judicial process, claim, or other Encumbrance. Mortgagor additionally agrees to notify Mortgagee immediately in writing upon the occurrence of any default, or event that with the passage of time, failure to cure, or giving of notice, might result in a default under any of Mortgagor's obligations that may be secured by any presently existing or future Encumbrance, or that might result in an Encumbrance affecting the mortgaged Property, or should any of the mortgaged Property be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than Mortgagee.

**ADDITIONAL ADVANCES FOR SPECIFIC PURPOSES.** Mortgagee shall have the right, within Mortgagee's sole option and discretion, to make Additional Advances on Mortgagor's behalf for the following purposes:

Insurance. If Mortgagor should for any reason fail to maintain insurance on the Property as required under this Mortgage, Mortgagee may make additional Advances on Mortgagor's behalf for the purpose of purchasing and maintaining, and Mortgagee may purchase and maintain such insurance coverage (including insurance protecting only Mortgagee's interests in the Property).

Taxes. If Mortgagor should for any reason fail to promptly pay, when due, taxes, assessments and governmental and other charges as required under this Mortgage, Mortgagee may, but is not required to, make Additional Advances on Mortgagor's behalf for the purpose of paying, and Mortgagee may pay, such taxes, assessments and governmental and other charges.

Repairs. If Mortgagor should for any reason fail to make all necessary repairs to the Property and to keep the Property in good working order and condition as required under this Mortgage, Mortgagor agrees that Mortgagee may make Additional Advances on Mortgagor's behalf for the purpose of making, and Mortgagee may make, such repairs and maintenance to the Property as Mortgagee may deem to be necessary and proper within its sole discretion,

Encumbrances. If Mortgagor should permit or allow any Encumbrance to attach to or be recorded or filed against the Property, without having first obtained Mortgagee's prior written consent, or if Mortgagor should for any reason default under any obligation secured by any presently existing or future Encumbrance, Mortgagee may make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to pay and fully satisfy such obligation and/or Encumbrance, to cure or rectify any such default or defaults, and to prevent the occurrence of any future defaults.

Other. Mortgagee may further make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to cure and rectify any actions or inactions on Mortgagor's part, as are required under this Mortgage, that are not listed immediately above.

No Obligations. Nothing under this Mortgage shall obligate Lender to make any such Additional Advances or to take any of the above actions on Grantor's behalf, or as making Lender in any way responsible or liable for any loss, damage or injury to Grantor, or to any other person or persons, resulting from Lender's election not to advance such additional sums or to take such action or actions. In addition, Lender's election to make Additional Advances and/or to take the above actions on Grantor's behalf shall not constitute a waiver or forbearance by Lender of any Event of Default under this Mortgage.



796503





**OBLIGATION TO REPAY ADDITIONAL ADVANCES; INTEREST.** Mortgagor unconditionally agrees to repay any and all Additional Advances that Mortgagee may elect to make on Mortgagor's behalf, together with interest as provided herein, immediately upon demand by Mortgagee. Mortgagor further agrees to pay Mortgagee interest on the amount of such Additional Advances at the legal rate of interest provided under applicable law from the date of such Advance until all such Advances are, repaid in full. Mortgagor's obligations to repay Additional Advances to Mortgagee, together with interest thereon, shall be secured by this Mortgage.

**COLLATERAL ASSIGNMENT AND PLEDGE OF RIGHTS AS ADDITIONAL SECURITY.** As additional security for the prompt and punctual payment and satisfaction of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon as provided herein, and, as additional collateral, Mortgagor hereby assigns, pledges and grants Mortgagee a continuing security interest in and to:

**Proceeds.** Any and all proceeds derived or to be derived from the sale, transfer, conveyance, insurance loss, damage, destruction, condemnation, expropriation, or other taking of the Property, or other proceeds and proceeds of proceeds, and any unearned insurance premiums relating thereto, including the rights of Mortgagor to receive such proceeds directly from the obligor or obligors therefor, and to further enforce any rights that Mortgagor may have to collect such proceeds, including without limitation, Mortgagor's rights to commence an appropriate collection or enforcement action or actions incident thereto.

**Leases, Rents and Profits.** Any and all present and future leases or subleases affecting the mortgaged Property, and all rents, income, and profits therefrom, including without limitation, any and all rents, income, profits, bonuses, revenues, royalties, cash or security deposits, advance rentals and other payments, and further including Mortgagor's rights to enforce all present and future leases or subleases and to receive and enforce any rights that Mortgagor might have to collect rental and all other payments.

**Deposits.** Any and all present and future deposits or other security or advance payments, including rental payments, made by or on behalf of Mortgagor to others, with respect to (i) utility service regarding the Property, (ii) cleaning, maintenance, repair, or similar services regarding the Property, (iii) refuse removal or sewer service regarding the Property, (iv) rentals of equipment, if any, used in the operation by or on behalf of Mortgagor regarding the Property, and/or (v) parking or similar services or rights regarding the Property.

**Options.** Any and all present and future options to sell or lease the mortgaged Property or any interest therein.

**Contract Rights.** To the extent assignable and/or transferable, any and all of Mortgagor's present and future contract rights, instruments, documents, and general intangibles necessary for use or useful in connection with the ownership and operation of all or any part of the Property, whether now existing or hereafter created, or otherwise acquired by Mortgagor, and all liens, security interests, guaranties, remedies, privileges and other rights pertaining thereto, and all rights and remedies of any kind forming the subject matter thereof.

**REPRESENTATIONS AND WARRANTIES CONCERNING RIGHTS.** Mortgagor represents and warrants that: (i) Mortgagor is and/or will be the lawful owner of all of the Rights to the Property; (ii) Mortgagor has the right to collaterally assign and pledge all such Rights to Mortgagee; (iii) to the extent applicable, all of Mortgagor's Rights that consist of or give rise to obligations of third parties, represent and/or will at all times continue to represent bona fide obligations of the obligors thereunder, free of any offset, compensation, deduction or counterclaim. The collateral assignment and pledge of Mortgagor's Rights are further binding upon Mortgagor, as well as Mortgagor's heirs, successors, representatives and/or assigns, and are legally enforceable in accordance with the foregoing terms and conditions.

**ADDITIONAL OBLIGATIONS OF MORTGAGOR WITH REGARD TO COLLATERALLY ASSIGNED AND PLEDGED RIGHTS.** Mortgagor additionally agrees:



796503

 



**Prohibitions Regarding Property.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign, pledge, do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**No Settlement or Compromise.** Mortgagor shall not, without the prior written consent of Mortgagee, compromise, settle, adjust or extend payment under or with regard to any of Mortgagor's Rights subject hereto.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Mortgagee to examine and audit Mortgagor's books and records at all reasonable times.

**Notice to Obligors.** Upon request by Mortgagee, Mortgagor immediately will notify individual obligors and debtors under Mortgagor's Rights, advising such obligors and debtors of the fact that their respective agreements or obligations have been collaterally assigned and pledged to Mortgagee. In the event that Mortgagor should fail to provide such notices for any reason upon Mortgagee's request, Mortgagor agrees that Mortgagee may forward appropriate notices to such obligors and debtors either in Mortgagee's name or in Mortgagor's name.

**Protection of Rights.** Mortgagor will at all times protect and preserve all of Mortgagor's Rights.

**Notice of Change of Names.** Mortgagor will promptly notify Mortgagee of any change in Mortgagor's name, including any change to the assumed business names of Mortgagor. Mortgagor will also promptly notify Mortgagee of any change in Mortgagor's social security number or employer identification number. Mortgagor further agrees to notify Mortgagee in writing prior to any change in address or location of Mortgagor's principal office.



**EVENTS OF DEFAULT.** The following actions or inactions or both shall constitute Events of Default under this Mortgage:

**Default Under the Indebtedness.** Should Mortgagor default in the payment of principal or interest under the Indebtedness.

**Default Under the Loan Agreement.** Should an "Event of Default" as defined in the Loan Agreement occur.

**Default Under this Mortgage.** Should Mortgagor violate, or fail to comply fully with, any of the terms and conditions of this Mortgage.

**Default Under other Agreements.** Should Mortgagor violate, or fail to comply fully with, any of the terms and conditions of any Related Document which directly or indirectly secures repayment of any of the Indebtedness.

**Other Defaults.** Should Mortgagor or any guarantor violate, or fail to comply fully with, any of the terms and conditions of any other loan, extension of credit, security right, instrument, document, or agreement (such as a loan agreement) or obligation in favor of Mortgagee.

**Insolvency.** Should the suspension, failure or insolvency, however evidenced, of Mortgagor or any Guarantor occur or exist.

**Readjustment of Indebtedness.** Should proceedings for readjustment of indebtedness, reorganization, composition or extension under any insolvency law be brought by or against Mortgagor or any Guarantor.



796503





**Assignment for Benefit of Creditors.** Should Mortgagor or any Guarantor file proceedings for a respite or make a general assignment for the benefit of creditors.

**Receivership.** Should a receiver of all or any part of Mortgagor's Property, or the property of any Guarantor, be applied for or appointed.

**Dissolution Proceedings.** Should proceedings for the dissolution or appointment of a liquidator of Mortgagor or any guarantor be commenced.

**Failure to Pay Additional Advances.** Should Mortgagor fail to pay any Additional Advance, together with interest thereon, as provided in this Mortgage, upon Mortgagee's demand,

**False Statement.** Should Mortgagor make or furnish any warranty, representation or statement to Mortgagee that is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter or should such false or misleading warranty, representation or statement be made or furnished on Mortgagor's behalf.

**OTHER DEFAULTS.** Mortgagor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Mortgagee and Mortgagor.

**MORTGAGEE'S RIGHTS UPON DEFAULT.** Should one or more Event of Default occur or exist under this Mortgage, as provided above, Mortgagee, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights and remedies provided by law:

**Acceleration; Foreclosure.** Mortgagee shall have the right, at its sole option, to accelerate the maturity and demand immediate payment in full of any and all of the Indebtedness. Mortgagee shall then have the right to commence appropriate foreclosure proceedings against the Property and against Mortgagor's Rights as provided in this Mortgage.

**Seizure and Sale of Property.** In the event that Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under this Mortgage, Mortgagee may cause the Property, or any part or parts thereof, to be enforced by executory or ordinary process, and to be immediately seized and sold, whether in term of court or in vacation, under ordinary or executory process, in accordance with applicable Louisiana law, to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying Mortgagor or placing Mortgagor in default, all of which are expressly waived.

**Confession of Judgment.** For purposes of foreclosure under Louisiana executory process procedures, Mortgagor confesses judgment and acknowledges to be indebted to Mortgagee, up to the full amount of the Indebtedness in principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges. Mortgagor further confesses judgment and acknowledges to be indebted unto and in favor of Mortgagee in the amount of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon. To the extent permitted under applicable Louisiana law, Mortgagor additionally waives: (i) the benefit of appraisal as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (ii) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (iii) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iv) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (v) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above. Mortgagor further agrees that any declaration of fact made by authentic act before a Notary and two witnesses by a person declaring that such facts are within his or her knowledge, shall constitute authentic evidence of such facts for purposes of foreclosure under applicable Louisiana law and for purposes of La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, to the extent applicable.



796503





Keeper. Should any or all of the Property be seized as an incident to an action for the recognition or enforcement of this Mortgage, by executory process, sequestration, attachment, writ of fieri facias or otherwise, Mortgagor hereby agrees that the court issuing any such order shall, if requested by Mortgagee, appoint Mortgagee, or any agent designated by Mortgagee or any person or entity named by Mortgagee at the time such seizure is requested, or any time thereafter, as Keeper of the Property as provided under La. R.S. 9:5136, *et seq.* Such a Keeper shall be entitled to reasonable compensation. Mortgagor agrees to pay the reasonable fees of such Keeper, which compensation to the Keeper shall also be secured by this Mortgage in the form of an Additional Advance as provided in this Mortgage.

Declaration of Fact. Should it become necessary for Mortgagee to foreclose under this Mortgage, all declarations of fact, which are made under an authentic act before a Notary Public in the presence of two witnesses, by a person declaring such facts to lie within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, where applicable.

Separate Sale of Mortgagor's Rights Following Default. Should one or more Event of Default occur or exist under this Mortgage, Mortgagee shall have the additional right, at its sole option, to separately sell the aforesaid Rights, or any part or parts thereof, at private or public sale, at such price or prices as Mortgagee may deem best, either for cash or for any other compensation; or on credit, or for future delivery, without the assumption of any credit risk. The sale of the aforesaid Rights may be without appraisement, the benefit of which is also expressly waived by Mortgagor. Mortgagee may exercise any other remedies with regard to Mortgagor's Rights as may be authorized under the Louisiana Commercial Laws (La. R.S. 10:9-101, *et seq.*).

Automatic Transfer of Rights. In the event of foreclosure under this Mortgage, or other transfer of title or assignment of the Property, or any part or parts thereof, in lieu of payment of the Indebtedness, whether in whole or in part, all policies of insurance and other Rights applicable to the foreclosed upon or transferred Property shall automatically inure to the benefit of and shall pass to the purchaser(s) or transferee(s) thereof, subject to the rights of the purchaser(s) or transferee(s) to reject such insurance coverage and/or Rights at its or their sole option and election.

Specific Performance. Mortgagee may, in addition to or in lieu of the foregoing remedies, in Mortgagee's sole discretion, commence an appropriate action against Mortgagor seeking specific performance of any covenant contained in this Mortgage or in aid of the execution or enforcement of any power in this Mortgage granted.

Election of Remedies. Except as may be prohibited by applicable law, all of Mortgagee's rights and remedies, whether evidenced by this Mortgage or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Mortgagee to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Mortgagor under this Mortgage, after Mortgagor's failure to perform, shall not affect Mortgagee's right to declare a default and exercise its remedies. Nothing under this Mortgage, or otherwise, shall be construed so as to limit or restrict the rights and remedies available to Mortgagee following an Event of Default, or in any way to limit or restrict the rights and ability of Mortgagee to proceed directly against Mortgagor and/or against any other co-maker, guarantor, surety or endorser of the Indebtedness, and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**MORTGAGEE'S RIGHT TO DIRECTLY COLLECT AND RECEIVE PROCEEDS AND PAYMENTS BEFORE OR AFTER DEFAULT.** Mortgagee shall have the right, at its sole option and election, at any time, whether or not one or more Event of Default then exist under this Mortgage, to directly collect and receive all proceeds and/or payments arising under or in any way accruing from Mortgagor's Rights, as such amounts become due and payable. In order to permit the foregoing, Mortgagor unconditionally agrees to deliver to Mortgagee, immediately following demand, any and all of Mortgagors records, ledger sheets, and other documentation, in the form requested by Mortgagee, with regard to Mortgagor's Rights and any and all proceeds and/or payments applicable thereto.



796503





Mortgagee shall have the further right, whether or not an Event of Default then exists under this Mortgage, where appropriate and within Mortgagee's sole discretion, to file suit, either in Mortgagee's own name or in the name of Mortgagor, to collect any and all proceeds and payments that may then and/or in the future be due and owing under and/or as a result of such rights. Where it is necessary for Mortgagee to attempt to collect any such proceeds and/or payments from the obligors therefor, Mortgagee may compromise, settle, extend, or renew for any period (whether or not longer than the original period) any obligation or indebtedness thereunder or evidenced thereby, or surrender, release, or exchange all or any part of said obligation or indebtedness, without affecting the liability of Mortgagor under this Mortgage or under the indebtedness. To that end, Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact, coupled with an interest and with full power of substitution, to take any and all such actions and any and all other actions permitted hereby, either in the name of Mortgagor or Mortgagee.

**PROTECTION OF MORTGAGEE'S SECURITY RIGHTS.** Mortgagor will be fully responsible for any losses that Mortgagee may suffer as a result of anyone other than Mortgagee asserting any rights or interest in or to the Property and/or Mortgagor's Rights collaterally assigned and pledged hereunder. Mortgagor agrees to appear in and to defend all actions or proceedings purporting to affect Mortgagee's security interests in any of the Property and/or Rights subject to this Mortgage and any of the rights and powers granted Mortgagee hereunder. In the event that Mortgagor fails to do what is required of it under this Mortgage, or if any action or proceeding is commenced naming Mortgagee as a party or affecting Mortgagee's security interests or the rights and powers granted under this Mortgage, then Mortgagee may, without releasing Mortgagor from any of its obligations under this Mortgage, do whatever Mortgagee believes to be necessary and proper within its sole discretion to protect the security of this Mortgage, including without limitation making Additional Advances on Mortgagor's behalf as provided herein. Should the reappraisal of the Property occur, whether to comply with appropriate regulatory requirements or otherwise, Mortgagor agrees to pay the costs of such appraisal or reappraisals or to reimburse Mortgagee for the costs thereof.



**INDEMNIFICATION OF MORTGAGE.** Mortgagor agrees to indemnify, to defend and to save and hold Mortgagee harmless from any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, Mortgagee's attorney's fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Mortgagee, its officers, directors, employees, and agents arising out of or in any manner occasioned by this Mortgage and the exercise of the rights and remedies granted Mortgagee hereunder. The foregoing indemnity provisions shall survive the cancellation of this Mortgage as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Mortgagee elects to exercise any of the remedies as provided under this Mortgage following default hereunder.

**EXECUTION OF ADDITIONAL DOCUMENT.** Mortgagor agrees to execute all additional documents, instruments and agreements that Mortgagee may deem to be necessary and proper, within its sole discretion, in form and substance satisfactory to Mortgagee, to keep this Mortgage in effect, to better reflect the true intent of this Mortgage, and to consummate fully all of the transactions contemplated hereby and by any other agreement, instrument or document heretofore, now or at any time or times hereafter executed by Mortgagor and delivered to Mortgagee.

**INSPECTION OF PROPERTY.** Mortgagee and Mortgagee's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Property wherever located.

**AUDITS.** Mortgagee and its agents may also periodically conduct audits of Mortgagor's books and records that in any way pertain to the Property, the foregoing Rights and any part or parts thereof.

**APPLICATION OF PAYMENTS.** Mortgagor agrees that all payments and other sums and amounts received by Mortgagee under the Indebtedness or under this Mortgage, shall be applied: first, to reimburse Mortgagee for its costs of collecting the same (including but not limited to, reimbursement of Mortgagee's reasonable attorney's fees); second, to the repayment of interest on all Additional Advances that Mortgagee may have made on Mortgagor's behalf pursuant to this Mortgage, third, to the payment of principal of all such Additional Advances; and finally, to the payment of principal and interest on the Indebtedness then outstanding, which may be applied in such order and priority, as Mortgagee may determine within its sole discretion.



 

 **TAXATION.** In the event that there should be any change in law with regard to taxation of mortgages or the debts they secure, Mortgagor agrees to pay any taxes, assessments or charges that may be imposed upon Mortgagee as a result of this Mortgage.

**ADDITIONAL REPRESENTATIONS AND WARRANTIES.** If Mortgagor is not a natural person, it further represents, warrants and covenants that:

**Organization.** Mortgagor is a corporation duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Louisiana. Mortgagor is duly authorized to transact business in all other states in which Mortgagor is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Mortgagor is doing business. Specifically, Mortgagor is, and at all times shall be, duly qualified as a foreign corporation, partnership or company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Mortgagor has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Mortgagor maintains an office at the address set out above. Unless Mortgagor has designated otherwise in writing, the principal office is the office at which Mortgagor keeps its books and records, including its records concerning the collateral. Mortgagor will notify Mortgagee prior to any change in the location of Mortgagor's state of organization or any change in Mortgagor's name. Mortgagor shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Mortgagor and Mortgagor's business activities.

**Authorization.** Mortgagor's execution, delivery, and performance of this Mortgage and all the Related Documents have been duly authorized by all necessary action by Mortgagor and do not conflict with, result in a violation of, or constitute a default under (i) any provision of Mortgagor's articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Mortgagor or (ii) any law, governmental regulation, court decree, or order applicable to Mortgagor or to Mortgagor's properties.

**Consents and Approvals.** If notice to or the consent or approval of any governmental body or authority, or any third party (including without limitation, any other creditor of Mortgagor) is now or any time hereafter required in connection with the execution, delivery and performance by Mortgagor of this Mortgage, then (i) with respect to all currently applicable requirements, such notice has been given and consent or approval obtained by Mortgagor prior to the execution hereof and written evidence thereof has been concurrently herewith delivered to Mortgagee, and (ii) with respect to such requirements that shall at any time hereafter be imposed or become applicable, such notice will be given and such consent or approval will be obtained by Mortgagor prior to the time such failure to do so will constitute a violation of law or result in any breach, default or failure by Mortgagor under any contract or instrument, and written evidence thereof will at such time be delivered to Mortgagee.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** No amendment, modification, consent or waiver of any provision of this Mortgage, and no consent to any departure by Mortgagor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Mortgagee, and then shall be effective only as to the specific instance and for the specific purpose for which given.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Effect of Waivers.** Any failure or delay on the part of the Mortgagee to exercise any of the rights and remedies granted under this Mortgage or under any other agreement or agreements by and between Mortgagor and Mortgagee, shall not have the effect of waiving any of Mortgagee's rights and remedies. Any partial exercise of any rights and remedies granted to Mortgagee shall furthermore not constitute a waiver of any of Mortgagee's other rights and remedies; it being Mortgagor's intent and agreement that all of Mortgagee's rights and remedies shall be cumulative in nature. Furthermore, any failure on the part of



796503

 



Mortgagee at any time or times hereafter to require strict performance by Mortgagor of any of the provisions, warranties, terms and conditions contained herein or in any other agreement, document or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall not waive, affect, or diminish the rights of Mortgagee to thereafter demand strict compliance and performance therewith and with respect to all other provisions, warranties, terms and conditions contained herein or therein. None of the warranties, conditions, provisions and terms contained in this Mortgage or any other agreement, document, or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall be deemed to have been waived by any act or knowledge of Mortgagee, its agents, directors, officers or employees; but only by an instrument in writing specifying such waiver, signed by a duly authorized officer of Mortgagee and delivered to Mortgagor. A waiver or forbearance on the part of Mortgagee as to one Event of Default shall not constitute a waiver or forbearance as to any other or subsequent default.

**Successors and Assigns Bound; Solidary Liability.** Subject to the limitations set forth herein, on transfer of the Property, this Mortgage shall be binding upon and inure to the benefit of the parties, their heirs, representatives, successors and/or assigns.

**Governing Law.** This Mortgage will be governed by, construed and enforced In accordance with, federal law and the laws of the State of Louisiana. This Mortgage has been accepted by Mortgagee in the State of Louisiana.

**Severability.** If any provision of this Mortgage is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall, be fully severable. This Mortgage shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Mortgage shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Mortgage, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.



**WAIVER OF CERTIFICATES.** The parties to this Mortgage hereby waive the production of certificates of mortgage, conveyance, tax, paving, chattel mortgage, assignment of accounts, and all other certificates and relieve and release the Notary Public before whom this Mortgage is passed, from all responsibilities and liabilities in connection therewith.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Louisiana Commercial Laws (R.S. 10: 9-101 *et seq.*):

**Additional Advance.** The words "Additional Advance" mean any and all additional sums that Mortgagee may advance on Mortgagor's behalf as provided under this Mortgage.

**Advance.** The word "Advance" means a disbursement of loan funds made, or to be made, to Mortgagor or on Mortgagor's behalf on a line of credit or multiple advance basis under the terms and conditions of this Mortgage.

**Borrower.** The word "Borrower" means Jay Doyle Valentino and Kathryn Aguzin Valentino, and their successors and assigns.

**Encumbrance.** The word "Encumbrance" means individually, collectively and interchangeably any and all presently existing and/or future mortgages, liens, privileges and other contractual and/or statutory security interests and rights, of every nature and kind, whether in admiralty, at law, or in equity, that now and/or in the future may affect the Property or any part or parts thereof.



796503





**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 *et seq.* ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Rub. L. No, 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*, or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the default section of this Mortgage.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means and includes all amounts identified in the Indebtedness section of this Mortgage.

**Leases.** The word "Leases" shall mean any and all leases, subleases, licenses, concessions or grants of other possessory interests, now or hereafter in force, oral or written, covering or affecting the mortgaged Property, any part thereof or any interest therein, including any and all security therefore and guarantees thereof.

**Lender.** The word "Lender" means any individual, natural person, corporation, partnership or limited liability company who loans money, advances funds or extends credit to Mortgagor or entities associated with Mortgagor, presently or in the future.

**Mortgage.** The word "Mortgage" means this Multiple Indebtedness Mortgage as it may be amended, supplemented, restated or otherwise modified from time to time.

**Mortgagee.** The word "Mortgagee" mean First Bank and Trust, its representatives, successors and/or assigns, and any future holder or holders of the Indebtedness or any interest therein.

**Mortgagor.** The word "Mortgagor" means individually, collectively and interchangeably, Nantucket Bay Subdivision, L.L.C., as well as any and all persons and entities subsequently purchasing the mortgaged Property, with or without assumption of this Mortgage.

**Notes.** The word "Notes" shall mean the Notes given by Mortgagor to Mortgagee in evidence of its loans provided by Mortgagee.

**Property.** The word "Property" means all of Mortgagor's right, title and interest in and to all the Property as described in the "Property Description" section of this Mortgage.

**Real Property.** The words "Real Property" mean the immovable property, interests and real rights, as further described in this Mortgage.



796503





**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" shall mean all of the rents, revenue, income, profits and proceeds derived and to be derived from the mortgaged Property or arising from the use of enjoyment of any portion thereof or from any Lease, including but not limited to liquidated damages following default under any such Lease, or payments applicable to a termination of a Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from damage to any part of the mortgaged Property, all of Mortgagor's rights to recover monetary amounts from any tenant in bankruptcy, together with any sums of money that may now or at any time hereafter be or become due and payable to Mortgagor by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and all future oil, gas, mineral and mining leases covering the mortgaged Property or any part thereof, and all proceeds and other amounts paid or owing to Mortgagor under or pursuant to any and all contracts and bonds relating to the construction or renovation of the mortgaged Property.

**Rights.** The word "Rights" means any and all of Mortgagor's additional rights and interests collaterally assigned and pledged to Mortgagee as provided under this Mortgage.

**THUS DONE AND SIGNED,** on the day, month and year first written above, in New Orleans, Louisiana, in the presence of the undersigned competent witnesses, who hereunto sign their names with Mortgagor and me, Notary, after reading of the whole.

WITNESSES:

Mortgagor:

Nantucket Bay Subdivision, L.L.C.

Printed name: _Julie H. Galliano_

By: _____
Christina Singleton, Manager

Printed name: _Susan M. Pundt_

_____
Notary Public

Notary's Printed Name: _JOHN D. WOGAN_

Notary's Notary ~~or Bar~~ Roll No.: _33668_

JOHN D. WOGAN
Notary Public
State of Louisiana
Louisiana State Bar #13629
My Commission is Issued for Life

Exhibit "A"

to Multiple Indebtedness Mortgage granted by

Nantucket Bay Subdivision, L.L.C.

to

Little Pine Island Corporation

Nantucket Bay Subdivision, L.L.C.'s ownership interest, lease and leaseback rights, servitude interests, riparian rights, and all other rights pertaining to all of the immovable property hereinafter described in Section I through Section VII of this Exhibit, less and except the property excepted from this description in Section VIII of this Exhibit.

Section I

The following described property conveyed by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Special Warranty Deed and Assignment of Lease recorded in the records of Sabine Parish, Louisiana on March 12, 2004 as Instrument No. 386601 (the "S&S Deed"). The reference in the following description to "the attached survey" refers to a survey of Meyer, Meyer, LaCroix & Hixson, Inc. of land situated in Sections 34 and 35, T-8-N, R-13,W and a portion of Section 2, T-17-N, R-13-W attached to and recorded with the S&S Deed.

TRACT NO. 1

Beginning at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence N 89 deg. 51 min. 20 sec. E along the north line of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35 a distance of 109.75 feet to a 2" iron pipe found at the 175 foot msl elevation; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L24 | S 01 deg. 56 min. 56 sec. W | for 243.50 feet; |
| L25 | S 50 deg. 35 min. 29 sec. W | for 107.82 feet; |
| L26 | S 66 deg. 44 min. 48 sec. W | for 136.68 feet; |
| L27 | N 30 deg. 54 min. 44 sec. E | for 93.04 feet; |
| L28 | N 20 deg. 12 min. 29 sec. W | for 245.37 feet; |
| L29 | N 09 deg. 39 min. 52 sec. W | for 165.72 feet; |
| L30 | N 70 deg. 31 min. 55 sec. E | for 131.82 feet; |
| L31 | N 26 deg. 56 min. 15 sec. W | for 117.45 feet; |
| L32 | S 59 deg. 04 min. 30 sec. W | for 169.22 feet; |
| L33 | N 35 deg. 48 min. 48 sec. W | for 92.18 feet; |
| L34 | N 15 deg. 30 min. 38 sec. E | for 184.69 feet; |
| L35 | N 29 deg. 30 min. 42 sec. E | for 137.47 feet; |
| L36 | S 84 deg. 05 min. 36 sec. W | for 60.23 feet; |
| L37 | S 43 deg. 41 min. 48 sec. W | for 106.02 feet; |
| L38 | S 78 deg. 43 min. 48 sec. W | for 147.13 feet; |
| L39 | S 21 deg. 42 min. 36 sec. E | for 159.28 feet; |
| L40 | S 65 deg. 24 min. 49 sec. W | for 80.90 feet; |
| L41 | N 19 deg. 39 min. 32 sec. W | for 85.48 feet; |
| L42 | N 52 deg. 25 min. 37 sec. W | for 170.03 feet; |

Page 1-A

| | | |
|---|---|---|
| L43 | N 27 deg. 44 min. 55 sec. W | for 122.88 feet; |
| L44 | S 60 deg. 08 min. 00 sec. E | for 177.78 feet; |
| L45 | N 33 deg. 27 min. 00 sec. W | for 114.37 feet; |
| L46 | N 33 deg. 00 min. 45 sec. E | for 57.60 feet; |
| L47 | N 52 deg. 24 min. 09 sec. E | for 99.36 feet; |
| | N 89 deg. 51 min. 29 sec. E | for 396.81 feet; |
| | S 89 deg. 56 min. 49 sec. E | for 97.00 feet to the point of beginning |

of this tract, containing 6.790 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

TRACT NO. 2

Commencing at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;
Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence S 76 deg. 17 min. 52 sec. W for a distance of 346.27 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| L15 | S 38 deg. 31 min. 02 sec. E | for 111.25 feet; |
| L16 | S 04 deg. 00 min. 52 sec. E | for 123.54 feet; |
| L17 | S 08 deg. 18 min. 46 sec. W | for 139.18 feet; |
| L18 | S 23 deg. 36 min. 50 sec. E | for 98.77 feet; |
| L19 | S 56 deg. 38 min. 20 sec. E | for 182.93 feet; |
| L20 | N 68 deg. 02 min. 11 sec. E | for 138.22 feet; |
| L21 | N 52 deg. 09 min. 54 sec. E | for 151.22 feet; |
| L22 | N 44 deg. 40 min. 44 sec. E | for 151.92 feet; |
| L23 | N 13 deg. 55 min. 49 sec. W | for 65.42 feet; |
| L2 | S 89 deg. 01 min. 40 sec. E | for 138.55 feet; |
| L3 | S 76 deg. 12 min. 18 sec. E | for 232.44 feet; |
| L4 | S 13 deg. 29 min. 42 sec. E | for 132.09 feet; |
| L5 | S 89 deg. 49 min. 30 sec. W | for 269.77 feet; |
| L6 | S 66 deg. 58 min. 25 sec. W | for 174.11 feet; |
| L7 | S 35 deg. 56 min. 23 sec. W | for 203.63 feet; |
| L8 | N 83 deg. 38 min. 45 sec. W | for 294.43 feet; |
| L9 | N 73 deg. 20 min. 49 sec. W | for 244.15 feet; |
| L10 | N 00 deg. 44 min. 41 sec. W | for 317.43 feet; |
| L11 | N 43 deg. 10 min. 33 sec. W | for 171.64 feet; |
| L12 | N 75 deg. 49 min. 14 sec. W | for 94.90 feet; |
| L13 | N 70 deg. 21 min. 54 sec. E | for 176.45 feet; |
| L14 | N 83 deg. 31 min. 07 sec. E | for 140.56 feet; to the point of |

beginning of this tract, containing 5.691 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

TRACT NO. 3

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;
Thence S 00 deg. 25 min. 02 sec. W along the west line of the SW 1/4 of the SW 1/4 for a distance of 1185.58 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | | |
|---|---|---|
| | N 81 deg. 15 min. 50 sec. E | for 353.05 feet; |
| L63 | N 52 deg. 31 min. 51 sec. E | for 253.34 feet; |



Page 2-A

| L64 | N 03 deg. 38 min. 23 sec. W | for 298.09 feet; |
|-----|------------------------------|------------------|
| L65 | N 49 deg. 59 min. 36 sec. E | for 241.55 feet; |
| L66 | N 26 deg. 14 min. 22 sec. W | for 83.42 feet; |
| L67 | N 08 deg. 40 min. 56 sec. E | for 91.83 feet; |
| L68 | N 34 deg. 25 min. 11 sec. W | for 112.75 feet; |
| L69 | N 30 deg. 57 min. 17 sec. W | for 101.35 feet; |
| L70 | N 52 deg. 03 min. 40 sec. W | for 61.43 feet; |
| L48 | S 76 deg. 21 min. 01 sec. W | for 130.01 feet; |
| L49 | S 56 deg. 09 min. 00 sec. E | for 136.37 feet; |
| L50 | S 61 deg. 53 min. 28 sec. E | for 82.85 feet; |
| L51 | S 20 deg. 55 min. 11 sec. E | for 93.61 feet; |
| L52 | S 72 deg. 46 min. 26 sec. W | for 176.88 feet; |
| L53 | S 81 deg. 06 min. 06 sec. W | for 388.35 feet; |
| L54 | N 89 deg. 19 min. 27 sec. E | for 191.22 feet; |
| L55 | S 52 deg. 28 min. 26 sec. E | for 156.44 feet; |
| L56 | S 15 deg. 45 min. 54 sec. W | for 111.43 feet; |
| L57 | S 69 deg. 37 min. 56 sec. W | for 162.76 feet; |
| L58 | S 74 deg. 20 min. 10 sec. W | for 316.39 feet; |
| L59 | S 36 deg. 21 min. 46 sec. W | for 167.18 feet; |
| L60 | S 36 deg. 10 min. 13 sec. W | for 205.46 feet; |
| L61 | S 72 deg. 12 min. 52 sec. E | for 232.51 feet; |
|  | N 81 deg. 15 min. 50 sec. E | for 102.81 feet to the point of |

beginning of this tract, containing 9.326 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

TRACT NO. 4

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 89 deg. 51 min. 29 sec. E along the north line of the SW 1/4 of the SW 1/4 for a distance of 523.21 feet to a 1/2" iron rod set at the southeast corner of the 1 acre tract lying south of the road in the SW corner of the NW 1/4 of the SW 1/4 of Section 35 acquired from Ruby Martinez Danner; thence N 60 deg. 48 min. 21 sec. W a distance of 278.86 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L71 | S 28 deg. 06 min. 24 sec. W | for 232.62 feet; |
|-----|------------------------------|------------------|
| L72 | S 60 deg. 37 min. 29 sec. W | for 130.63 feet; |
| L73 | N 64 deg. 28 min. 00 sec. W | for 194.02 feet; |
| L74 | N 06 deg. 42 min. 10 sec. W | for 77.89 feet; |
| L75 | N 75 deg. 07 min. 24 sec. E | for 421.73 feet to the point of |

beginning of this tract, containing 1.316 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Page 3-A

<u>TRACT NO. 5</u>

Commencing at the southeast corner of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 00 deg. 16 min. 21 sec. W along the east line of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West for a distance of 658.72 feet to the northeast corner of the S1/2 of the NE 1/4 of the SE 1/4 of Section 34; thence S 50 deg. 11 min 31 sec. W a distance of 562.55 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L167 | S 32 deg. 16 min. 39 sec. W | for 421.68 feet; |
| L168 | N 39 deg. 51 min. 21 sec. W | for 102.67 feet; |
| L169 | N 01 deg. 34 min. 50 sec. W | for 351.25 feet; |
| L170 | N 07 deg. 04 min. 53 sec. W | for 177.36 feet; |
| L171 | N 48 deg. 46 min. 46 sec. E | for 92.10 feet; |
| L172 | S 13 deg. 14 min. 46 sec. E | for 124.76 feet; |
| L173 | S 56 deg. 29 min. 07 sec. E | for 141.27 feet; |
| L174 | S 44 deg. 00 min. 27 sec. E | for 153.85 feet to the point of |

beginning of this tract, containing 2.491 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

**Section II**

TRACT III:
That portion of the South Half of the Southwest Quarter of the Northwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana that lies South of Louisiana Highway 482, together with all leaseback rights thereto.

Being a portion of the same property acquired by DeLoutre Property Rentals, L.L.C. from Joe Nell Kimbrell Blakey and Nancy Kimbrell Kerce, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on May 9, 2004, as Instrument No. 375,939; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rental, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

**Section III**

The West 198 yards of the West fifty-three (53) acres of the North half of the Southwest Quarter (N-1/2 of SW-1/4) of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana, less one acre more or less South of the road which crosses said land near the Southwest corner thereof, said tract containing approximately 17 acres, LESS 14.78 acres below the 175 foot contour sold to Sabine river Authority, together with all leaseback rights from Sabine River Authority relating to the foregoing described property and all other property and interest in property described in the acquisition documents specified in the next following paragraph.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Richard S. Ramsey and Mary R. Bush by Cash Deed recorded in the official records of Sabine Parish, Louisiana, on April 12, 2002, as Document No. 375527, and acquired by Nantucket Bay Subdivision from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine parish, LA, on November 30, 2009, as Instrument #419907 in Conveyance Book 649, page 908.

Section IV

<u>TRACT NO. 1</u>

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35 and marking the point of beginning;

Thence N 89 deg. 17 min. 56 sec. W along the South line of the NW 1/4 of the SW 1/4 for a distance of 97.00 feet to a 5/8" rebar set; thence N 60 deg. 33 min. 55 sec. W 354.61 feet to a 5/8" rebar set; thence N 45 deg. 02 min. 13 sec. W 457.77 feet to a 5/8" rebar set; thence N 20 deg. 17 min. 29 sec. W 209.66 feet to a 5/8" rebar set; thence N 02 deg. 41 min. 33 sec. E 384.49 feet to a 5/8" rebar set; thence N 10 deg. 10 min. 10 sec. E 217.14 feet to a 5/8" rebar set on the South right-of-way line of Louisiana Highway No. 482; thence S 78 deg. 31 min. 00 sec. E along said right-of-way line 331.67 feet to a concrete right-of-way marker found; thence continuing S 78 deg. 31 min. 00 sec. E along said right-of-way line 701.04 feet to a concrete right-of-way marker found; thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take Line; thence S 74 deg. 08 min. 00 sec. E along said right-of-way line 75.59 feet to a new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said new 175 foot contour line as follows:

S 23 deg 35 min 41 sec W 146.37 feet to a 5/8" rebar set;
S 11 deg 59 min 22 sec W 111.55 feet to a 5/8" rebar set;
S 23 deg 06 min 23 sec W 132.07 feet to a 5/8" rebar set;
S 32 deg 46 min 37 sec W 68.09 feet to a 5/8" rebar set;
S 64 deg 16 min 29 sec W 164.16 feet to a 5/8" rebar set;
S 83 deg 13 min 58 sec W 220.39 feet to a 5/8" rebar set;
N 09 deg 52 min 11 sec W 140.31 feet to a 5/8" rebar set;
N 00 deg 54 min 53 sec W 214.51 feet to a 5/8" rebar set;
N 23 deg 56 min 05 sec W 121.82 feet to a 5/8" rebar set;
N 63 deg 32 min 55 sec W 119.61 feet to a 5/8" rebar set;
N 78 deg 51 min 40 sec W 234.46 feet to a 5/8" rebar set;
S 81 deg 21 min 10 sec W 74.76 feet to a 5/8" rebar set;
S 48 deg 28 min 05 sec W 63.47 feet to a 5/8" rebar set;
S 14 deg 36 min 09 sec W 194.94 feet to a 5/8" rebar set;
S 12 deg 59 min 21 sec E 146.61 feet to a 5/8" rebar set;
S 43 deg 04 min 17 sec E 140.05 feet to a 5/8" rebar set;
S 66 deg 16 min 58 sec E 175.64 feet to a 5/8" rebar set;
S 35 deg 10 min 18 sec E 193.32 feet to a 5/8" rebar set;
S 73 deg 56 min 18 sec E 115.79 feet to a 5/8" rebar set;
S 86 deg 55 min 59 sec E 144.14 feet to a 5/8" rebar set;
N 87 deg 26 min 16 sec E 128.22 feet to a 5/8" rebar set;
S 35 deg 39 min 38 sec E 102.70 feet to a 5/8" rebar set;
S 40 deg 56 min 31 sec E 155.09 feet to a 5/8" rebar set;
S 01 deg 14 min 43 sec E 44.38 feet to a 5/8" rebar set;

S 32 deg 44 min 05 sec W 25.65 feet to a 5/8" rebar set;
S 63 deg 30 min 24 sec W 98.74 feet to a 5/8" rebar set on the South line of the NE 1/4 of the SW 1/4 of said Section 35; thence N 89 deg. 17 min. 56 sec. W (leaving said 175 foot contour line) along said forty line (also being the North line of the David Combs property, as per the survey by R. V. Leone, PLS, survey dated May 11, 1971) 223.99 feet to the point of beginning containing 18.334 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Less and except the following tract:



Page 5-A

TRACT NO. 4

Commencing at the point of beginning, being the Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence S 27 deg. 49 min. 17 sec. W along said line 149.91 feet to SRA point 383; thence S 59 deg. 14 min. 18 sec W along said take line 285.81 feet to SRA point 384; thence S 21 deg. 56 min. 54 sec. W along said line 88.45 feet to the new 175 contour line (new take line); thence S 83 deg. 13 min. 58 sec. W along said new 175 contour line 91.25 feet to a 5/8" rebar set; thence N 09 deg. 52 min. 11 sec. W along said new take line 140.31 feet to a 5/8" rebar set; thence N 00 deg. 54 min. 53 sec. W along said line 97.40 feet to the original take line; thence N 34 deg. 17 min. 36 sec. E along said original take line 108.97 feet to SRA point 390; thence N 17 deg. 24 min. 34 sec. E along said original take line 174.90 feet to SRA point 391; thence N 57 deg. 22 min. 56 sec. E along said original take line 198.91 feet to SRA point 392; thence N 20 deg. 35 min. 22 sec. W along said original take line 2.75 feet to the South right-of-way line of Louisiana Highway 482; thence S 78 deg. 31 min. 00 sec. E along said right-of-way line 47.98 feet to a concrete right-of-way marker; thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take Line; thence S 11 deg. 09 min. 00 sec W along said take line 169.64 feet to the point of beginning containing 3.960 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Also less and except the following tract:

TRACT NO. 5

Commencing at the point of beginning, being the Sabine River Authority Angle Point No. 386 on the Toledo Bend Take Line; thence S 68 deg. 56 min. 33 sec. W along said line 122.92 feet to SRA point 387; thence N 63 deg. 45 min. 36 sec. W along said take line 157.88 feet to SRA point 388; thence N 08 deg. 15 min. 48 sec. W along said line 41.94 feet to the new 175 contour line (new take line); thence S 73 deg. 56 min. 18 sec. E along said new 175 contour line 10.94 feet to a 5/8" rebar set; thence S 86 deg. 55 min. 59 sec. E along said new take line 144.14 feet to a 5/8" rebar set; thence N 87 deg. 26 min. 16 sec. E along said line 50.55 feet to the original take line; thence S 44 deg. 22 min. 55 sec. E along said original take line 82.08 feet to the point of beginning containing 0.402 of an acre, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Page 6-A

<u>TRACT NO. 3</u>

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35, thence S 89 deg. 17 min. 56 sec. E along the South line of the NE 1/4 of the SW 1/4 for a distance of 223.99 feet to a 5/8" rebar set on the new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said 175 foot contour line as follows:

N 63 deg. 30 min. 24 sec. E  98.74 feet to a 5/8" rebar set;
N 32 deg. 44 min. 05 sec. E  25.65 feet to a 5/8" rebar set;
N 01 deg. 14 min. 43 sec. W  44.38 feet to a 5/8" rebar set;
N 40 deg. 56 min. 31 sec. W 155.09 feet to a 5/8" rebar set;
N 35 deg. 39 min. 38 sec. W 102.70 feet to a 5/8" rebar set.
S 87 deg. 26 min. 16 sec. W  77.67 feet to the original Toledo Bend Take Line for a point of beginning;

Thence continuing with said new 175 foot contour line as follows:

S 87 deg. 26 min. 16 sec. W  50.55 feet to a 5/8" rebar set;
N 86 deg. 55 min. 59 sec. W 144.14 feet to a 5/8" rebar set;
N 73 deg. 56 min. 18 sec. W  10.94 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 08 deg. 15 min. 48 sec. W  24.26 feet;

Thence N 00 deg. 13 min. 51 sec. E 306.22 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 34 deg. 17 min. 36 sec. E 106.00 feet to the new 175 foot contour line;

Thence with said new 175 foot contour line as follows:

S 00 deg. 54 min. 53 sec. E  97.40 feet to a 5/8" rebar set;
S 09 deg. 52 min. 11 sec. E 140.31 feet to a 5/8" rebar set;
N 83 deg. 13 min. 58 sec. E  91.25 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line as follows:

S 21 deg. 56 min. 54 sec. W 129.43 feet to Point No. 385;
S 44 deg. 22 min. 55 sec. E 113.84 feet to the point of beginning containing 1.004 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Sabine River Authority, State of Louisiana, by Correction Deed recorded in the official records of Sabine Parish, Louisiana, on November 25, 2002, as Instrument No. 378954 (the "Correction Deed"), and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908. The above described property is shown on a survey of the property made by Jerry L. Rugg, Registered Professional Land Surveyor, dated November 15, 2002, attached to and recorded with the Correction Deed.

Page 7-A



Section V

A 5.36 acre tract located in the North Half of the Southwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana and being more particularly described as follows:

Beginning at a 1/2 inch iron rod set at Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence South 27 degrees 49 minutes 17 seconds West, 149.91 feet to a 1/2 inch iron rod set at SRA 383; thence South 59 degrees 14 minutes 18 seconds West, 285.81 feet to 60d nail set at SRA 384; thence South 21 degrees 56 minutes 54 seconds West, 217.88 feet to a 1/2 inch iron rod set at SRA 385; thence South 44 degrees 22 minutes 55 seconds East, 195.92 feet to a 1/2 inch iron rod set at SRA 386; thence South 68 degrees 56 minutes 33 seconds West, 122.91 feet to a 1/2 inch iron rod set at SRA 387; thence North 63 degrees 45 minutes 36 seconds West, 157.88 feet to a 1/2 inch iron set at SRA 388; thence North 08 degrees 15 minutes 48 seconds West, 66.19 feet to a point in a pond; thence North 00 degrees 13 minutes 52 seconds East, 306.23 feet to a point in a pond; thence North 34 degrees 17 minutes 36 seconds East, 214.97 feet to a point in a pond; thence North 17 degrees 24 minutes 34 seconds East, 174.90 feet to a 1/2 inch iron rod set at SRA 391; thence North 57 degrees 22 minutes 56 seconds East, 198.91 feet to a 1/2 inch iron rod set at SRA 392; thence North 20 degrees 35 minutes 22 seconds West, 2.46 feet to a 1/2 inch iron rod set on the Southerly right of way of a Louisiana State Highway; thence South 78 degrees 31 minutes 10 seconds East, 47.73 feet along said right of way to a concrete monument; thence South 70 degrees 51 minutes 26 seconds East, 147.33 feet along said right of way to a 1/2 inch iron rod; thence 31.91 feet along the arc of a curve to the left having a central angle of 00 degrees 25 minutes 57 seconds, a radius of 4227.18 feet and chord bearing South 78 degrees 16 minutes 02 seconds East, 31.91 feet to a 1/2 inch iron rod set on the Toledo Bend Take Line; thence South 11 degrees 09 minutes 00 seconds West, 169.39 feet to the Point of Beginning and containing 5.36 acres.

AND

Any and all interest they may have in the East Half of the Northwest Quarter of the Southwest Quarter of Section 35, Township 8 North, Range 13, Sabine Parish, Louisiana.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Mildred Ann Sebren Moreau, and others, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on March 18, 2002 as Document No. 375112; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Contribution Deed filed in the official records of Sabine Parish, Louisiana, on May 28, 2004, as Instrument No. 387883 and by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Page 8-A



Section VI

All contractual rights granted by Sabine River Authority, State of Louisiana, to S&S Marina, L.L.C. in that certain Act of Cash Sale and Lease recorded in the official records of Sabine Parish, LA, on March 12, 2004 as Instrument #386600, including, but not limited to the *following contractual rights to purchase additional property, set forth on page 6 of the Act of Cash Sale and Lease, providing as follows:*

> S&S Marina, L.L.C. and SABINE RIVER AUTHORITY, STATE
> OF LOUISIANA, hereby agree that upon complying with the
> terms and conditions of the SABINE RIVER AUTHORITY,
> STATE OF LOUISIANA's Shoreline Enhancement Policy as it
> currently exists, S&S MARINA, L.L.C. will be allowed to do
> shoreline enhancement, and up on completion of said enhancement
> as approved by the Authority of all and/or any portion of the
> Leased Property, that the SABINE RIVER AUTHORITY, STATE
> OF LOUISIANA will sell and S&S MARINA, L.L.C., or its
> successor in title, will purchase the Leased Property at a price of
> $4,500.00 per acre, cash, recognizing that there must be a 50 foot
> wide strip of the Leased Property remaining between the new 172'
> msl elevation line and the property to be conveyed.

which rights were assigned by *S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by* Assignment of Contractual Rights recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Section VII

All servitude rights running in favor of Nantucket Bay Subdivision, L.L.C., or property owned by Nantucket Bay Subdivision, L.L.C., including, without limitation, the servitude created by Servitude Agreement between DeLoutre Property Rentals, L.L.C. and Nantucket Bay Subdivision, L.L.C., recorded in the official records of Sabine Parish, LA, on March 12, 2004, under Instrument No. 386602

That certain property consisting of Nantucket Cove road as reflected on *Plat of Survey of* Nantucket Bay Subdivision dated January 2, 2003 and filed under Registry Number 379395, Sabine Parish, Louisiana.

Page 9-A

# Exhibit 6

Exhibit "A"

to Multiple Indebtedness Mortgage granted by

Nantucket Bay Subdivision, L.L.C.

to

Little Pine Island Corporation

Nantucket Bay Subdivision, L.L.C.'s ownership interest, lease and leaseback rights, servitude interests, riparian rights, and all other rights pertaining to all of the immovable property hereinafter described in Section I through Section VII of this Exhibit, less and except the property excepted from this description in Section VIII of this Exhibit.

Section I

The following described property conveyed by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Special Warranty Deed and Assignment of Lease recorded in the records of Sabine Parish, Louisiana on March 12, 2004 as Instrument No. 386601 (the "S&S Deed"). The reference in the following description to "the attached survey" refers to a survey of Meyer, Meyer, LaCroix & Hixson, Inc. of land situated in Sections 34 and 35, T-8-N, R-13,W and a portion of Section 2, T-17-N, R-13-W attached to and recorded with the S&S Deed.

TRACT NO. 1

Beginning at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.56 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence N 89 deg. 51 min. 20 sec. E along the north line of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35 a distance of 109.75 feet to a 2" iron pipe found at the 175 foot msl elevation; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L24 | S 01 deg. 56 min. 56 sec. W | for 243.50 feet; |
| L25 | S 50 deg. 35 min. 29 sec. W | for 107.82 feet; |
| L26 | S 66 deg. 44 min. 48 sec. W | for 136.68 feet; |
| L27 | N 30 deg. 54 min. 44 sec. E | for 93.04 feet; |
| L28 | N 20 deg. 12 min. 29 sec. W | for 245.37 feet; |
| L29 | N 09 deg. 39 min. 52 sec. W | for 165.72 feet; |
| L30 | N 70 deg. 31 min. 55 sec. E | for 131.82 feet; |
| L31 | N 26 deg. 56 min. 15 sec. W | for 117.45 feet; |
| L32 | S 59 deg. 04 min. 30 sec. W | for 169.22 feet; |
| L33 | N 35 deg. 48 min. 48 sec. W | for 92.18 feet; |
| L34 | N 15 deg. 30 min. 38 sec. E | for 184.69 feet; |
| L35 | N 29 deg. 30 min. 42 sec. E | for 137.47 feet; |
| L36 | S 84 deg. 05 min. 36 sec. W | for 60.23 feet; |
| L37 | S 43 deg. 41 min. 48 sec. W | for 106.02 feet; |
| L38 | S 78 deg. 41 min. 48 sec. W | for 147.13 feet; |
| L39 | S 21 deg. 42 min. 36 sec. E | for 159.28 feet; |
| L40 | S 65 deg. 24 min. 49 sec. W | for 80.90 feet; |
| L41 | N 19 deg. 39 min. 32 sec. W | for 85.48 feet; |
| L42 | N 52 deg. 25 min. 37 sec. W | for 170.03 feet; |

Page 1-A

| L43 | N 27 deg. 44 min. 55 sec. W | for 122.88 feet; |
| L44 | S 60 deg. 08 min. 00 sec. E | for 177.78 feet; |
| L45 | N 33 deg. 27 min. 00 sec. W | for 114.37 feet; |
| L46 | N 33 deg. 00 min. 45 sec. E | for 57.60 feet; |
| L47 | N 52 deg. 24 min. 09 sec. E | for 99.36 feet; |
| | N 89 deg. 51 min. 29 sec. E | for 396.81 feet; |
| | S 89 deg. 56 min. 49 sec. E | for 97.00 feet to the point of beginning |

of this tract, containing 6.790 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

<u>TRACT NO. 2</u>

Commencing at a 2" iron pipe found at the northeast corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 04 min. 42 sec. E along the east line of the SW 1/4 of the SW 1/4 for a distance of 658.36 feet to a 5/8" iron rod found at the northwest corner of the SW 1/4 of the SE 1/4 of the SW 1/4 of Section 35; thence S 76 deg. 17 min. 52 sec. W for a distance of 346.27 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L15 | S 38 deg. 31 min. 02 sec. E | for 111.25 feet; |
| L16 | S 04 deg. 00 min. 52 sec. E | for 123.54 feet; |
| L17 | S 08 deg. 18 min. 46 sec. W | for 139.18 feet; |
| L18 | S 23 deg. 36 min. 50 sec. E | for 98.77 feet; |
| L19 | S 56 deg. 38 min. 20 sec. E | for 182.93 feet; |
| L20 | N 68 deg. 02 min. 11 sec. E | for 138.22 feet; |
| L21 | N 52 deg. 09 min. 54 sec. E | for 151.22 feet; |
| L22 | N 44 deg. 40 min. 44 sec. E | for 151.92 feet; |
| L23 | N 13 deg. 55 min. 49 sec. W | for 65.42 feet; |
| L2 | S 89 deg. 01 min. 40 sec. E | for 138.55 feet; |
| L3 | S 76 deg. 12 min. 18 sec. E | for 232.44 feet; |
| L4 | S 13 deg. 29 min. 42 sec. E | for 132.09 feet; |
| L5 | S 89 deg. 49 min. 30 sec. W | for 269.77 feet; |
| L6 | S 66 deg. 58 min. 25 sec. W | for 174.11 feet; |
| L7 | S 35 deg. 56 min. 23 sec. W | for 203.63 feet; |
| L8 | N 83 deg. 38 min. 45 sec. W | for 294.43 feet; |
| L9 | N 73 deg. 20 min. 49 sec. W | for 244.15 feet; |
| L10 | N 00 deg. 44 min. 41 sec. W | for 317.43 feet; |
| L11 | N 43 deg. 10 min. 33 sec. W | for 171.64 feet; |
| L12 | N 75 deg. 49 min. 14 sec. W | for 94.90 feet; |
| L13 | N 70 deg. 21 min. 54 sec. E | for 176.45 feet; |
| L14 | N 83 deg. 31 min. 07 sec. E | for 140.56 feet; to the point of |

beginning of this tract, containing 5.691 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

<u>TRACT NO. 3</u>

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence S 00 deg. 25 min. 02 sec. W along the west line of the SW 1/4 of the SW 1/4 for a distance of 1185.58 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| | N 81 deg. 15 min. 50 sec. E | for 353.05 feet; |
| L63 | N 52 deg. 31 min. 51 sec. E | for 253.34 feet; |



Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 103

| L64 | N 03 deg. 38 min. 23 sec. W | for 298.09 feet; |
| L65 | N 49 deg. 59 min. 36 sec. E | for 241.55 feet; |
| L66 | N 26 deg. 14 min. 22 sec. W | for 83.42 feet; |
| L67 | N 08 deg. 40 min. 56 sec. E | for 91.83 feet; |
| L68 | N 34 deg. 25 min. 11 sec. W | for 112.75 feet; |
| L69 | N 30 deg. 57 min. 17 sec. W | for 101.35 feet; |
| L70 | N 52 deg. 03 min. 40 sec. W | for 61.43 feet; |
| L48 | S 76 deg. 21 min. 01 sec. E | for 130.01 feet; |
| L49 | S 56 deg. 09 min. 00 sec. E | for 136.37 feet; |
| L50 | S 61 deg. 53 min. 28 sec. E | for 82.85 feet; |
| L51 | S 20 deg. 55 min. 11 sec. E | for 93.61 feet; |
| L52 | S 72 deg. 46 min. 26 sec. W | for 176.88 feet; |
| L53 | S 81 deg. 06 min. 06 sec. W | for 388.35 feet; |
| L54 | N 89 deg. 19 min. 27 sec. E | for 191.22 feet; |
| L55 | S 52 deg. 28 min. 26 sec. E | for 156.44 feet; |
| L56 | S 15 deg. 45 min. 54 sec. W | for 111.43 feet; |
| L57 | S 69 deg. 37 min. 56 sec. W | for 162.76 feet; |
| L58 | S 74 deg. 20 min. 10 sec. W | for 316.39 feet; |
| L59 | S 36 deg. 21 min. 46 sec. W | for 167.18 feet; |
| L60 | S 36 deg. 10 min. 13 sec. W | for 205.46 feet; |
| L61 | S 72 deg. 12 min. 52 sec. E | for 232.51 feet; |
| | N 81 deg. 15 min. 50 sec. E | for 102.81 feet to the point of |

beginning of this tract, containing 9.326 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

<u>TRACT NO. 4</u>

Commencing at the northwest corner of the SW 1/4 of the SW 1/4 of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 89 deg. 51 min. 29 sec. E along the north line of the SW 1/4 of the SW 1/4 for a distance of 523.21 feet to a 1/2" iron rod set at the southeast corner of the 1 acre tract lying south of the road in the SW corner of the NW 1/4 of the SW 1/4 of Section 35 acquired from Ruby Martinez Danner; thence N 60 deg. 48 min. 21 sec. W a distance of 278.86 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L71 | S 28 deg. 06 min. 24 sec. W | for 232.62 feet; |
| L72 | S 60 deg. 37 min. 29 sec. W | for 130.63 feet; |
| L73 | S 64 deg. 28 min. 00 sec. W | for 194.02 feet; |
| L74 | N 06 deg. 42 min. 10 sec. W | for 77.89 feet; |
| L75 | N 75 deg. 07 min. 24 sec. W | for 421.73 feet to the point of |

beginning of this tract, containing 1.316 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;



*Page 3-A*



<u>TRACT NO. 5</u>

Commencing at the southeast corner of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West, Sabine Parish, Louisiana;

Thence N 00 deg. 16 min. 21 sec. W along the east line of the S 1/2 of the NE 1/4 of the SE 1/4 of Section 34, Township 8 North, Range 13 West for a distance of 658.72 feet to the northeast corner of the S1/2 of the NE 1/4 of the SE 1/4 of Section 34; thence S 50 deg. 11 min 31 sec. W a distance of 562.55 feet to a point on the 175 foot msl elevation traverse for a point of beginning; thence along the traverse representing the 175 foot msl elevation as shown on the attached survey as follows:

| L167 | S 32 deg. 16 min. 39 sec. W | for 421.68 feet; |
| L168 | N 39 deg. 51 min. 21 sec. W | for 102.67 feet; |
| L169 | N 01 deg. 34 min. 50 sec. W | for 351.25 feet; |
| L170 | N 07 deg. 04 min. 53 sec. W | for 177.36 feet; |
| L171 | N 48 deg. 46 min. 46 sec. E | for 92.10 feet; |
| L172 | S 13 deg. 14 min. 46 sec. E | for 124.76 feet; |
| L173 | S 56 deg. 29 min. 07 sec. E | for 141.27 feet; |
| L174 | S 44 deg. 00 min. 27 sec. E | for 153.85 feet to the point of |

beginning of this tract, containing 2.491 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Section II

TRACT III:
That portion of the South Half of the Southwest Quarter of the Northwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana that lies South of Louisiana Highway 482, together with all leaseback rights thereto.

Being a portion of the same property acquired by DeLoutre Property Rentals, L.L.C. from Joe Nell Kimbrell Blakey and Nancy Kimbrell Kerce, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on May 9, 2004, as Instrument No. 375,939; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rental, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Section III

The West 198 yards of the West fifty-three (53) acres of the North half of the Southwest Quarter (N-1/2 of SW-1/4) of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana, less one acre more or less South of the road which crosses said land near the Southwest corner thereof, said tract containing approximately 17 acres, LESS 14.78 acres below the 175 foot contour sold to Sabine river Authority, together with all leaseback rights from Sabine River Authority relating to the foregoing described property and all other property and interest in property described in the acquisition documents specified in the next following paragraph.

Being the same property acquired by *DeLoutre Property Rentals, L.L.C.* from Richard S. Ramsey and Mary R. Bush by Cash Deed recorded in the official records of Sabine Parish, Louisiana, on April 12, 2002, as Document No. 375527, and acquired by Nantucket Bay Subdivision from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine parish, LA, on November 30, 2009, as Instrument #419907 in Conveyance Book 649, page 908.

Section IV

## TRACT NO. 1

    Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35 and marking the point of beginning;

    Thence N 89 deg. 17 min. 56 sec. W along the South line of the NW 1/4 of the SW 1/4 for a distance of 97.00 feet to a 5/8" rebar set;  thence N 60 deg. 33 min. 55 sec. W 354.61 feet to a 5/8" rebar set; thence N 45 deg. 02 min. 13 sec. W 457.77 feet to a 5/8" rebar set; thence N 20 deg. 17 min. 29 sec. W 209.66 feet to a 5/8" rebar set; thence N 02 deg. 41 min. 33 sec. E 384.49 feet to a 5/8" rebar set; thence N 10 deg. 10 min. 10 sec. E 217.14 feet to a 5/8" rebar set on the South right-of-way line of Louisiana Highway No. 482;  thence S 78 deg. 31 min. 00 sec. E along said right-of-way line 331.67 feet to a concrete right-of-way marker found;  thence continuing S 78 deg. 31 min. 00 sec. E along said right-of-way line 701.04 feet to a concrete right-of-way marker found;  thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg. 25 min. 52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take Line;  thence S 74 deg. 08 min. 00 sec. E along said right-of-way line 75.59 feet to a new 175 foot contour line of the Toledo Bend Reservoir;

    Thence along said new 175 foot contour line as follows:
S 23 deg 35 min 41 sec W 146.37 feet to a 5/8" rebar set;
S 15 deg 59 min 22 sec W 115.55 feet to a 5/8" rebar set;
S 23 deg 06 min 23 sec W 132.07 feet to a 5/8" rebar set;
S 32 deg 46 min 37 sec W  68.09 feet to a 5/8" rebar set;
S 64 deg 16 min 29 sec W 164.16 feet to a 5/8" rebar set;
S 83 deg 13 min 58 sec W 220.39 feet to a 5/8" rebar set;
N 09 deg 52 min 11 sec W 140.31 feet to a 5/8" rebar set;
N 00 deg 54 min 53 sec W 214.51 feet to a 5/8" rebar set;
N 23 deg 56 min 05 sec W 121.82 feet to a 5/8" rebar set;
N 63 deg 32 min 55 sec W 119.61 feet to a 5/8" rebar set;
N 78 deg 51 min 40 sec W 234.46 feet to a 5/8" rebar set;
S 81 deg 21 min 10 sec W  74.76 feet to a 5/8" rebar set;
S 48 deg 28 min 05 sec W  63.47 feet to a 5/8" rebar set;
S 14 deg 36 min 09 sec W 194.94 feet to a 5/8" rebar set;
S 12 deg 59 min 21 sec E 146.61 feet to a 5/8" rebar set;
S 43 deg 04 min 17 sec E 140.05 feet to a 5/8" rebar set;
S 66 deg 16 min 58 sec E 175.64 feet to a 5/8" rebar set;
S 35 deg 10 min 18 sec E 193.32 feet to a 5/8" rebar set;
S 73 deg 56 min 18 sec E 115.79 feet to a 5/8" rebar set;
S 86 deg 55 min 59 sec E 144.14 feet to a 5/8" rebar set;
N 87 deg 26 min 16 sec E 128.22 feet to a 5/8" rebar set;
S 35 deg 39 min 38 sec E 102.70 feet to a 5/8" rebar set;
S 40 deg 56 min 31 sec E 155.09 feet to a 5/8" rebar set;
S 01 deg 14 min 43 sec E  44.38 feet to a 5/8" rebar set;

    S 32 deg 44 min 05 sec W  25.65 feet to a 5/8" rebar set;
    S 63 deg 30 min 24 sec W  98.74 feet to a 5/8" rebar set on the South line of the NE 1/4 of the SW 1/4 of said Section 35; thence N 89 deg. 17 min. 56 sec. W (leaving said 175 foot contour line) along said forty line (also being the North line of the David Combs property, as per the survey by R. V. Leone, PLS, survey dated May 11, 1971) 223.99 feet to the point of beginning containing 18.334 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Less and except the following tract:



Page 5-A

### TRACT NO. 4

Commencing at the point of beginning, being the Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence S 27 deg. 49 min. 17 sec. W along said line 149.91 feet to SRA point 383; thence S 59 deg. 14 min. 13 sec W along said take line 285.81 feet to SRA point 384; thence S 21 deg. 56 min. 54 sec. W along said line 88.45 feet to the new 175 contour line (new take line); thence S 83 deg. 13 min. 58 sec. W along said new 175 contour line 91.25 feet to a 5/8" rebar set;  thence N 09 deg. 52 min. 11 sec. W along said new take line 140.31 feet to a 5/8" rebar set; thence N 00 deg. 54 min. 53 sec. W along said line 97.40 feet to the original take line; thence N 34 deg. 17 min. 36 sec. E along said original take line 108.97 feet to SRA point 390; thence N 17 deg. 24 min. 34 sec. E along said original take line 174.90 feet to SRA point 391;   thence N 57 deg. 22 min. 56 sec. E along said original take line 198.91 feet to SRA point 392;  thence N 20 deg. 35 min. 22 sec. W along said original take line 2.75 feet to the South right-of-way line of Louisiana Highway 482; thence S 78 deg. 31 min.  00 sec. E along said right-of-way line 47.98 feet to a concrete right-of-way marker; thence S 70 deg. 51 min. 26 sec. E along said right-of-way line 147.33 feet; thence southeasterly along said right-of-way line, being an arc of a curve to the left for a distance of 31.81 feet, curve having a central angle of 00 deg.  25 min.  52 sec., a radius of 4,227.18 feet, and a chord bearing of S 78 deg. 16 min. 00 sec. E, 31.81 feet to the Toledo Bend Take Line; thence S 11 deg. 09 min. 00 sec W along said take line 169.64 feet to the point of beginning containing 3.960 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use;

Also less and except the following tract:

### TRACT NO. 5

Commencing at the point of beginning, being the Sabine River Authority Angle Point No. 386 on the Toledo Bend Take Line; thence S 68 deg. 56 min. 33 sec. W along said line 122.92 feet to SRA point 387; thence S 63 deg. 45 min. 36 sec. W along said take line 157.88 feet to SRA point 388; thence N 08 deg. 15 min. 48 sec. W along said line 41.94 feet to the new 175 contour line (new take line); thence S 73 deg. 56 min. 18 sec. E along said new 175 contour line 10.94 feet to a 5/8" rebar set; thence S 86 deg. 55 min. 59 sec. E along said new take line 144.14 feet to a 5/8" rebar set; thence N 87 deg. 26 min. 16 sec. E along said line 50.55 feet to the original take line; thence S 44 deg. 22 min. 55 sec. E along said original take line 82.08 feet to the point of beginning containing 0.402 of an acre, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Page 6-A

TRACT NO. 3

Commencing at a 2" iron pipe representing the SW corner of the NE 1/4 of the SW 1/4 of said Section 35, thence S 89 deg. 17 min. 56 sec. E along the South line of the NE 1/4 of the SW 1/4 for a distance of 223.99 feet to a 5/8" rebar set on the new 175 foot contour line of the Toledo Bend Reservoir;

Thence along said 175 foot contour line as follows:
N 63 deg. 30 min. 24 sec. E 98.74 feet to a 5/8" rebar set;
N 32 deg. 44 min. 05 sec. E 25.65 feet to a 5/8" rebar set;
N 01 deg. 14 min. 43 sec. W 44.38 feet to a 5/8" rebar set;
N 40 deg. 56 min. 31 sec. W 155.09 feet to a 5/8" rebar set;
N 35 deg. 39 min. 38 sec. W 102.70 feet to a 5/8" rebar set;
S 87 deg. 26 min. 16 sec. W 77.67 feet to the original Toledo Bend Take Line for a point of beginning;

Thence continuing with said new 175 foot contour line as follows:
S 87 deg. 26 min. 16 sec. W 50.55 feet to a 5/8" rebar set;
N 86 deg. 55 min. 59 sec. W 144.14 feet to a 5/8" rebar set;
N 73 deg. 56 min. 18 sec. W 10.94 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 08 deg. 15 min. 48 sec. W 24.26 feet;

Thence N 00 deg. 13 min. 51 sec. E 306.22 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line N 34 deg. 17 min. 36 sec. E 106.00 feet to the new 175 foot contour line;

Thence with said new 175 foot contour line as follows:
S 00 deg. 54 min. 53 sec. E 97.40 feet to a 5/8" rebar set;
S 09 deg. 52 min. 11 sec. E 140.31 feet to a 5/8" rebar set;
N 83 deg. 13 min. 58 sec. E 91.25 feet to the original Toledo Bend Take Line;

Thence with said original Toledo Bend Take Line as follows:
S 21 deg. 56 min. 54 sec. W 129.43 feet to Point No. 385;
S 44 deg. 22 min. 55 sec. E 113.84 feet to the point of beginning containing 1.004 acres, more or less, and being subject to any rights-of-ways, easements or servitudes of record or use.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Sabine River Authority, State of Louisiana, by Correction Deed recorded in the official records of Sabine Parish, Louisiana, on November 25, 2002, as Instrument No. 378954 (the "Correction Deed"), and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908. The above described property is shown on a survey of the property made by Jerry L. Rugg, Registered Professional Land Surveyor, dated November 15, 2002, attached to and recorded with the Correction Deed.



Page 7-A

Section V

A 5.36 acre tract located in the North Half of the Southwest Quarter of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana and being more particularly described as follows:

Beginning at a 1/2 inch iron rod set at Sabine River Authority Angle Point No. 382 on the Toledo Bend Take Line; thence South 27 degrees 49 minutes 17 seconds West, 149.91 feet to a 1/2 inch iron rod set at SRA 383; thence South 59 degrees 14 minutes 18 seconds West, 285.81 feet to 60d nail set at SRA 384; thence South 21 degrees 56 minutes 54 seconds West, 217.88 feet to a 1/2 inch iron rod set at SRA 385; thence South 44 degrees 22 minutes 55 seconds East, 195.92 feet to a 1/2 inch iron rod set at SRA 386; thence South 68 degrees 56 minutes 33 seconds West, 122.91 feet to a 1/2 inch iron rod set at SRA 387; thence North 63 degrees 45 minutes 36 seconds West, 157.88 feet to a 1/2 inch iron set at SRA 388; thence North 08 degrees 15 minutes 48 seconds West, 66.19 feet to a point in a pond; thence North 00 degrees 13 minutes 52 seconds East, 306.23 feet to a point in a pond; thence North 34 degrees 17 minutes 36 seconds East, 214.97 feet to a point in a pond; thence North 17 degrees 24 minutes 34 seconds East, 174.90 feet to a 1/2 inch iron rod set at SRA 391; thence North 57 degrees 22 minutes 56 seconds East, 198.91 feet to a 1/2 inch iron rod set at SRA 392; thence North 20 degrees 35 minutes 22 seconds West, 2.46 feet to a 1/2 inch iron rod set on the Southerly right of way of a Louisiana State Highway; thence South 78 degrees 31 minutes 10 seconds East, 47.73 feet along said right of way to a concrete monument; thence South 70 degrees 51 minutes 26 seconds East, 147.33 feet along said right of way to a 1/2 inch iron rod; thence 31.91 feet along the arc of a curve to the left having a central angle of 00 degrees 25 minutes 57 seconds, a radius of 4227.18 feet and chord bearing South 78 degrees 16 minutes 02 seconds East, 31.91 feet to a 1/2 inch iron rod set on the Toledo Bend Take Line; thence South 11 degrees 09 minutes 00 seconds West, 169.39 feet to the Point of Beginning and containing 5.36 acres.

AND

Any and all interest they may have in the East Half of the Northwest Quarter of the Southwest Quarter of Section 35, Township 8 North, Range 13, Sabine Parish, Louisiana.

Being the same property acquired by DeLoutre Property Rentals, L.L.C. from Mildred Ann Sebren Moreau, and others, by Cash Sale Deed recorded in the official records of Sabine Parish, Louisiana, on March 18, 2002 as Document No. 375112; and acquired by Nantucket Bay Subdivision, L.L.C. from DeLoutre Property Rentals, L.L.C. by Contribution Deed filed in the official records of Sabine Parish, Louisiana, on May 28, 2004, as Instrument No. 387883 and by Quitclaim Deed with Partial Mineral Reservation and Assignment of Leaseback, recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

Page 8-A

### Section VI

All contractual rights granted by Sabine River Authority, State of Louisiana, to S&S Marina, L.L.C. in that certain Act of Cash Sale and Lease recorded in the official records of Sabine Parish, LA, on March 12, 2004 as Instrument #386600, including, but not limited to the following contractual rights to purchase additional property, set forth on page 6 of the Act of Cash Sale and Lease, providing as follows:

> S&S Marina, L.L.C. and SABINE RIVER AUTHORITY, STATE OF LOUISIANA, hereby agree that upon complying with the terms and conditions of the SABINE RIVER AUTHORITY, STATE OF LOUISIANA's Shorline Enhancement Policy as it currently exists, S&S MARINA, L.L.C. will be allowed to do shoreline enhancement, and up on completion of said enhancement as approved by the Authority of all and/or any portion of the Leased Property, that the SABINE RIVER AUTHORITY, STATE OF LOUISIANA will sell and S&S MARINA, L.L.C., or its successor in title, will purchase the Leased Property at a price of $4,500.00 per acre, cash, recognizing that there must be a 50 foot wide strip of the Leased Property remaining between the new 172' msl elevation line and the property to be conveyed.

which rights were assigned by S&S Marina, L.L.C. to Nantucket Bay Subdivision, L.L.C. by Assignment of Contractual Rights recorded in the official records of Sabine Parish, LA, on November 30, 2009, as Instrument # 419907 in Conveyance Book 649, page 908.

### Section VII

All servitude rights running in favor of Nantucket Bay Subdivision, L.L.C., or property owned by Nantucket Bay Subdivision, L.L.C., including, without limitation, the servitude created by Servitude Agreement between DeLoutre Property Rentals, L.L.C. and Nantucket Bay Subdivision, L.L.C., recorded in the official records of Sabine Parish, LA, on March 12, 2004, under Instrument No. 386602

That certain property consisting of Nantucket Cove road as reflected on Plat of Survey of Nantucket Bay Subdivision dated January 2, 2003 and filed under Registry Number 379395, Sabine Parish, Louisiana.

Page 9-A

# Exhibit 3

**11ᵀᴴ JUDICIAL DISTRICT COURT FOR THE PARISH OF SABINE**

**STATE OF LOUISIANA**

DOCKET NO: _____                                    DIV. "____"

**JOHN J. CUMMINGS, III**

**VERSUS**

**CAPITOL PROPERTIES, LLC, JACK SINGLETON, AND NANTUCKET PLAZA L.L.C.**

FILED: _____           _____
                                                                    **DEPUTY CLERK**

**PETITION TO COLLECT SUMS DUE ON A PROMISSORY NOTE, A GUARANTY AGREEMENT AND TO RECOGNIZE AND ENFORCE A MORTGAGE**

NOW INTO COURT, though undersigned counsel, comes plaintiff, John J. Cummings, III, who files this Petition to Collect Sums Due on a Promissory Note, Guaranty Agreement and To Recognize and Enforce a Mortgage (the "Petition"), and in support thereof shows as follows:

**PARTIES**

1.

Plaintiff, John J. Cummings, III ("Mr. Cummings"), is an individual of the full age of majority who is domiciled in Jefferson Parish, State of Louisiana.

2.

Defendant, Capitol Properties, LLC ("Capitol"), is a Louisiana limited liability company with both its domicile and principal place of business located in the Parish of Sabine, State of Louisiana.

3.

Defendant, Jack Singleton, ("Mr. Singleton"), is an individual of full age of majority who is domiciled in the Parish of Sabine, State of Louisiana.

4.

Defendant, Nantucket Plaza, L.L.C. ("Nantucket"), is a Louisiana limited liability company with both its domicile and principal place of business located in the Parish of Sabine, State of Louisiana.

## VENUE

5.

Venue for this proceeding is proper in Sabine Parish, Louisiana pursuant to Articles 42(2) and 72 of the Louisiana Code of Civil Procedure.

## THE NOTE

6.

Mr. Cummings is the holder of a promissory note (the "Note") made by Capitol on March 31, 2010, in the principal amount of $500,000.00, with interest accruing at the rate of 4% per annum until paid. A copy of the Note is attached as **Exhibit 1**.[1]

7.

The Note is endorsed and guaranteed by Mr. Singleton and Nantucket through its manager, Christina Singleton. Mr. Singleton and Nantucket jointly, severally, and solidarily guaranteed the full payment of the amounts due under the Note.

8.

The Note matured on March 31, 2012, and thus the entire amount of the Note is due and exigible. The Note also provides for attorneys' fees in collecting the amount due and owing on the Note.

9.

To date, Mr. Cummings has received no payment on the Note, and thus the Defendants are in default under the terms of the Note.

## THE MULTIPLE INDEBTEDNESS MORTGAGE, THE INDEBTEDNESS, AND THE MORTGAGED PROPERTY

10.

Mr. Cummings is the mortgagee under a Multiple Indebtedness Mortgage (the "MIM") executed contemporaneously with the Note on March 31, 2010, by Nantucket, through its manager Christina Singleton, as mortgagor. The MIM was passed before a notary public and

---

[1] The original note was filed with the *Verified Petition to Collect Sums Due on Promissory Notes and Guarantees and for Declaratory Relief as to Extent, Validity, and Enforceability of Mortgage*, filed in Civil District Court, Parish of Orleans, under Case No. 2014-07139, and subsequently transferred to the this Court under Case No. 66609.

2

two witnesses, and was recorded in the public records of Sabine Parish, Louisiana.  A copy of the MIM is attached as **Exhibit 2**.

11.

The MIM was granted to secure the satisfaction of all present and future obligations of the Mortgagor including the obligations of Capitol, to Mr. Cummings up to the maximum amount of $1,250,000.00 (collectively, the "Indebtedness").

12.

Since the Defendants have defaulted under the terms of the Note, an event of default has occurred under the MIM, which entitles Mr. Cummings to assert the rights and remedies under the MIM as described below.

13.

In the MIM, the Mortgagor specifically mortgaged all of its present and future rights, title, and interest in the property described in Exhibit "A" to the MIM (the "Mortgaged Property").  A precise legal description of the Mortgaged Property is reproduced and attached separately as **Exhibit 3**.

14.

Upon default, Mr. Cummings is entitled to the seizure and sale of the Mortgaged Property and hereby requests judicial recognition of the same.

15.

In the MIM, the Mortgagor confessed judgment on the Indebtedness and agreed that, in the event the Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under the MIM, the Mortgagee may cause the Mortgaged Property to be immediately seized and sold, under ordinary or executory process in accordance with applicable Louisiana law to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying the Mortgagor or placing the Mortgagor in default.

16.

In the MIM, the Mortgagor also expressly waived the following:  (a) the benefit of appraisement, as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws conferring the same; (b) the demand and three-day delay accorded

3

by Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (c) the notice of seizure required by Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (d) the three-day delay provided by Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (e) the benefit of the other provisions of Articles 2331, 2722, and 2723 of the Louisiana Code of Civil Procedure.

17.

In the MIM, the Mortgagor further agreed that all reasonable costs, expenses, and liabilities incurred by the Mortgagee in connection with managing, operating, and maintaining the Mortgaged Property shall constitute a demand obligation owed by the Mortgagor to the Mortgagee, and that all such costs, expenses, and liabilities shall constitute a portion of the Indebtedness secured by the MIM.

**RELIEF SOUGHT AND BALANCE DUE**

18.

Based on the foregoing, Mr. Cummings is entitled to a judgment against Mr. Singleton, Capitol and Nantucket, jointly, severally, and solidarily, comprised of the following:

(a)    Principal in the amount of $500,000.00;

(b)    Accrued interest in the amount of $98,630.14;

(c)    After February 5, 2015 interest will continue to accrue at the per diem rate of $54.79, until paid in full.

(d)    Attorney's fees incurred in recovering the sums owed; and,

(e)    The costs of these proceedings.

19.

Mr. Cummings also seeks a judgment recognizing the validity and perfection of the MIM and security interest as a first-ranked lien and security interest on the Mortgaged Property, to secure the payment of the judgment, up to the maximum amount permitted by law.

**PRAYER**

WHEREFORE, Mr. Cummings, prays that its Petition be found sufficient and the Court render a judgment in favor of Mr. Cummings and against Mr. Singleton, Capitol and Nantucket, jointly, severally, and solidarily, in the following amounts:

a.    Principal in the amount of $500,000;

4

b.  Accrued interest in the amount of $98,630.14;

c.  After February 5, 2015 interest will continue to accrue at the per diem rate of $54.79, until paid in full;

d.  Attorney's fees in collecting the amounts due and owing; and

e.  All costs of these proceedings.

Mr. Cummings further prays for a judgment recognizing the validity and perfection of the MIM and security interest as a first-ranked lien and security interest on the Mortgaged Property to secure the payment of the judgment on the Note, up to the maximum amount permitted by law.  Finally, Mr. Cummings prays for all other legal and equitable relief to which it may be entitled.

Respectfully submitted,

R. PATRICK VANCE (LA #13008)
LAURA F. ASHLEY (LA #32820)
TYLER J. RENCH (LA #34049)
Jones Walker LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170
Telephone: (504) 582-8000
Facsimile:  (504) 589-8118
pvance@joneswalker.com
lashley@joneswalker.com
trench@joneswalker.com

**PLEASE SERVE:**

**Service instructions will be provided shortly.**

5

# Exhibit 1

Promissory Note

$500,000.00                                              New Orleans, LA  January 7, 2009

For value received, Bayou Sand and Gravel Company, L.L.C., a Louisiana limited liability company ("Maker") represented by its undersigned duly authorized member and manager, promises to pay to the order of Capitol Properties, L.L.C. ( "Holder"), mailing address 1039 Lakeshore Boulevard, Slidell, LA  70461, the principal sum of Five Hundred Thousand Dollars ($500,000.00), with interest as provided in this promissory note (the "Note") on the following terms and conditions:

Maker shall pay to Holder interest on the principal balance outstanding on this Note at the annual rate of Six percent (6.00%).  Principal and interest are payable on demand.  If it becomes necessary to collect this note by legal action, maker agrees to pay the fees and expenses of Holder's attorney in demanding and enforcing this Note.

This Note shall be governed by the laws of the State of Louisiana.

THUS DONE AND SIGNED on the date first above written.

Bayou Sand and Gravel Company, L.L.C.

By: _____
Jack Singleton, Manager

Endorsement in Blank

Pay to the Order of Bearer

Capital Properties, L.L.C.

By: _____
Jack Singleton, Manager

# Exhibit 2



# MULTIPLE INDEBTEDNESS MORTGAGE

By:    Nantucket Plaza, L.L.C.                    United States of America

                                                 State of Louisiana

To:    John J. Cummings, III                     Parish of Orleans

BE IT KNOWN, that on this 31st day of March, 2010,

BEFORE ME, the undersigned Notary Public, and in the presence of the undersigned competent witnesses,

PERSONALLY APPEARED:

Nantucket Plaza, L.L.C., a Louisiana limited liability company, having a mailing address of 1039 Lakeshore Blvd., Slidell, LA 70461

(hereinafter collectively referred to as "Mortgagor"),

who declared that Mortgagor grants this Multiple Indebtedness Mortgage in favor of John J. Cummings, III, having mailing address of 416 Gravier Street, New Orleans, LA 70130 (hereinafter referred to as "Mortgagee" or "Lender"), and any future holder or holders of the Indebtedness, under the following:

## TERMS AND CONDITIONS:



INDEBTEDNESS. The word "Indebtedness" as used in this Mortgage means individually, collectively and interchangeably any and all indebtedness, obligations and present and future obligations of Mortgagor to Mortgagee, including, without limitation, all obligations of Mortgagor on guaranties and endorsements by Mortgagor of the obligations of Capitol Properties, L.L.C., a Louisiana limited liability company, that evidenced by the Notes, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges, together with all other indebtedness, obligations, costs and expenses for which the Mortgagor is responsible under this mortgage. In addition, the word "Indebtedness" also includes any and all loans, extensions of credit, obligations, debts and liabilities, plus interest thereon, of Mortgagor, that may now or in the future be owed to or incurred in favor of Mortgagee, as well as all claims by Mortgagee against Mortgagor, whether existing now or later; whether they are voluntary or involuntary, due or to become due, direct or indirect or by way of assignment, determined or undetermined, absolute or contingent, liquidated or unliquidated; whether Mortgagor may be liable individually or jointly with others, of every nature and kind whatsoever, in principal, interest, costs, expenses and reasonable attorney's fees and all other fees and charges; whether Mortgagor may be obligated as guarantor, surety, accommodation party or otherwise; whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations; and whether such Indebtedness may be or hereafter may become void or otherwise unenforceable. Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness that may be outstanding at any time and from time to time that this Mortgage secures shall be One Million Two Hundred Fifty Thousand Dollars ($1,250,000.00).

GRANTING OF MORTGAGE. And now, in order to secure the prompt and punctual payment and satisfaction of the Indebtedness, in principal, interest, costs, expenses, attorneys' fees and other fees and charges, and additionally to secure repayment of any and all Additional Advances that Mortgage may make on behalf of Mortgagor as provided in this Mortgage, together with interest thereon, Mortgagor does by these presents specifically mortgage, affect and hypothecate unto and in favor of Mortgagee, or any future holder or holders of the Indebtedness, any and all of Mortgagor's present and future rights, title and interest in and to the following described Property located in Sabine Parish, Louisiana (the "Property"):



796509



The Property is specifically described as follows:

See Exhibit "A" or other description document which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

Together with any and all present and future buildings, constructions, component parts, improvements, attachments, appurtenances, fixtures, rights, ways, privileges, advantages, batture, and batture rights, servitudes and easements of every type and description, now and/or in the future relating to the Property, and any and all items and fixtures attached to and/or forming integral or component parts of the Property in accordance with the Louisiana Civil Code.

**MORTGAGE SECURING FUTURE INDEBTEDNESS.** This Mortgage has been executed by Mortgagor pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing Mortgagor's Indebtedness that may now be existing or that may arise in the future as provided herein, with the preferences and priorities provided under applicable Louisiana law. However, nothing under this Mortgage shall be construed as limiting the duration of this Mortgage or the purpose or purposes for which Mortgagor's Indebtedness may be requested or extended. Mortgagor's additional loans will automatically be secured by this Mortgage without the necessity that Mortgagor agrees or consents to such a result at the time additional Indebtedness is incurred under the Construction Contract.

**COLLATERAL ASSIGNMENT OF LEASES AND RENTS.** In order to further secure the full and punctual payment and performance of the Indebtedness up to a maximum of $1,250,000.00, the Mortgagor hereby pledges, pawns, conveys, assigns and transfers unto the Mortgagee, the Leases and the Rents. The assignment of Leases and Rents in this Article is, and is intended to be, an assignment from the Mortgagor to the Mortgagee made in accordance with and to the fullest extent permitted by La. R.S. 9:4401. Mortgagee has not heretofore assigned the Rents. Mortgagor covenants with Mortgagee to observe and perform all the obligations imposed upon the lessor under any of the Leases and not to do or permit to be done anything to impair the security thereof; not to collect any of the rents, income and profits arising or accruing under the Leases or from the mortgaged Property more than one (1) month in advance of the time when the same shall become due; not to execute any other assignment of lessor's interest in the Leases or assignment of rents arising or accruing from the Leases or from the mortgaged Property; at Mortgagee's request, to assign and transfer to Mortgagee any and all subsequent Leases upon all or any part of the mortgaged Property; and to execute and deliver at the request of Mortgagee all such further assurances and assignments as Mortgagee shall from time to time reasonably require. So long as no Event of Default has occurred and is continuing, Mortgagor shall have the right and license to collect at the time of, but not more than one (1) month prior to, the date provided for the payment thereof, all rents, income and profits arising under the Leases or from the mortgaged Property and to retain, use and enjoy the same.

Without limiting any further term hereof, upon the occurrence of an Event of Default, Mortgagee may at its option during the continuation of such Event of Default, without regard to the adequacy of the security for the said principal sum, interest and indebtedness secured hereby and by the Mortgage, either by a representative or by agent, with or without bringing any action or proceeding, or by a receiver or a keeper appointed by a court, take possession of the mortgaged Property and have, hold, manage, lease and operate the same on such terms and for such period of time as Mortgagee may deem proper and either with or without taking possession of the mortgaged Property in its own name, demand, sue for or otherwise collect and receive all rents, income and profits, including those past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may seem proper to Mortgagee and to apply such rents, income and profits to the payment of: (a) all expenses of managing the mortgaged Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees as Mortgagee may deem necessary or desirable and all expenses of operating and maintaining the mortgaged Property, including, without being limited thereto, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for all insurance which Mortgagee may deem necessary or desirable and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the mortgaged Property; and (b) the principal sum, interest and indebtedness secured hereby and by the Mortgage, together with all costs and attorneys' fees, in such order of priority as to any of the items mentioned in this Paragraph as Mortgagee in its sole discretion may determine, any statute, law, custom or use. The exercise by Mortgagee of the option granted hereby and the collection of the rents,



796500



income and profits and the application thereof as herein provided shall not be considered a waiver of any Event of Default.

Prior to any foreclosure proceeding under this Mortgage, Mortgagee shall not be liable for any loss sustained by Mortgagor resulting from Mortgagee's failure to let the mortgaged Property during the continuance of an Event of Default or from any other act or omission of Mortgagee in managing the mortgaged Property. Nor shall Mortgagee be obligated to perform or discharge nor does Mortgagee hereby undertake to perform or discharge any obligation, duty or liability under any of the Leases or under or by reason of this Assignment, and Mortgagor shall, and does hereby agree, to indemnify Mortgagee for, and to hold Mortgagee harmless from, any and all liability, loss or damage which may or might be incurred under the Leases or under or by reason of this assignment and from any and all claims and demands whatsoever which may be asserted against Mortgagee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases. Should Mortgagee incur any such liability under the Leases or under or by reason of this assignment or in defense of any such claims or demands, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured hereby and Mortgagor shall reimburse Mortgagee therefor immediately upon demand and upon the failure of Mortgagor so to do, Mortgagee may, at its option, during the continuation of such condition declare all sums secured hereby and by the Mortgage immediately due and payable. And it is further understood that this Assignment shall not operate to place responsibility for the control, care, management or repair of the mortgaged Property upon Mortgagee, nor for the carrying out of any of the terms and conditions of the Leases; nor shall it operate to make Mortgagee responsible or liable for any waste committed on the mortgaged Property by the tenants or any other parties, or for any dangerous or defective condition of the mortgaged Property, or for any negligence in the management, upkeep, repair or control of the mortgaged Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. Mortgagor hereby authorizes and directs the lessees named in the Leases or any other or future lessees or occupants of the mortgaged Property described herein upon receipt from Mortgagee of written notice to the effect that Mortgagee is then the holder of the Notes and this Mortgage and that a default exists thereunder to pay over to Mortgagee all rents, income and profits arising or accruing under the Leases or from the mortgaged Property described therein or in said Notes and this Mortgage and to continue so to do until otherwise notified by Mortgagee.



DURATION OF MORTGAGE. This Mortgage will remain in effect until (i) all of the Indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness; and (ii) Mortgagor cancels this Mortgage by filing a written cancellation Instrument signed by Mortgagee. When all of the indebtedness is fully paid and satisfied and there is no agreement or commitment to advance any additional Indebtedness, Mortgagor may request Mortgagee to sign such a written cancellation instrument by writing Mortgagee at the above address or at such other address as Mortgagee may advise. Mortgagee may delay providing Mortgagor with such a mortgage cancellation instrument for a period of sixty (60) days following receipt of Mortgagor's written request, or such longer time as may be necessary for Mortgagee to verify that all conditions, precedent for mortgage cancellation have been satisfied.

PROHIBITIONS REGARDING PROPERTY. So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign or pledge the Property or do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

REPRESENTATIONS AND WARRANTIES CONCERNING THE PROPERTY. Except as previously disclosed to Mortgagee in writing, Mortgagor represents and warrants that: (i) Mortgagor is and will continue to be the lawful owner of the Property; (ii) Mortgagor has the right to mortgage the Property to Mortgagee; (iii) as of the time this Mortgage is recorded, there are no encumbrances affecting the Property; (iv) the security rights and interest granted under this Mortgage will at no time become subordinate or junior to any security rights, interests, liens, or claims of, or in favor of, any person, firm, corporation, or other entity; and (v) this Mortgage is binding upon Mortgagor, as well as, Mortgagor's heirs, successors, legatees, administrators, executors, representatives and warranties, and all other representations and warranties contained in this Mortgage, are and will be continuing in nature and will remain in full force and effect until such time as this Mortgage is cancelled in the manner provided above.





**INSURANCE PROVISIONS.** The following insurance provisions are a part of this Mortgage:

**Required Insurance.** So long as this Mortgage remains in effect, Mortgagor shall, at its sole cost, keep and/or cause others, at their expense, to keep the Property constantly insured against loss by fire, by hazards included within the term "extended coverage," and by such other hazards (including flood insurance, where applicable) as may be required by Mortgagee. Such insurance shall be in an amount not less than the full replacement value of the Property, or such other amount or amounts as Mortgagee may require or approve in writing. Mortgagor shall further provide and maintain, at its sole cost and expense, comprehensive public liability insurance, naming both Mortgagor and Mortgagee as parties insured, protecting against claims for bodily injury, death and/or property damage arising out of the use, ownership, occupancy, possession, operation and condition of the Property, and further containing a broad form contractual liability endorsement covering Mortgagor's obligations to indemnify Mortgagee as provided hereunder. Should the Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Mortgagor agrees to obtain and maintain Federal Flood Insurance, if available, in the amount of the full unpaid principal balance of the loan and any prior liens on the Property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Mortgagee, and to maintain such insurance for the term of the loan.

**Insurance Companies and Policies.** Mortgagor may purchase such insurance from any insurance company or broker that is acceptable to Mortgagee, provided that such approval may not be unreasonably withheld. All such insurance policies, including renewals and replacements, must also be in form and substance acceptable to Mortgagee, and must additionally contain a lender's loss payee endorsement in favor of Mortgagee, providing in part that (i) all proceeds and returned premiums under such policies of insurance will be paid directly to Mortgagee, and (ii) no act or omission on the part of Mortgagor, or any of its directors, officers, agents, employees or representatives, however, or breach of any warranty contained in such policies, shall affect the obligations of the insurer to pay the full amount of any loss to Mortgagee. Such policies of insurance must also contain a provision prohibiting cancellation, nonrenewal, or the alteration of such insurance without at least thirty (30) days prior written notice to Mortgagee of such intended cancellation, renewal or alteration. Mortgagor agrees to provide Mortgagee with originals or certified copies of such policies of insurance. Mortgagor further agrees to promptly furnish Mortgagee with copies of all renewal notices and, if requested by Mortgagee, with copies of receipts for paid premiums. Mortgagor shall provide Mortgagee with originals or certified copies of all renewal or replacement policies of insurance no later than fifteen (15) days before any such existing policy or policies should expire. If Mortgagor's insurance policies and renewals are held by another person, Mortgagor agrees to supply original or certified copies of the same to Mortgagee within the time periods required above.



**Property Losses and Claims.** Mortgagor agrees to immediately notify Mortgagee in writing of any material casualty to or accident involving the Property, whether or not such casualty or loss is covered by insurance. Mortgagor further agrees to promptly notify Mortgagor's insurance company and to submit an appropriate claim and proof of claim to the insurance company in the event that any of the Property is lost, damaged, or destroyed as a result of an insured hazard. Mortgagee may submit such a claim and proof of claim to the insurance company on Mortgagor's behalf, should Mortgagor fail to do so promptly for any reason. Mortgagor hereby irrevocably appoints Mortgagee as its agent and attorney-in-fact, such agency being coupled with an interest, to make, settle and adjust claims under such policy or policies of insurance and to endorse the name of Mortgagor on any check or other item of payment for the proceeds thereof; it being understood, however, that unless one or more Events of Default exist under this Mortgage, Mortgagee will not settle or adjust any such claim without the prior approval of Mortgagor (which approval shall not be unreasonably withheld).

**Insurance Proceeds.** Mortgagee shall have the right to directly receive the proceeds of all insurance protecting the Property. In the event that Mortgagor should receive any such insurance proceeds, Mortgagor agrees to immediately turn over and to pay such proceeds directly to Mortgagee. All insurance proceeds may be applied, at Mortgagee's sole option and discretion, and in such a manner as Mortgagee may determine (after payment of all reasonable costs, expenses and attorney's fees necessarily paid or incurred by Mortgagee in this connection), for the purpose of: (i) repairing or restoring

796609



the lost, damaged or destroyed Property; or (ii) reducing the then outstanding balance of the Indebtedness and any Additional Advances that Mortgagee may have made on Mortgagor's behalf, together with interest thereon. Mortgagee's receipt of such insurance proceeds and the application of such proceeds as provided herein shall not, however, affect the lien of this Mortgage. Nothing under this section shall be deemed to excuse Mortgagor from its obligations to promptly repair, replace or restore any "loss or damaged Property, whether or not the same may be covered by insurance, and whether or not such proceeds of insurance are available, and whether such proceeds are sufficient in amount to complete such repair, replacement or restoration to the satisfaction of Mortgagee. Furthermore, unless otherwise confirmed by Mortgagee in writing, the application or release of any insurance proceeds by Mortgagee shall not be deemed to cure or waive any Event of Default under this Mortgage.

**TAXES AND LIENS.** Mortgagor shall promptly pay or cause to be paid when due, all taxes, local and special assessments, and governmental and other charges, as well as all public and/or private utility charges, of every type and description, that may from time to time be imposed, assessed and levied against the mortgaged Property or against Mortgagor.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Mortgagor agrees that Mortgagor's possession and use of the Property shall be governed by the following provisions.

Use of Property. Mortgagor shall not use the Property and shall not permit others to use the Property, for any purpose or purposes other than those previously disclosed to Mortgagee in writing, and in no event shall any of the Property be used in any manner that would damage, depreciate, or diminish its value, or that may result in a cancellation or termination of insurance coverage. Mortgagor additionally agrees not to do or to suffer to be done anything which may increase the risk of fire or other hazard to the Property or any part or parts thereof. Mortgagor shall not permit the Property, or any portion thereof, to be used by the public and others as may make possible a claim or claims of adverse usage, easement, servitude, right of way or habitation, or adverse possession by the public and others, or any implied, tacit or other dedication of the Property.



Compliance with Applicable Laws and Regulations. Mortgagor shall observe and abide by, and shall cause others to observe and abide by, all present and future laws, ordinances, orders, rules, regulations, restrictions, and requirements of all federal, state and municipal governments, courts, departments, commissions, boards, agencies, and officers, affecting the Property and its use.

Mortgagor shall further promptly perform and observe, and shall cause others to promptly perform and observe, all the terms, covenants and conditions of any requirements, instruments and agreements affecting the Property, non-compliance with which may adversely affect the priority of this Mortgage, or which may impose any duty or obligation upon Mortgagor, or upon any lessee or other occupant of the Property. Mortgagor shall further do and cause to be done all things necessary to preserve intact and unimpaired any and all easements, servitudes, appurtenances and other interests and rights in favor of, or constituting any portion of, the Property.

Compliance With Environmental Laws. Mortgagor represents and warrants to Mortgagee that: (i) During the period of Mortgagor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (ii) Mortgagor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Mortgagee in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (iii) except as previously disclosed to and acknowledged by Mortgagee in writing, (a) neither Mortgagor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Mortgagor authorizes Mortgagee and its agents to enter upon the Property to make

796509

-Page 5-



such inspections and tests, at Mortgagor's expense, as Mortgagee may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Mortgagee shall be for Mortgagee's purposes only and shall not be construed to create any responsibility or liability on the part of Mortgagee to Mortgagor or to any other person. The representations and warranties contained herein are based on Mortgagor's due diligence in investigating the Property for Hazardous Substance.

Mortgagor hereby (i) releases and waives any future claims against Mortgagee for indemnity or contribution in the event Mortgagor becomes liable for cleanup or other costs under any such laws; and (ii) agrees to indemnify and hold harmless Mortgagee against any and all claims, losses, liabilities, damages, penalties, and expenses which Mortgagee may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Mortgagor's ownership or interest in the Property, whether or not the same was or should have been known to Mortgagor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Mortgagee's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**ERISA.** Mortgagor represents and warrants to Lender that the granting of this Mortgage and the consummation of any loan or loans or other transactions contemplated or secured thereby will not violate the provisions of, and will not constitute a prohibited transaction under the ERISA.

**Alterations.** Mortgagor shall not, without the prior written consent of Mortgagee, demolish, remove, construct, restore, add to or alter any building(s) or other improvements to or upon the Property, or any part or parts thereof, or consent to, or permit any such demolition, removal, construction, restoration, addition or alteration. Mortgagor shall further not, without the prior written consent of Mortgagee, remove or permit the removal of any present or future fixtures and other property forming part of the Property, except as contemplated by the Construction Contract and any other construction contract hereafter entered into by Mortgagor to complete the project contemplated by Construction Contract. Mortgage may condition its consent to permit Mortgagor to demolish or to remove such improvements, fixtures and/or other property upon Mortgagor's agreement to replace the same with new improvements and/or fixtures of at least equal value then satisfactory to Mortgagee.

**Abandonment of Property.** Mortgagor shall not, nor shall Mortgagor permit others to, abandon, commit waste, or destroy the Property, or any part or parts thereof.

**Repairs and Maintenance.** Mortgagor shall keep and maintain, and/or cause others to keep and maintain, the Property and the sidewalks and curbs adjoining the Property, in good order, repair and condition. Mortgagor shall further make and/or cause all necessary repairs to be made to the Property (including the repair and restoration of any portion of the Property that may have been damaged, lost or destroyed).

**ENCUMBRANCES.** The following provisions relating to Encumbrances on the Property are a part of this Mortgage:

**Prior Encumbrances.** To the extent applicable, Mortgagor shall fully and timely perform any and all of Mortgagor's obligations under any prior Encumbrances affecting the Property. Without limiting the foregoing, Mortgagor shall not commit or permit to exist any breach of or default under any such prior Encumbrances. Mortgagor shall further promptly notify Mortgagee in writing upon the occurrence of any event or circumstances that would, or that might, result in a breach of or default under any such prior Encumbrance. Mortgagor shall further not modify or extend any of the terms of any prior Encumbrance or any indebtedness secured thereby.

**Future Encumbrances.** Mortgagor shall not, without the prior written consent of Mortgagee, grant any Encumbrance that may affect the mortgaged Property, or any part or parts thereof, nor shall Mortgagor permit or consent to any Encumbrance attaching to or being filed against any of the mortgaged Property in favor of anyone other than Mortgagee. Mortgagor shall further promptly pay when due all statements and charges of mechanics, materialmen, laborers and others incurred in connection with the alteration,



796509

-Page 6-



improvement, repair and maintenance of the mortgaged Property, or otherwise furnish appropriate security or bond, so that no future Encumbrance may ever attach to or be filed against the Property or any of Mortgagor's Rights.

**Notice of Encumbrances.** Mortgagor shall immediately notify Mortgagee in writing upon the filing of any attachment, lien, judicial process, claim, or other Encumbrance. Mortgagor additionally agrees to notify Mortgagee immediately in writing upon the occurrence of any default, or event that with the passage of time, failure to cure, or giving of notice, might result in a default under any of Mortgagor's obligations that may be secured by any presently existing or future Encumbrance, or that might result in an Encumbrance affecting the mortgaged Property, or should any of the mortgaged Property be seized or attached or levied upon, or threatened by seizure or attachment or levy, by any person other than Mortgagee.

**ADDITIONAL ADVANCES FOR SPECIFIC PURPOSES.** Mortgagee shall have the right, within Mortgagee's sole option and discretion, to make Additional Advances on Mortgagor's behalf for the following purposes:

**Insurance.** If Mortgagor should for any reason fail to maintain insurance on the Property as required under this Mortgage, Mortgagee may make additional Advances on Mortgagor's behalf for the purpose of purchasing and maintaining, and Mortgagee may purchase and maintain such insurance coverage (including insurance protecting only Mortgagee's interests in the Property).

**Taxes.** If Mortgagor should for any reason fail to promptly pay, when due, taxes, assessments and governmental and other charges as required under this Mortgage, Mortgagee may, but is not required to, make Additional Advances on Mortgagor's behalf for the purpose of paying, and Mortgagee may pay, such taxes, assessments and governmental and other charges.

**Repairs.** If Mortgagor should for any reason fail to make all necessary repairs to the Property and to keep the Property in good working order and condition as required under this Mortgage, Mortgagor agrees that Mortgagee may make Additional Advances on Mortgagor's behalf for the purpose of making, and Mortgagee may make, such repairs and maintenance to the Property as Mortgagee may deem to be necessary and proper within its sole discretion.

**Encumbrances.** If Mortgagor should permit or allow any Encumbrance to attach to or be recorded or filed against the Property, without having first obtained Mortgagee's prior written consent, or if Mortgagor should for any reason default under any obligation secured by any presently existing or future Encumbrance, Mortgagee may make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to pay and fully satisfy such obligation and/or Encumbrance, to cure or rectify any such default or defaults, and to prevent the occurrence of any future defaults.

**Other.** Mortgagee may further make Additional Advances on Mortgagor's behalf and take such other action or actions as Mortgagee may deem to be necessary and proper, within Mortgagee's sole discretion, to cure and rectify any actions or inactions on Mortgagor's part, as are required under this Mortgage, that are not listed immediately above.

**No Obligations.** Nothing under this Mortgage shall obligate Lender to make any such Additional Advances or to take any of the above actions on Grantor's behalf, or as making Lender in any way responsible or liable for any loss, damage or injury to Grantor, or to any other person or persons, resulting from Lender's election not to advance such additional sums or to take such action or actions. In addition, Lender's election to make Additional Advances and/or to take the above actions on Grantor's behalf shall not constitute a waiver or forbearance by Lender of any Event of Default under this Mortgage.

**OBLIGATION TO REPAY ADDITIONAL ADVANCES; INTEREST.** Mortgagor unconditionally agrees to repay any and all Additional Advances that Mortgagee may elect to make on Mortgagor's behalf, together with interest as provided herein, immediately upon demand by Mortgagee. Mortgagor further agrees to pay Mortgagee interest on the amount of such Additional Advances at the legal rate of interest provided under applicable law from



796509



the date of such Advance until all such Advances are, repaid in full. Mortgagor's obligations to repay Additional Advances to Mortgagee, together with interest thereon, shall be secured by this Mortgage.

**COLLATERAL ASSIGNMENT AND PLEDGE OF RIGHTS AS ADDITIONAL SECURITY.** As additional security for the prompt and punctual payment and satisfaction of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon as provided herein, and, as additional collateral, Mortgagor hereby assigns, pledges and grants Mortgagee a continuing security interest in and to:

**Proceeds.** Any and all proceeds derived or to be derived from the sale, transfer, conveyance, insurance loss, damage, destruction, condemnation, expropriation, or other taking of the Property, or other proceeds and proceeds of proceeds, and any unearned insurance premiums relating thereto, including the rights of Mortgagor to receive such proceeds directly from the obligor or obligors therefor, and to further enforce any rights that Mortgagor may have to collect such proceeds, including without limitation, Mortgagor's rights to commence an appropriate collection or enforcement action or actions incident thereto.

**Leases, Rents and Profits.** Any and all present and future leases or subleases affecting the mortgaged Property, and all rents, income, and profits therefrom, including without limitation, any and all rents, income, profits, bonuses, revenues, royalties, cash or security deposits, advance rentals and other payments, and further including Mortgagor's rights to enforce all present and future leases or subleases and to receive and enforce any rights that Mortgagor might have to collect rental and all other payments.

**Deposits.** Any and all present and future deposits or other security or advance payments, including rental payments, made by or on behalf of Mortgagor to others, with respect to (i) utility service regarding the Property, (ii) cleaning, maintenance, repair, or similar services regarding the Property, (iii) refuse removal or sewer service regarding the Property, (iv) rentals of equipment, if any, used in the operation by or on behalf of Mortgagor regarding the Property, and/or (v) parking or similar services or rights regarding the Property.

**Options.** Any and all present and future options to sell or lease the mortgaged Property or any interest therein.

**Contract Rights.** To the extent assignable and/or transferable, any and all of Mortgagor's present and future contract rights, instruments, documents, and general intangibles necessary for use or useful in connection with the ownership and operation of all or any part of the Property, whether now existing or hereafter created, or otherwise acquired by Mortgagor, and all liens, security interests, guaranties, remedies, privileges and other rights pertaining thereto, and all rights and remedies of any kind forming the subject matter thereof.

**REPRESENTATIONS AND WARRANTIES CONCERNING RIGHTS.** Mortgagor represents and warrants that: (i) Mortgagor is and/or will be the lawful owner of all of the Rights to the Property; (ii) Mortgagor has the right to collaterally assign and pledge all such Rights to Mortgagee; (iii) to the extent applicable, all of Mortgagor's Rights that consist of or give rise to obligations of third parties, represent and/or will at all times continue to represent bona fide obligations of the obligors thereunder, free of any offset, compensation, deduction or counterclaim. The collateral assignment and pledge of Mortgagor's Rights are further binding upon Mortgagor, as well as Mortgagor's heirs, successors, representatives and/or assigns, and are legally enforceable in accordance with the foregoing terms and conditions.

**ADDITIONAL OBLIGATIONS OF MORTGAGOR WITH REGARD TO COLLATERALLY ASSIGNED AND PLEDGED RIGHTS.** Mortgagor additionally agrees:

**Prohibitions Regarding Property.** So long as this Mortgage remains in effect, Mortgagor shall not, without the prior written consent of Mortgagee, sell, transfer, forego, assign, pledge, do anything or permit anything to be done that may in any way affect Mortgagee's security interests and rights in and to the



796509



mortgaged Property, or create or permit to exist any Encumbrance in or against any of the Property, in favor of any person other than Mortgagee.

**No Settlement or Compromise.** Mortgagor shall not, without the prior written consent of Mortgagee, compromise, settle, adjust or extend payment under or with regard to any of Mortgagor's Rights subject hereto.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Mortgagee to examine and audit Mortgagor's books and records at all reasonable times.

**Notice to Obligors.** Upon request by Mortgagee, Mortgagor immediately will notify individual obligors and debtors under Mortgagor's Rights, advising such obligors and debtors of the fact that their respective agreements or obligations have been collaterally assigned and pledged to Mortgagee. In the event that Mortgagor should fail to provide such notices for any reason upon Mortgagee's request, Mortgagor agrees that Mortgagee may forward appropriate notices to such obligors and debtors either in Mortgagee's name or in Mortgagor's name.

**Protection of Rights.** Mortgagor will at all times protect and preserve all of Mortgagor's Rights.

**Notice of Change of Names.** Mortgagor will promptly notify Mortgagee of any change in Mortgagor's name, including any change to the assumed business names of Mortgagor. Mortgagor will also promptly notify Mortgagee of any change in Mortgagor's social security number or employer identification number. Mortgagor further agrees to notify Mortgagee in writing prior to any change in address or location of Mortgagor's principal office.

**EVENTS OF DEFAULT.** The following actions or inactions or both shall constitute Events of Default under this Mortgage:

**Default Under the Indebtedness.** Should Mortgagor default in the payment of principal or interest under the Indebtedness.

**Default Under the Loan Agreement.** Should an "Event of Default" as defined in the Loan Agreement occur.

**Default Under this Mortgage.** Should Mortgagor violate, or fail to comply fully with, any of the terms and conditions of this Mortgage.

**Default Under other Agreements.** Should Mortgagor violate, or fail to comply fully with, any of the terms and conditions of any Related Document which directly or indirectly secures repayment of any of the Indebtedness.

**Other Defaults.** Should Mortgagor or any guarantor violate, or fail to comply fully with, any of the terms and conditions of any other loan, extension of credit, security right, instrument, document, or agreement (such as a loan agreement) or obligation in favor of Mortgagee.

**Insolvency.** Should the suspension, failure or insolvency, however evidenced, of Mortgagor or any Guarantor occur or exist.

**Readjustment of Indebtedness.** Should proceedings for readjustment of indebtedness, reorganization, composition or extension under any insolvency law be brought by or against Mortgagor or any Guarantor.

**Assignment for Benefit of Creditors.** Should Mortgagor or any Guarantor file proceedings for a respite or make a general assignment for the benefit of creditors.



796509



**Receivership.** Should a receiver of all or any part of Mortgagor's Property, or the property of any Guarantor, be applied for or appointed.

**Dissolution Proceedings.** Should proceedings for the dissolution or appointment of a liquidator of Mortgagor or any guarantor be commenced.

**Failure to Pay Additional Advances.** Should Mortgagor fail to pay any Additional Advance, together with interest thereon, as provided in this Mortgage, upon Mortgagee's demand.

**False Statement.** Should Mortgagor make or furnish any warranty, representation or statement to Mortgagee that is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter or should such false or misleading warranty, representation or statement be made or furnished on Mortgagor's behalf.

**OTHER DEFAULTS.** Mortgagor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Mortgagee and Mortgagor.

**MORTGAGEE'S RIGHTS UPON DEFAULT.** Should one or more Event of Default occur or exist under this Mortgage, as provided above, Mortgagee, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights and remedies provided by law:

**Acceleration; Foreclosure.** Mortgagee shall have the right, at its sole option, to accelerate the maturity and demand immediate payment in full of any and all of the Indebtedness. Mortgagee shall then have the right to commence appropriate foreclosure proceedings against the Property and against Mortgagor's Rights as provided in this Mortgage.



**Seizure and Sale of Property.** In the event that Mortgagee elects to commence appropriate Louisiana foreclosure proceedings under this Mortgage, Mortgagee may cause the Property, or any part or parts thereof, to be enforced by executory or ordinary process, and to be immediately seized and sold, whether in term of court or in vacation, under ordinary or executory process, in accordance with applicable Louisiana law, to the highest bidder for cash, with or without appraisement, and without the necessity of making additional demand upon or notifying Mortgagor or placing Mortgagor in default, all of which are expressly waived.

**Confession of Judgment.** For purposes of foreclosure under Louisiana executory process procedures, Mortgagor confesses judgment and acknowledges to be indebted to Mortgagee, up to the full amount of the Indebtedness in principal, interest, costs, expenses, reasonable attorneys' fees and other fees and charges. Mortgagor further confesses judgment and acknowledges to be indebted unto and in favor of Mortgagee in the amount of all Additional Advances that Mortgagee may make on Mortgagor's behalf pursuant to this Mortgage, together with interest thereon. To the extent permitted under applicable Louisiana law, Mortgagor additionally waives: (i) the benefit of appraisal as provided in Articles 2332, 2336, 2723, and 2724 of the Louisiana Code of Civil Procedure, and all other laws with regard to appraisal upon judicial sale; (ii) the demand and three (3) days' delay as provided under Articles 2639 and 2721 of the Louisiana Code of Civil Procedure; (iii) the notice of seizure as provided under Articles 2293 and 2721 of the Louisiana Code of Civil Procedure; (iv) the three (3) days' delay provided under Articles 2331 and 2722 of the Louisiana Code of Civil Procedure; and (v) all other benefits provided under Articles 2331, 2722 and 2723 of the Louisiana Code of Civil Procedure and all other Articles not specifically mentioned above. Mortgagor further agrees that any declaration of fact made by authentic act before a Notary and two witnesses by a person declaring that such facts are within his or her knowledge, shall constitute authentic evidence of such facts for purposes of foreclosure under applicable Louisiana law and for purposes of La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, to the extent applicable.

**Keeper.** Should any or all of the Property be seized as an incident to an action for the recognition or enforcement of this Mortgage, by executory process, sequestration, attachment, writ of fieri facias or



796509



otherwise, Mortgagor hereby agrees that the court issuing any such order shall, if requested by Mortgagee, appoint Mortgagee, or any agent designated by Mortgagee or any person or entity named by Mortgagee at the time such seizure is requested, or any time thereafter, as Keeper of the Property as provided under La. R.S. 9:5136, *et seq.* Such a Keeper shall be entitled to reasonable compensation. Mortgagor agrees to pay the reasonable fees of such Keeper, which compensation to the Keeper shall also be secured by this Mortgage in the form of an Additional Advance as provided in this Mortgage.

**Declaration of Fact.** Should it become necessary for Mortgagee to foreclose under this Mortgage, all declarations of fact, which are made under an authentic act before a Notary Public in the presence of two witnesses, by a person declaring such facts to lie within his or her knowledge, shall constitute authentic evidence for purposes of executory process and also for purposes of La. R.S. 9:3509.1, La. R.S. 9:3504(D)(6) and La. R.S. 10:9-508, where applicable.

**Separate Sale of Mortgagor's Rights Following Default.** Should one or more Event of Default occur or exist under this Mortgage, Mortgagee shall have the additional right, at its sole option, to separately sell the aforesaid Rights, or any part or parts thereof, at private or public sale, at such price or prices as Mortgagee may deem best, either for cash or for any other compensation; or on credit, or for future delivery, without the assumption of any credit risk. The sale of the aforesaid Rights may be without appraisement, the benefit of which is also expressly waived by Mortgagor. Mortgagee may exercise any other remedies with regard to Mortgagor's Rights as may be authorized under the Louisiana Commercial Laws (La. R.S. 10:9-101, *et seq.*).

*Automatic Transfer of Rights.* In the event of foreclosure under this Mortgage, or other transfer of title or assignment of the Property, or any part or parts thereof, in lieu of payment of the Indebtedness, whether in whole or in part, all policies of insurance and other Rights applicable to the foreclosed upon or transferred Property shall automatically inure to the benefit of and shall pass to the purchaser(s) or transferee(s) thereof, subject to the rights of the purchaser(s) or transferee(s) to reject such insurance coverage and/or Rights at its or their sole option and election.

**Specific Performance.** Mortgagee may, in addition to or in lieu of the foregoing remedies, in Mortgagee's sole discretion, commence an appropriate action against Mortgagor seeking specific performance of any covenant contained in this Mortgage or in aid of the execution or enforcement of any power in this Mortgage granted.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Mortgagee's rights and remedies, whether evidenced by this Mortgage or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Mortgagee to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Mortgagor under this Mortgage, after Mortgagor's failure to perform, shall not affect Mortgagee's right to declare a default and exercise its remedies. Nothing under this Mortgage, or otherwise, shall be construed so as to limit or restrict the rights and remedies available to Mortgagee following an Event of Default, or in any way to limit or restrict the rights and ability of Mortgagee to proceed directly against Mortgagor and/or against any other co-maker, guarantor, surety or endorser of the Indebtedness, and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**MORTGAGEE'S RIGHT TO DIRECTLY COLLECT AND RECEIVE PROCEEDS AND PAYMENTS BEFORE OR AFTER DEFAULT.** Mortgagee shall have the right, at its sole option and election, at any time, whether or not one or more Event of Default then exist under this Mortgage, to directly collect and receive all proceeds and/or payments arising under or in any way accruing from Mortgagor's Rights, as such amounts become due and payable. In order to permit the foregoing, Mortgagor unconditionally agrees to deliver to Mortgagee, immediately following demand, any and all of Mortgagors records, ledger sheets, and other documentation, in the form requested by Mortgagee, with regard to Mortgagor's Rights and any and all proceeds and/or payments applicable thereto.



Mortgagee shall have the further right, whether or not an Event of Default then exists under this Mortgage, where appropriate and within Mortgagee's sole discretion, to file suit, either in Mortgagee's own name or in the name of

796609



Mortgagor, to collect any and all proceeds and payments that may then and/or in the future be due and owing under and/or as a result of such rights. Where it is necessary for Mortgagee to attempt to collect any such proceeds and/or payments from the obligors therefor, Mortgagee may compromise, settle, extend, or renew for any period (whether or not longer than the original period) any obligation or indebtedness thereunder or evidenced thereby, or surrender, release, or exchange all or any part of said obligation or indebtedness, without affecting the liability of Mortgagor under this Mortgage or under the indebtedness. To that end, Mortgagor hereby irrevocably constitutes and appoints Mortgagee as its attorney-in-fact, coupled with an interest and with full power of substitution, to take any and all such actions and any and all other actions permitted hereby, either in the name of Mortgagor or Mortgagee.

**PROTECTION OF MORTGAGEE'S SECURITY RIGHTS.** Mortgagor will be fully responsible for any losses that Mortgagee may suffer as a result of anyone other than Mortgagee asserting any rights or interest in or to the Property and/or Mortgagor's Rights collaterally assigned and pledged hereunder. Mortgagor agrees to appear in and to defend all actions or proceedings purporting to affect Mortgagee's security interests in any of the Property and/or Rights subject to this Mortgage and any of the rights and powers granted Mortgagee hereunder. In the event that Mortgagor fails to do what is required of it under this Mortgage, or if any action or proceeding is commenced naming Mortgagee as a party or affecting Mortgagee's security interests or the rights and powers granted under this Mortgage, then Mortgagee may, without releasing Mortgagor from any of its obligations under this Mortgage, do whatever Mortgagee believes to be necessary and proper within its sole discretion to protect the security of this Mortgage, including without limitation making Additional Advances on Mortgagor's behalf as provided herein. Should the reappraisal of the Property occur, whether to comply with appropriate regulatory requirements or otherwise, Mortgagor agrees to pay the costs of such appraisal or reappraisals or to reimburse Mortgagee for the costs thereof.

**INDEMNIFICATION OF MORTGAGE.** Mortgagor agrees to indemnify, to defend and to save and hold Mortgagee harmless from any and all claims, suits, obligations, damages, losses, costs, expenses (including, without limitation, Mortgagee's attorney's fees), demands, liabilities, penalties, fines and forfeitures of any nature whatsoever that may be asserted against or incurred by Mortgagee, its officers, directors, employees, and agents arising out of or in any manner occasioned by this Mortgage and the exercise of the rights and remedies granted Mortgagee hereunder. The foregoing indemnity provisions shall survive the cancellation of this Mortgage as to all matters arising or accruing prior to such cancellation and the foregoing indemnity shall survive in the event that Mortgagee elects to exercise any of the remedies as provided under this Mortgage following default hereunder.



**EXECUTION OF ADDITIONAL DOCUMENT.** Mortgagor agrees to execute all additional documents, instruments and agreements that Mortgagee may deem to be necessary and proper, within its sole discretion, in form and substance satisfactory to Mortgagee, to keep this Mortgage in effect, to better reflect the true intent of this Mortgage, and to consummate fully all of the transactions contemplated hereby and by any other agreement, instrument or document heretofore, now or at any time or times hereafter executed by Mortgagor and delivered to Mortgagee.

**INSPECTION OF PROPERTY.** Mortgagee and Mortgagee's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Property wherever located.

**AUDITS.** Mortgagee and its agents may also periodically conduct audits of Mortgagor's books and records that in any way pertain to the Property, the foregoing Rights and any part or parts thereof.

**APPLICATION OF PAYMENTS.** Mortgagor agrees that all payments and other sums and amounts received by Mortgagee under the Indebtedness or under this Mortgage, shall be applied: first, to reimburse Mortgagee for its costs of collecting the same (including but not limited to, reimbursement of Mortgagee's reasonable attorney's fees); second, to the repayment of interest on all Additional Advances that Mortgagee may have made on Mortgagor's behalf pursuant to this Mortgage, third, to the payment of principal of all such Additional Advances; and finally, to the payment of principal and interest on the Indebtedness then outstanding, which may be applied in such order and priority, as Mortgagee may determine within its sole discretion.

**TAXATION.** In the event that there should be any change in law with regard to taxation of mortgages or the debts they secure, Mortgagor agrees to pay any taxes, assessments or charges that may be imposed upon Mortgagee as a result of this Mortgage.



796609





**ADDITIONAL REPRESENTATIONS AND WARRANTIES.** If Mortgagor is not a natural person, it further represents, warrants and covenants that:

**Organization.** Mortgagor is a corporation duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Louisiana. Mortgagor is duly authorized to transact business in all other states in which Mortgagor is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Mortgagor is doing business. Specifically, Mortgagor is, and at all times shall be, duly qualified as a foreign corporation, partnership or company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Mortgagor has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Mortgagor maintains an office at the address set out above. Unless Mortgagor has designated otherwise in writing, the principal office is the office at which Mortgagor keeps its books and records, including its records concerning the collateral. Mortgagor will notify Mortgagee prior to any change in the location of Mortgagor's state of organization or any change in Mortgagor's name. Mortgagor shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Mortgagor and Mortgagor's business activities.

**Authorization.** Mortgagor's execution, delivery, and performance of this Mortgage and all the Related Documents have been duly authorized by all necessary action by Mortgagor and do not conflict with, result in a violation of, or constitute a default under (i) any provision of Mortgagor's articles of incorporation or organization, or bylaws, or any agreement or other instrument binding upon Mortgagor or (ii) any law, governmental regulation, court decree, or order applicable to Mortgagor or to Mortgagor's properties.

**Consents and Approvals.** If notice to or the consent or approval of any governmental body or authority, or any third party (including without limitation, any other creditor of Mortgagor) is now or any time hereafter required in connection with the execution, delivery and performance by Mortgagor of this Mortgage, then (i) with respect to all currently applicable requirements, such notice has been given and consent or approval obtained by Mortgagor prior to the execution hereof and written evidence thereof has been concurrently herewith delivered to Mortgagee, and (ii) with respect to such requirements that shall at any time hereafter be imposed or become applicable, such notice will be given and such consent or approval will be obtained by Mortgagor prior to the time such failure to do so will constitute a violation of law or result in any breach, default or failure by Mortgagor under any contract or instrument, and written evidence thereof will at such time be delivered to Mortgagee.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** No amendment, modification, consent or waiver of any provision of this Mortgage, and no consent to any departure by Mortgagor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of Mortgagee, and then shall be effective only as to the specific instance and for the specific purpose for which given.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Effect of Waivers.** Any failure or delay on the part of the Mortgagee to exercise any of the rights and remedies granted under this Mortgage or under any other agreement or agreements by and between Mortgagor and Mortgagee, shall not have the effect of waiving any of Mortgagee's rights and remedies. Any partial exercise of any rights and remedies granted to Mortgagee shall furthermore not constitute a waiver of any of Mortgagee's other rights and remedies; it being Mortgagor's intent and agreement that all of Mortgagee's rights and remedies shall be cumulative in nature. Furthermore, any failure on the part of Mortgagee at any time or times hereafter to require strict performance by Mortgagor of any of the provisions, warranties, terms and conditions contained herein or in any other agreement, document or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall not waive, affect, or diminish the rights of Mortgagee to thereafter demand strict compliance and performance therewith and



796509

-Page 13-



with respect to all other provisions, warranties, terms and conditions contained herein or therein. None of the warranties, conditions, provisions and terms contained in this Mortgage or any other agreement, document, or instrument now or hereafter executed by Mortgagor and delivered to Mortgagee, shall be deemed to have been waived by any act or knowledge of Mortgagee, its agents, directors, officers or employees; but only by an instrument in writing specifying such waiver, signed by a duly authorized officer of Mortgagee and delivered to Mortgagor. A waiver or forbearance on the part of Mortgagee as to one Event of Default shall not constitute a waiver or forbearance as to any other or subsequent default.

**Successors and Assigns Bound; Solidary Liability.** Subject to the limitations set forth herein, on transfer of the Property, this Mortgage shall be binding upon and inure to the benefit of the parties, their heirs, representatives, successors and/or assigns.

**Governing Law.** *This Mortgage will be governed by, construed and enforced in accordance with, federal law and the laws of the State of Louisiana. This Mortgage has been accepted by Mortgagee in the State of Louisiana.*

**Severability.** If any provision of this Mortgage is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall, be fully severable. This Mortgage shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Mortgage shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Mortgage, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

**WAIVER OF CERTIFICATES.** The parties to this Mortgage hereby waive the production of certificates of mortgage, conveyance, tax, paving, chattel mortgage, assignment of accounts, and all other certificates and/or relieve and release the Notary Public before whom this Mortgage is passed, from all responsibilities and liabilities in connection therewith.



**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular; as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Louisiana Commercial Laws (R.S. 10: 9-101 *et seq.*):

**Additional Advance.** The words "Additional Advance" mean any and all additional sums that Mortgagee may advance on Mortgagor's behalf as provided under this Mortgage.

**Advance.** The word "Advance" means a disbursement of loan funds made, or to be made, to Mortgagor or on Mortgagor's behalf on a line of credit or multiple advance basis under the terms and conditions of this Mortgage.

**Borrower.** The word "Borrower" means Jay Doyle Valentino and Kathryn Aguzin Valentino, and their successors and assigns.

**Encumbrance.** The word "Encumbrance" means individually, collectively and interchangeably any and all presently existing and/or future mortgages, liens, privileges and other contractual and/or statutory security interests and rights, of every nature and kind, whether in admiralty, at law, or in equity, that now and/or in the future may affect the Property or any part or parts thereof.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 *et seq.* ("CERCLA"), the Superfund Amendments and Reauthorization



796509

Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 133



Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 *et seq.*, or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**ERISA.** The word "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and including all regulations and published interpretations of the act.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the default section of this Mortgage.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means and includes all amounts identified in the Indebtedness section of this Mortgage.

**Leases.** The word "Leases" shall mean any and all leases, subleases, licenses, concessions or grants of other possessory interests, now or hereafter in force, oral or written, covering or affecting the mortgaged Property, any part thereof or any interest therein, including any and all security therefore and guarantees thereof.

**Lender.** The word "Lender" means any individual, natural person, corporation, partnership or limited liability company who loans money, advances funds or extends credit to Mortgagor or entities associated with Mortgagor, presently or in the future.

**Mortgage.** The word "Mortgage" means this Multiple Indebtedness Mortgage as it may be amended, supplemented, restated or otherwise modified from time to time.

**Mortgagee.** The word "Mortgagee" mean First Bank and Trust, its representatives, successors and/or assigns, and any future holder or holders of the Indebtedness or any interest therein.

**Mortgagor.** The word "Mortgagor" means individually, collectively and interchangeably, Nantucket Plaza, L.L.C., as well as any and all persons and entities subsequently purchasing the mortgaged Property, with or without assumption of this Mortgage.

**Notes.** The word "Notes" shall mean the Notes given by Mortgagor to Mortgagee in evidence of its loans provided by Mortgagee.

**Property.** The word "Property" means all of Mortgagor's right, title and interest in and to all the Property as described in the "Property Description" section of this Mortgage.

**Real Property.** The words "Real Property" mean the immovable property, interests and real rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.



796509

-Page 15-



**Rents.** The word "Rents" shall mean all of the rents, revenue, income, profits and proceeds derived and to be derived from the mortgaged Property or arising from the use of enjoyment of any portion thereof or from any Lease, including but not limited to liquidated damages following default under any such Lease, or payments applicable to a termination of a Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from damage to any part of the mortgaged Property, all of Mortgagor's rights to recover monetary amounts from any tenant in bankruptcy, together with any sums of money that may now or at any time hereafter be or become due and payable to Mortgagor by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and all future oil, gas, mineral and mining leases covering the mortgaged Property or any part thereof, and all proceeds and other amounts paid or owing to Mortgagor under or pursuant to any and all contracts and bonds relating to the construction or renovation of the mortgaged Property.

**Rights.** The word "Rights" means any and all of Mortgagor's additional rights and interests collaterally assigned and pledged to Mortgagee as provided under this Mortgage.

**THUS DONE AND SIGNED,** on the day, month and year first written above, in New Orleans, Louisiana, in the presence of the undersigned competent witnesses, who hereunto sign their names with Mortgagor and me, Notary, after reading of the whole.

WITNESSES:                                            Mortgagor:

                                                     Nantucket Plaza, L.L.C.

Printed name: _Julie N. Galliano_          By: _____
                                                     Christina Singleton, Manager

Printed name: _Susan M. Pundt_

                          _____
                                 Notary Public

Notary's Printed Name: _JOHN D. WOGAN_

Notary's Notary or Bar Roll No.: _33668_


                          JOHN D. WOGAN
                             Notary Public
                          State of Louisiana
                       Louisiana State Bar #13629
                     My Commission is Issued for Life



796509

-Page 16-



EXHIBIT "A"

<u>Description of Property</u>

The entire right, title and interest of Nantucket Plaza, L.L.C. in and to the following described property:

That certain tract of ground, comprising 19.149 acres, located in the following portions of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana:

1.  a portion of the south half (S-1/2) of the southwest quarter (SW-1/4) of the northwest quarter (NW-1/4);

2.  a portion of the south half (S-1/2) of the southeast quarter (SE-1/4) of the northwest quarter (NW-1/4); and

3.  a portion of the north half (N-1/2) of the northwest quarter (NW-1/4) of the southwest quarter (SW-1/4)



as shown on a Certificate of Survey of J. Michael Bradas, Registered Professional Land Surveyor, of Meyer, Meyer LaCroix & Hixson, Inc., dated April 2, 2003, a copy of which is attached to this Exhibit "A"

The mortgage granted herein excludes the undivided interest and additional mineral interest therein conveyed by Nantucket Plaza, L.L.C. to SHJJ, L.L.C. on the date hereof.



796509



All of their remaining interests lying West of Louisiana Highway 191, and North of Louisiana Highway 482 in the S1/2  S1/4  NW1/4, a portion of the S1/2 SE1/4 NW1/4, a portion of the N1/2 NW1/4 SW1/4, Section 35, T-8-N, R-13-W, Sabine Parish, Louisiana in Toledo Bend joint project project tracts 3236-1-3 as shown in Instrument 187483, Book 184, Page 399 and to their leaseback assignments from the Sabine River Authority of Louisiana in Instrument 187485, Book 184, Page 408 of said tracts. More specifically defined in the attached survey by Meyer, Meyer, LaCroix & Hixon, Inc. dated April 2, 2003 platting vendors defined fee land, undefined leaseback in said survey (see Toledo Bend joint project survey Deigze State 18), and undefinedAuthased Sabine River Authority of Louisiana 2a land in Toledo Bend Reservoir and Louisiana Highway 191 and Louisiana Highway 482 right of ways.



# Exhibit 3





EXHIBIT "A"

Description of Property

The entire right, title and interest of Nantucket Plaza, L.L.C. in and to the following described property:

That certain tract of ground, comprising 19.149 acres, located in the following portions of Section 35, Township 8 North, Range 13 West, Sabine Parish, Louisiana:

1.  a portion of the south half (S-1/2) of the southwest quarter (SW-1/4) of the northwest quarter (NW-1/4);

2.  a portion of the south half (S-1/2) of the southeast quarter (SE-1/4) of the northwest quarter (NW-1/4); and

3.  a portion of the north half (N-1/2) of the northwest quarter (NW-1/4) of the southwest quarter (SW-1/4)



as shown on a Certificate of Survey of J. Michael Bradas, Registered Professional Land Surveyor, of Meyer, Meyer LaCroix & Hixson, Inc., dated April 2, 2003, a copy of which is attached to this Exhibit "A"

The mortgage granted herein excludes the undivided interest and additional mineral interest therein conveyed by Nantucket Plaza, L.L.C. to SHJJ, L.L.C. on the date hereof.



796609

Case Number: 066609 Transaction Date: 3/13/2015 Seq: 39 Page Sequence: 139



All of their remaining interests lying West of Louisiana Highway 191, and North of Louisiana Highway 482 in the S1/2 S1/4 NW1/4, a portion of the S1/2 SE1/4 NW1/4, a portion of the N1/2 NW1/4 SW1/4, Section 35, T-8-N, R-13-W, Sabine Parish, Louisiana in Toledo Bend joint project tracts 3236-1-3 as shown in instrument 187483, Book 184, Page 399 and to their leaseback assignment from the Sabine River Authority of Louisiana in instrument 187485, Book 184, Page 408 of said tracts. More specifically defined in the attached survey by Meyer, Meyer, LaCroix & Hixon, Inc. dated April 2, 2003 platting vendors defined fee land, undefined leaseback in said survey (see Toledo Bend joint project survey Delgra Sheet 18), and undefined/unleased Sabine River Authority of Louisiana 2a land in Toledo Bend Reservoir and Louisiana Highway 191 and Louisiana Highway 482 right of ways.

