STATE OF LOUISIANA PARISH OF SABINE
11TH JUDICIAL DISTRICT COURT

JOHN J. CUMMINGS, III
CUMMINGS CUMMINGS &
DUDENHEFER A PROFESSIONAL
LAW CORPORATION, LITTLE
PINE ISLAND CORPORATION

RECEIVED AND FILED

2015 APR 14   AM 10 44

JURY DEMAND

CLERK OF COURT
SABINE PARISH

VERSUS

CIVIL ACTION NO: 66,609

CAPITOL PROPERTIES, LLC
NANTUCKET PLAZA, LLC,
JACK SINGLETON, AND
NANTUCKET BAY
SUBDIVISION, LLC

INTERVENTION OF CHRISTINA SINGLETON,
ANSWER, AFFIRMATIVE DEFENSES, RECONVENTIONAL AND THIRD
PARTY DEMAND OF CAPITOL PROPERTIES, LLC, JACK SINGLETON,
NANTUCKET BAY SUBDIVISION, LLC, NANTUCKET PLAZA, LLC
AND CHRISTINA SINGLETON

Defendants, Jack Singleton [Singleton], Capitol Properties, LLC, [Capitol] and its

wholly owned subsidiaries Nantucket Plaza, LLC, [NP] and Nantucket Bay Subdivision,

LLC, [NB] represented herein by undersigned counsel do respectfully represent:

I.

INTERVENTION OF CHRISTINA SINGLETON

Christina Singleton, a major domiciliary of Sabine Parish, Louisiana represented

herein by undersigned counsel, respectfully represents that she is a necessary and

indispensible party to these proceedings in that the matters addressed herein affect her

property rights and credits and that pursuant to Louisiana Code of Civil Procedure

articles 1033 and 1091 she does now of right intervene into these proceedings by

assuming the position of an additional Defendant/Plaintiff In Reconvention herein and

adopting these proceedings as she finds them.

II.

AFFIRMATIVE DEFENSES AND ANSWER

Defendants and Christina Singleton deny all and singularly the allegations of the

original petition herein except those hereinafter expressly admitted and further plead the

affirmative defenses of fault of the plaintiff and others, duress, error, mistake, estoppel,

extinguishment of the obligations sued upon, unclean hands, detrimental reliance, abuse

[1]

**Exhibit 37**

of process, failure and lack of consideration, fraud and illegality, and now responding

paragraph by paragraph do represent:

1.     Paragraph 1 is admitted.

2.     Paragraph 2 is admitted.

3.     Paragraph 3 is admitted.

4.     Paragraph 4 is admitted.

5.     Paragraph 5 is admitted.

6.     Paragraph 6 is admitted.

7.     Paragraph 7 is admitted.

8.     Paragraph 8 is denied for lack of sufficient information to justify belief therein as to all allegations thereof.

9.     Paragraph 9 is denied and the Civil District Court for the Parish of Orleans has ruled upon venue to the contrary.

10.     Paragraph 10 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

11.     Paragraph 11 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

12.     Paragraph 12 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

13.     Paragraph 13 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

14.     Paragraph 14 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

15.     Paragraph 15 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

16.     Paragraph 16 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

17.     Paragraph 17 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

18.     Paragraph 18 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

19.     Paragraph 19 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

20.     Paragraph 20 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

21.     Paragraph 21 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

22.     Paragraph 22 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

23.     Paragraph 23 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

24.     Paragraph 24 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

25.     Paragraph 25 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

26.     Paragraph 26 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

27.     Paragraph 27 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

28.     Paragraph 28 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

29.     Paragraph 29 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

30.     Paragraph 30 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

31.     Paragraph 31 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

32.     Paragraph 32 is admitted as to a Loan Agreement but any such document is the best evidence of its content and LP defaulted under the Loan Agreement causing significant damages.

33.     Paragraph 33 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

34.     Paragraph 34 is admitted.

35.     Paragraph 35 is admitted but any such document is the best evidence of its

content and is unenforceable for the reasons hereinafter set forth.

36.     Paragraph 36 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

37.     Paragraph 37 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

38.     Paragraph 38 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

39.     Paragraph 39 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

40.     Paragraph 40 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

41.     Paragraph 41 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

42.     Paragraph 42 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

43.     Paragraph 43 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

44.     Paragraph 44 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

45.     Paragraph 45 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

46.     Paragraph 46 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

47.     Paragraph 47 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

48.     Paragraph 48 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

49.     Paragraph 49 is denied as written. Any such document is the best evidence of

its content and is unenforceable for the reasons hereinafter set forth.

50.     Paragraph 50 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

51.     Paragraph 51 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

52.     Paragraph 52 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

53.     Paragraph 53 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

54.     Paragraph 54 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

55.     Paragraph 55 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

56.     Paragraph 56 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

57.     Paragraph 57 is denied as written. Any such document is the best evidence of its content and is unenforceable for the reasons hereinafter set forth.

58.     Paragraph 58 is denied as written. Any such documents are the best evidence of their content and are unenforceable for the reasons hereinafter set forth.

59.     Paragraph 59 is denied as written. Any such documents are the best evidence of their content and are unenforceable for the reasons hereinafter set forth.

### III.

### RECONVENTIONAL AND THIRD PARTY DEMAND

61.     Now assuming the status of **Plaintiffs In Reconvention**, Capitol Properties, LLC, Nantucket Plaza, LLC, Jack Singleton, Christina Singleton and Nantucket Bay Subdivision, LLC, represented herein by undersigned counsel do respectfully represent:

### IV.

### PARTIES

62.     Made **Defendants in Reconvention** are: John J. Cummings III, [Cummings] a major domiciliary of the state of Louisiana; Cummings, Cummings & Dudenhefer, [CCD] A Professional Law Corporation believed to be organized under the laws of the

State of Louisiana; and Little Pine Island Corporation, a [LPIC] Louisiana business organization.

63.     Made **Third Party Defendants** herein are: Maggie D, LLC, [Maggie D] a Louisiana business organization; the members of Maggie D, who are believed to be: Cummings and Peter J. Babin III [Mr. Babin] both major domiciliaries of the State of Louisiana; and SHJJ, LLC, a Louisiana business organization. The right is reserved to add additional members of all juridical entity defendants following discovery of any other actual members participating in or benefiting from any wrongful or fraudulent conduct in connection with the matters hereinafter alleged.

V.

**JURISDICTION**

64.     Jurisdiction is proper in this court because most of the acts giving rise to this suit occurred within this state.

VI.

**VENUE**

65.     Venue is proper in this court because actions taken by Defendants in Reconvention in furtherance of their scheme to defraud included actions taken in this parish including but not limited to filing false claims in the mortgage records of this parish by wrongfully claiming moneys due allegedly secured by mortgages granted and failing and refusing to cancel mortgages ostensibly securing notes which were never funded and claiming mortgages to secure indebtedness which never actually existed and fraudulently having mortgages granted in connection with transactions that called for no mortgage.

VII.

**FACTUAL BACKGROUND**

66.     Defendants in Reconvention and Third Party Defendants are liable jointly and in solido unto Plaintiffs in Reconvention for all damages sustained as a consequence of their deliberate, continuing, intentional and fraudulent conduct in connection with their concerted efforts to wrongfully deprive Plaintiffs in Reconvention of virtually all of their property and tangible rights as a consequence of schemes and artifices to defraud, all for the reasons more fully set forth below.

[6]

67.     Cummings is a 1961 graduate of Loyola Law School, is an accomplished attorney licensed to practice in Louisiana and has been practicing in the New Orleans area for more than fifty years.

68.     Mrs. Cummings is a 1980 graduate of Loyola Law School, is also an accomplished attorney and has been practicing in the New Orleans area since 1981.

69.     Peter J. Babin III is a New Orleans businessman, a director of First National Bank of Commerce [FNBC] in New Orleans and the former business manager and financial manager of Local Union 406 of the AFL/CIO in New Orleans Louisiana.

70.     Singleton was reared in the agricultural sector, familiar with farming, heavy equipment and cotton ginning. His entire career has involved manual labor, farming and heavy equipment.

71.     Jack and Christina Singleton [Singletons] were married on May 5, 2003 and established their matrimonial domicile in Sabine Parish, Louisiana where they now reside. The Singletons have one child together who is still in elementary school.

72.     On July 15, 2003 the Singletons formed Capitol Properties, LLC the membership interests of which was and is their community property. Capitol became involved in developing real estate in Sabine Parish near Zwolle, Louisiana on the Toledo Bend Reservoir acquiring certain rights in certain property in that area.

73.     In 2006, Capitol also became involved in levee work providing clay for levee restorations following damage from hurricane Katrina. This involved moving of clay from southwest Mississippi to southeast Louisiana in the New Orleans East area. As part of this effort, Capitol helped form and became a one third owner in Chapel Hill, LLC, which performed the 2006 work and eventually obtained the largest clay supply contract for levee restoration work to be awarded by the U. S. Army Corps of Engineers in the New Orleans area.

74.     The Singletons and Capitol first met Cummings in late 2006. Cummings expressed an interest in doing business with Singleton and a brief period of business was conducted during late 2006 or 2007 when some clay was removed from a Cummings controlled business known as Little Pine Island Partnership in the New Orleans East area. That clay was moved to a landfill. The venture was not profitable and the relationship was terminated.

75.    Following the clay work relating to the New Orleans levees in 2006 there was a lull in levee restoration and building activity by the corps. Consequently an opportunity arose for the provision of aggregate to the concrete industry for the massive rebuilding effort required following Katrina. In February 2007 Capitol participated in the formation of Chapel Hill Sand & Gravel, LLC [CHS&G] owning a one third interest in CHS&G, and in March 2007, Private Lake Properties, LLC [PLP] owning a one half interest in PLP to provide sand & gravel for this demand.  PLP acquired several hundred acres of land in Tangipahoa Parish near Amite, Louisiana rich in sand and gravel deposits and leased the land to CHS&G. PLP also acquired the rights to acquire several hundred additional acres of like property close to nearby Fluker, Louisiana.

76.    In July 2007 CHS&G was in discussions with interested parties to sell its sand and gravel business, which Cummings became aware of. Consequently, on July 27, 2007 Cummings formed Maggie D LLC, which was to become a conduit to wrongfully divert funds from legitimate business operations by false pretenses to benefit him and other members of Maggie D personally.

77.    On or about August 1, 2007 CHS&G entered into an agreement to sell its business operations to Premier Aggregates, LLC [Premier] a Louisiana limited liability company. Capitol formed Capitol Aggregates, LLC [Capitol Aggregates] that was a fifty per cent owner of Premier and thus not only continued in the business through Premier but actually increased its ownership in the business from one third to one half. Premier took over operations on August 1, 2007 but the transaction did not close until late October 2007. Capitol realized approximately $1,000,000.00 from this sale and this became known to Cummings.

78.    On November 20, 2007, Cummings presented to Premier a "Consulting and Sales Agreement" from Maggie D wherein he represented that Maggie D was familiar with the market for sources of gravel and had identified certain purchasers in the market and had and would be essential in arranging introductions, facilitating appointments and negotiating agreements with those potential purchasers. Cummings specifically represented that Maggie D had in fact procured the business of Baker Ready Mix [Baker] and Boh Brothers Construction [Boh] and that under the agreement Maggie D was to be paid $0.50 per ton for all gravel sold by Premier to Baker and Boh. Cummings further

represented to Singleton that the co-owners in Maggie D were Donna Cummings, Mr. Babin and Mrs. Babin.[1] Premier executed the Consulting and Sales Agreement in good faith believing Cummings representations to be true.

79.     In May of 2008 a management deadlock had occurred within Premier and litigation ensued among the members of that company, which resulted in the cessation of business operations. By June 2008 Cummings, a practicing attorney, had taken Singleton to Bill Gamble, a New Orleans attorney for representation in connection with the Premier dispute. Gamble represented Singleton and Capitol Aggregates in connection with the Premier issues until his death in March of 2009. Shortly thereafter, Cummings took Singleton/Capitol Aggregates to Breazeale Sachse & Wilson [BS&W] a New Orleans law firm for continued representation on the Premier issues. On at least one occasion, BS&W represented in an email that Cummings was general counsel to Singleton/ Capitol during the term of BS&W's representation of Singleton and his family companies The primary attorney within BS&W was Stephen Chiccarelli who later moved to Baker Donelson, the attorney and firm filing this and other actions against Capitol and Singleton despite Chiccarelli's prior representation of them. Premier eventually was placed into bankruptcy proceedings with a trustee being appointed. . CCD law firm was also the attorneys for the Singleton family in connection with a house 'mold case' believed to have caused serious illness to Mrs. Singleton.

80.     Also in May 2008 other employees of Premier formed Bayou Sand & Gravel, LLC [BS&G]. BS&G filled the void in the market left by Premier.

81.     In August 2008, BS&G agreed to admit as members Capitol and Cummings. Cummings assigned his right to LEMS II, LLC [LEMS II] another Cummings company. The consideration was a loan by Cummings to BS&G in the amount of $450,000. In accordance with that agreement, and per instructions from Cummings, Capitol transferred to LEMS II a 20% ownership interest in BS&G effective December 1, 2008. This also left Capitol with 20% ownership interest in BS&G. Cummings made known to the principals in BS&G and Singleton that he was a financier and would take part in the management of the company. Although Cummings was to be the financier for BS&G,

---

[1] Mr. Babin has acknowledged to Singleton his ownership in Maggie D but Mrs. Cummings and Mrs. Babin have not. Consequently the right to amend to add additional members is reserved until discovery discloses the identity and the activity of actual members in relation to the factors at issue in this suit.

Capitol had loaned BS&G at least $800,000 by January 7, 2009, almost twice as much as Cummings had provided in financing for BS&G. This also became known to Cummings.

82.     Cummings had great influence over Singleton by this time and Singleton trusted him. Singleton could see the developing relationship and believed Cummings to be acting in his and Capitols' best interest. In part this led Singleton to explore divesting Capitol's ownership in Chapel Hill and in the latter part of September 2008 Capitol divested its ownership interest in Chapel Hill receiving in the process in excess of $1,200,000.00 in cash and notes and, by October of 2009, full ownership of the valuable development properties in Sabine Parish on Toledo Bend. Most of the Toledo Bend interest was acquired in the September 2008 Chapel Hill transaction. The groundwork there had been laid, and much of the development had occurred, for an approximate 200 plus [possibly more with sewage infrastructure] waterfront lot subdivision, which potentially could produce over twelve million dollars in real estate sales, properly developed over time. This also became known to Cummings.

83.     Also, in September 2008 Cummings acquired the approximately sixty five percent ownership interest in PLP from all members except Capitol. This left Capitol with the remaining approximately thirty five per cent interest in PLP. Thus Capitol and Cummings then owned all of PLP. Cummings promptly required changes to the operating agreement of PLP to give him more control as Manager over PLP, much broader than the authority he permitted Singleton to exercise under the operating agreements of the other affiliated companies as 'Manager'.

84.     In October 2008 Tangi Holdings, LLC [Tangi] was formed to acquire property contiguous to the PLP property. Capitol and Cummings were members of Tangi, which acquired 25 acres for the price of $325,000. This expanded the real estate holdings under the control of Singleton and Cummings. Capitol put up $178,000 of this amount.

85.     By January 2009 BS&G had a need for heavy equipment to mine the gravel ore. Chapel Hill had some seven million dollars invested in new heavy equipment that would more than meet the needs of BS&G. The equipment was financed and had been paid down to some four million dollars.

86.     Due to this need, an agreement was reached resulting in the formation of yet another company named C. Hill Equipment & Mining, LLC [C. Hill]. This company was

owned: 33 1/3% by Chapel Hill; 29 2/3% by BS&G; 18.5% by Capitol; 10% by Cummings; and 8.5% LEMS II, LLC. Under the agreement: C Hill [funded by Cummings] would pay an amount sufficient to pay the monthly note and insurance on the equipment [about $150,000 per month]; maintain the equipment; provide labor to man the equipment; and mine the PLP properties for the benefit of BS&G for $3.00 per ton for marketable gravel produced. Although Cummings had agreed with Singleton and Capitol that he would fund the transaction, when Singleton arrived at the closing at the offices of Liskow and Lewis, Cummings demanded that Capitol assign to Cummings or his designee certain obligations owed to Capitol by BS&G. Capitol acquiesced and did so, thus becoming at least as invested in C Hill, as was Cummings. In particular Capitol assigned to Cummings notes due Capitol by BS&G as follows: $500,000 note dated January 7, 2009; and a $300,000 note dated January 7, 2009.[2] Also, Cummings required Capitol to issue a $400,000.00 note dated January 7, 2009 from Capitol to Cummings secured by a security interest in the $500,000 and $300,000 BS&G notes to Capitol mentioned in the immediately preceding paragraph.

87.     By June 2009, the C Hill transaction had produced some $795,000 in receivables owed by BS&G, yet Cummings withheld continued funding and ordered the agreement with Chapel Hill terminated and the equipment be returned to Chapel Hill. Had Capitol known Cummings would not continue the funding if the C Hill venture was succeeding, Capitol would not have granted or assigned these notes, nor would Singleton or Capitol have endorsed them. Capitol believes and so believing alleges that Cummings' refusal to permit the C Hill venture to succeed was part of his scheme to encumber and acquire all of Capitol's assets.[3]

88.     Cummings claimed to have connections with Eastover Subdivision in New Orleans East. Eastover had undertaken to certify certain materials that it owned for use as clay in the New Orleans levee system. At Cummings' urging, Cummings and Capitol and Mr. Babin formed Delta Mining, LLC [Delta]. Delta was owned 50% by Capitol, 40% by

---

[2] Cummings let these notes prescribe as part of his wrongful conduct in connection with his other damaging acts.
[3] Even though he had no authority to do so, Cummings, without Manager Singleton's authority, ordered attorney John D. Wogan to file a lawsuit against Chapel Hill, LLC, causing further damaging conduct to C Hill. This erupted into unwarranted litigation, costs and damage and Cummings sued Singleton for not agreeing with him and Singleton responded and reconvened for damages for, *inter alia*, Cummings' fraudulent conduct, in the suit in Union Parish Third Judicial District Court Docket No: 44019.

Cummings, and 10% by Mr. Babin. Delta, primarily through Cummings efforts, obtained mining rights to the "Eastover" clay pit in New Orleans East.

89.     Through Cummings and Mr. Babin's efforts, Delta established a checking relationship with and obtained a one million dollar line of credit from FNBC in New Orleans where Mr. Babin was a director.

90.     In March 2009, at Cummings insistence, Myrtle Grove Mining, LLC was formed and obtained mining rights to another clay pit on property known as "Myrtle Grove" in Plaquemines parish. Again, at Cummings' insistence, ownership was divided 42.5% to Capitol, 42.5% to Cummings, and 15% to Mr. Babin. This diluted Capitol's ownership by 7.5% as compared to Delta, a similar company. Myrtle Grove also established a checking account relationship with FNBC but did not obtain a line of credit as had Delta. Upon information and belief, without Capitol or Singleton's knowledge or approval, Cummings and Babin wrongfully utilized funds from the Delta FNBC line of credit for the benefit of Myrtle Grove, a company in which Capitol had a 7.5% less ownership interest than in Delta and that 7.5% additional interest in Myrtle Grove had been issued to Babin and Cummings. As to Myrtle Grove, the agreement when that company was formed was that Cummings and Babin would provide the funding for it. Instead of doing so they used the Delta FNBC line. Singleton objected when he discovered what had happened. Neither Babin nor Cummings have rendered nor caused to be rendered any proper accountings to Singleton of the financial status or transactions of those two companies.

91.     By June 2009, Capitol had invested its available cash reserves into BS&G and C Hill. Capitol was also funding medical treatment for Mrs. Singleton due to a very serious medical condition for which she was uninsured. In fact it was believed that her condition was "mold-related" and CCD [Cummings] represented Mr. and Mrs. Singleton in connection with those claims against the property owner and real estate company related to the property from which it was believed the mold sickness was contracted.

92.     Singleton had been named, at Cummings direction, Manager of BS&G, C Hill, Delta, Tangi and Myrtle Grove. Cummings reserved for himself the status of Manager of PLP, which by now Cummings knew was rich not only in sand and gravel but also in hydrocarbons since he knew by then that the Tuscaloosa Marine Shale  [TMS] underlay all of the PLP property in Tangipahoa Parish.

93.     Singleton approached Cummings explaining that he needed income for his services, that he was being paid nothing for salary or labor and that his last earnings had been with Chapel Hill which had paid Capitol for Singleton's management services in the amount of $30,000.00 per month plus periodic profit distributions. Since the operating agreements of BS&G, C Hill, Delta, Tangi and Myrtle Grove all provided for the right of compensation to the manager of each, Singleton reasoned that he should be paid by the companies which collectively at times were generating hundreds of thousands of dollars per month in revenue. Cummings refused, claiming that none of the companies could afford to pay for management services but that he, Cummings, being a financier could loan Singleton through Capitol [Capitol and its subsidiaries owned real estate for collateral and Singleton did not] whatever amounts he needed. Despite the language of and contrary to the operating agreements, Cummings was the de facto manager of all the companies since his word on all fiscal matters was absolutely controlling. Consequently, Singleton had no choice since his liquidity was invested in the companies and he needed funds to meet his financial and family obligations. Singleton was never paid for his labor nor were any other distributions from the companies made to him or Capitol, except possibly minor expense reimbursements.

94.     Prior to the first loan from Cummings, and or his related entities, Capitol owned very valuable real estate and related property rights in Sabine Parish consisting of valuable water front property on Toledo Bend including his home and sufficient property and property rights to produce some two hundred or more water front lots. The lot contours had been laid out, the lots were preliminarily platted and all excavation work for contouring the subdivision had occurred at significant costs. Retail value, if completed, would have exceeded twelve million dollars over time. Also, Capitol's interest in PLP was fully paid and it owned approximately 35% of that company, which according to transactions of the recent sales of member interest exceeded $1,000,000.00. As noted above, Capitol also had available cash during this period of an additional $2,200,000.00 from the sale of CHS&G and Chapel Hill member interests. The potential value of all of Capitol's holdings by the end of 2008 was at least $15,200,000, less additional development costs and discounts for holding periods for marketing the waterfront lots. This also became known to Cummings.

95.     On or about May 14, 2009, Cummings took a $300,000 mortgage on Singleton's home [owned by Capitol]. LPIC loaned Capitol some $282,000 on April 20, 2009. If the $300,000 Mortgage was intended to have secured the LPIC loan, the mortgage was taken contrary to that intent in that Cummings took it personally and contrary to the rights of LPIC. Cummings never funded this note to pay the debt owed LPIC, yet in 2014 he sued on the note to foreclose the Singleton's home, while at the same time taking the position that the money was also owed to LPIC.

96.     On or about June 15, 2009 another $160,000 was loaned by LPIC and those funds were used to buy a residence for Singleton's daughter to use in Rapides Parish, Louisiana. This was secured by the residence and 40 acres of land owned by Capitol in Arkansas. All of this, less some $7600, was repaid with principal and interest from the sale of the 40 Acres in Arkansas and sale of membership interest in Tangi Holdings from Capitol to Cummings. There remained some $7,600 due on the note and after demand by LPIC, Capitol notified LPIC counsel, Baker, Donelson, Bearman, Caldwell & Berkowitz, that it would pay the debt if they would just give the payoff. After settlement negotiations as to all issues broke down, rather than merely giving the payoff, LPIC's counsel, presumably at the instruction of Cummings, ran up the attorney's fees and costs, filed suit, effected a seizure of the property, served notice of seizure on Singleton's daughter [as occupant] and then provided payoff amounts.[4] This increased the cost to Capitol by the payoff of $16,738.51 minus the debt actually due of approximately $7600.00 or some $8900.00 that would have been paid had LPIC counsel merely given the payoff. This was paid in full on October 14, 2014 but could and would have been paid sooner without the need for foreclosure and increased costs. This was the deliberate action of Cummings through LPIC to cause inconvenience, embarrassment and annoyance to Singleton and his family. Singleton's daughter actually moved from the house after this happened and Capitol sold the house.

97.     By October 2009 BS&W [the firm Cummings took Singleton to for continuing the legal work previously being handled by Bill Gamble, now deceased] was demanding

---

[4] Mr. Chiccarelli, lead lawyer for Baker Donelson on the representation of LPIC and Cummings in connection with this foreclosure and the attempted settlement negotiations, was also the lead lawyer for BS&W representing Capitol Aggregates, Capitol and Singleton in connection with the Premier Aggregates bankruptcy and disputes and lawsuits with other members of Premier. He did so with Cummings' involvement and intermeddling and gaining of financial knowledge as to Capitol and Singleton.

[14]

attorney fees. Singleton had paid the firm some fees by this time but it claimed more due. Cummings, through LPIC, entered into a loan agreement with Capitol and NBS for the purpose of paying those fees. The October 27, 2009 agreement obligated LPIC to loan Capitol up to $900,000 [paragraph 2 of the loan agreement] for the purpose of paying fees due and to become due to BS&W. Of course this again required collateral that was granted by Capitol, NBS and NP on the Toledo Bend development property by a mortgage in the amount of $1,250,000. Despite LPIC's agreement to loan $900,000, LPIC breached the loan agreement and only advanced $375,000 on October 27, 2009, $180,000 on December 2, 2009 and $100,000 on December 17, 2009. Thus, the total advanced was only $655,000 of the $900,000 required under the loan agreement.[5] Thus, LPIC breached the loan agreement by refusing to advance the additional $255,000 due under the loan agreement; yet it had encumbered the property by almost $600,000 more than it loaned. LPIC and Cummings also breached the loan agreement by refusing to permit the sale of less than 50 lots at one time, when paragraph 2 (d) of the agreement contemplated sales of lots with proceeds allocated for payment of the note under the loan agreement. This removed Singleton's ability to reach the equity in the collateral for other and future needs and to pay debt to Cummings and his entities.[6]

98.     Cummings interacted with BS&W and thus became privy to most if not all attorney client communication, helped prepare Singleton for depositions, and attended court appearances and guided Singleton/Capitol in their common business ventures and thus learned valuable information about Capitol, Capitol Aggregates and Singleton's personal and legal business, which he used to further his design and actions resulting in damage to Capitol and Singleton.

99.     By mid-December 2009, BS&G was experiencing cash flow needs. Singleton/Capitol had invested more than a million dollars in BS&G by this time. Cummings, the financier, would not agree to procure long term financing for the business operations of BS&G despite repeated requests to do so. Since BS&G needed money,

---

[5] Capitol Aggregates and Singleton are now defending a suit by BS&W for alleged unpaid legal fees in St. Tammany Parish under Civil Docket No. 2013-11309. Singleton believes BS&W fees to be excessive [some $1,500,000 of which Capitol paid some $1,100,000]. Cummings involvement in this is peculiar under the circumstances now known.
[6] When Singleton complained about the size of BS&W's bill for services, Cummings promised him he would have the bill audited and charged him for doing so but never provided a copy of any audit or report.

Cummings persuaded Singleton to have Capitol borrow from CCD Law Firm the amount of $445,000; but cautioned him not to put it all in BS&G at one time rather to put it in over the course of several weeks. Of course Cummings [CCD Law Firm] required collateral and Capitol gave it through another mortgage in the amount of $650,000 on NBS – the Toledo Bend Development property. Singleton complied with Cummings instructions and as it turned out, of the $445,000 put into BS&G, Cummings or his entities were paid most of these proceeds by BS&G per his instructions. This transaction is still not fully understood, given the amount, timing and circumstances surrounding it. Curiously, to Singletons' knowledge, Cummings never required any other member of BS&G to grant collateral to him or his related entities nor did he book the $445,000 diverted from CCD to BS&G through Capitol as a payable by BS&G to Capitol.

100.    By January 2010, the Premier bankruptcy was winding down and it owned more valuable land [the Gilman and Olivier tracts] also rich in sand and gravel deposits and also located in the best part of the TMS. The property was clearly very valuable.

101.    During this time Rock Mart, LLC was formed with Cummings owning 50% and Capitol owning 50%. Cummings made Singleton the Manager, but as he had done in other of the affiliated LLC's he and Singleton co-owned, he significantly limited Singletons authority to act to minor day to day ministerial duties with limited expenditure authority and no ability to sell or lease property. Since Cummings consent was required on such matters exceeding Singleton's authority as manager, Cummings was the de facto manager of all LLC's common to Capitol, Singleton and Cummings. Cummings had no such restrictions as to his authority as manager of PLP.

102.    In March 2010 Singleton had again approached Cummings about the need for income for his services as manager of the various companies, explaining that his wife was very ill, there was no insurance and medical expenses were very high. Instead of authorizing salaries, Cummings personally offered instead to buy an undivided 25% interest in NP and NBS.  A price of $500,000 and the terms of the transaction were agreed upon and John Wogan prepared to close that transaction on March 31, 2010. Mr. Wogan was Cummings' then lawyer with Liskow and Lewis A Professional Law Corporation, in New Orleans. The transaction was complicated and involved several documents. Cummings breached this oral contract at closing refusing to purchase the

member interests in NP and NBS and instead demanded and was sold a 25% undivided interest in the real estate at Toledo Bend owned by NP and NBS and a 20% fractional interest in underlying minerals in the same property. As it turned out, somehow a $500,000 mortgage was also taken by Cummings personally on the NP – Toledo Bend property at the same time that Cummings was supposed to be "buying his interest" in the actual real estate properties for the same amount. The mortgage was a sham and was fraudulent and Cummings continues to assert its validity.

103.    In late April 2010, Rock Mart purchased from Premier, through its Bankruptcy Trustee, the real estate owned by the Premier Bankruptcy Estate [Gilman and Olivier tracts] for $3,000,000. This transaction was 100% financed.

104.    During this period of time, Singleton had been instrumental in developing the various businesses and in particular:

    i.    In addition to its regular business, BS&G had obtained a $13,000,000 contract from Archer Western to provide gravel to levee projects in New Orleans East. [The AW gravel contract] This contract should have produced a 20% profit or $2,600,000. This contract was lost because Cummings would not agree to long term financing for the company, refused to keep the needed equipment to perform the work, required that most skilled employees and other essential workers be cut to $500 per week salary and committed fraud in connection with the Maggie D gravel contract, discussed more *infra*.

    ii.    Delta had obtained a clay contract also from Archer Western for $27,000,000. [The AW clay contract] This contract should have produced at least 20% profit or $5,400,000. This contract was lost due in part to Cummings insisting that all trucking be provided through Sherman Copelin, a Cummings associate who Cummings claimed owed him money. Singleton had made other arrangements for trucking through a reputable company with a proven track record. Cummings disapproved and consequently the working relationships deteriorated to the point of being impossible to manage properly.

    iii.    Myrtle Grove was in production providing clay into Plaquemines parish levee systems for Kiewit Corporation, Hill Brothers and others. This should have produced very substantial profits. Cummings, to this day, has refused to render

proper accountings or financial information for Myrtle Grove to Singleton or Capitol. Singleton believes and so believing alleges that Cummings and Babin used funds approved under the FNBC line of credit for Delta to divert into Myrtle Grove and they have not provided to Capitol/Singleton any meaningful information as to the source and application of funds related to Delta, much less Myrtle Grove. Singleton and Capitol believe and so believing allege that the wrongful actions of Cummings and Babin relating to Myrtle Grove cost the loss to Myrtle Grove, and /or Capitol as a member, hundreds of thousands of dollars in lost profits, none of which was paid to Capitol as a member[7] or Singleton for labor and management.

iv.     In May of 2010 Delta also had received a work order from Chapel Hill to provide clay for its levee clay supply contract to the U.S. Army Corps of Engineers [USACE] with potential sales of $30,000,000, which should have produced at least 20% profit or $6,000,000. [The Chapel Hill clay contract]. This contract was lost because Cummings wrongfully demanded that Singleton insist that Chapel Hill place Delta "on its contract with the USACE". Chapel Hill refused.

v.     Had Cummings not ordered the return of the Chapel Hill equipment under its agreement with C Hill, C Hill would have also been a very profitable venture because BS&G, Delta, Myrtle Grove and Chapel Hill would have used that equipment and more. Because it was no longer available, BS&G, Delta and Myrtle Grove had to acquire replacement equipment at much higher costs. Singleton estimates the cost of this action to the 'Cummings Singleton' companies alone to exceed lost profits of $5,000,000 or more. [The C Hill equipment issue].

105.   By May of 2010 Cummings had the TMS properties under his total control, had placed mortgages against the 'Singleton/Capitol NP NBS' real estate, totaling $3,450,000, had acquired a 25% surface ownership interest in the 'Toledo Bend properties' and a 20% mineral interest in the same properties, refused to lease any of the TMS or Toledo Bend properties for hydrocarbon exploration and extraction, had depleted

---

[7] With the possible exception of a relatively small payment from PLP.

Singleton's Capitol cash holdings through cash flow needs of the 'Cummings Singleton companies', held in pledge at least $800,000 in notes owed to Capitol by BS&G as security for funds he had advanced, had practically wrecked BS&G with fraudulent practices including 'Maggie D racketeering activity' and maneuvered Singleton and Capitol into a position of being completely financially dependent upon Cummings. Cummings, now a 25% owner also refused to consent to the sale of any of the Toledo Bend properties when Singleton requested that they begin to sell the properties to produce cash flow which would have helped Singleton and Capitol meet their financial obligations, including paying Cummings or his affiliated companies any just debt. Cummings on one occasion told Singleton that any sale of property must be no less than fifty lots per transaction and this effectively eliminated the possibility of selling any of the property.

106.    In March 2011, the members of Delta transferred all membership interest in Delta to Delta II, LLC, [Delta II] which in turn sold all Delta membership interest to Lagniappe Holdings, LLC a Donnie Pate [Pate] company, or another company owned or controlled by Pate. Pate is another associate of Cummings. The sale produced a note in the amount of approximately $1,000,000 payable to Delta II. Capitol owns 50% of Delta II, but Cummings has given no information on the status of this to Capitol.

107.    In 2011 the operations of Delta II, Myrtle Grove and C Hill had basically wound down. BS&G was still an operating entity and operated through at least March 2012, booking payables to Maggie D under the "Premier - Baker Ready Mix - Boh Brothers Contract".

108.    During the operation of BS&G, amounts were either paid to or booked as due to Maggie D under that contract in amounts believed to approach $189,000. Singleton believed that Cummings had been truthful in procuring and continuing the Maggie D contract in that he believed that Cummings had facilitated the acquisition and retention of the Baker and Boh business for Premier and later BS&G. During a later conversation with Arnold Baker, the principal of Baker Ready Mix, Singleton learned that neither Cummings nor Babin had anything to do with procuring the Baker business and later learned that they also had nothing to do with procuring the Boh business. The entire Maggie D contract was based upon fraudulent representations by Cummings and Mr.

Babin and was nothing more than a scheme and artifice to defraud Singleton, Capitol and BS&G. See Exhibit "A". In connection with a later discussion on October 26, 2012 Cummings sought to justify that Maggie D was entitled to its $.50 per ton payment from BS&G for the Boh and Baker business by saying: "Wait a second. If Arnold [Baker] and Boh Bros are in that agreement, its clear that [s] what we controlled" Later, in the same conversation Cummings stated; "Well because we control some of that business", referring to the Baker and Boh business.[8] This again was a false representation.

109.    Cummings, through his CCD employee, Scott Zazulak has kept the books and records of the 'Cummings Singleton' companies: C Hill, Delta, Delta II, Myrtle Grove, Rock Mart and PLP. The BS&G accounting records were kept at the plant site but Zazulak also monitored its financial operations on a daily basis for Cummings, though he was paid to do so by BS&G. Zazulak was responsible for most interaction with the CPA's for record keeping and reporting purposes. Despite repeated requests by Singleton/Capitol, Cummings and Zazulak failed to and consciously refused to provide to Capitol or Singleton the financial records or even summary information on those companies or their banking records and especially the banking records of those companies at the bank where Mr. Babin is a director.[9] Singleton believes and so believing alleges that his signature on some financial documents in connection with the 'Cummings Singleton' companies may have been forged because Singleton believes that he was the only authorized signatory, at the time checks were cleared on the checking account of Rock Mart at FNBC and he does not remember signing checks on that account. He does not believe his 'endorsed signature' on certain checks Cummings ordered to be made payable jointly to affiliated companies and Singleton is actually his signature, thus are forgeries.

110.    In connection with the Myrtle Grove activity Cummings continues efforts to obtain money from the USACE in the form of price adjustments claimed to be due under the theory that such is warranted under the terms of the cancellation of the prime contract with USACE. The value of this is unknown to Capitol.

---

[8] In the Matter of Bayou Sand & Gravel, LLC Meeting of October 26, 2012 beginning at Page 47 line 11.
[9] On April 6, 2015 a 2014 'tax return' on PLP was finally provided via Cummings' current counsel to Capitol's counsel. Other relevant and requested information has not been provided.

111.   Singleton believes and so believing alleges that Cummings has taken for his personal use and benefit assets of some of the companies including office buildings and equipment.

112.   When it became apparent that BS&G was no longer viable, Singleton brought Arnold Baker to Cummings for the purpose of taking over the BS&G operations and leasing PLP's gravel properties to Baker Ready Mix on very favorable terms to PLP. Cummings refused. Singleton then requested that Rock Mart lease its property to Baker for sand and gravel operations on the same terms as being requested of PLP. Cummings refused.

113.   Singleton requested Cummings let Myrtle Grove and Delta pay Rock Mart for oversize rock used in road base in those clay pits totaling some $250,000. Cummings refused.

114.   Singleton requested Cummings to grant mineral leases of oil and gas on both PLP and Rock Mart properties. To Singleton's knowledge, Cummings has and continues to refuse. Singleton believes that Rock Mart alone would have produced some one million dollars in lease bonus.

115.   Singleton believes and so believing alleges that PLP through Cummings has leased the PLP sand and gravel properties to Southern Aggregates for a minimum of $40,000 per month for up to a 20-year period. However despite many requests, Cummings refuses to provide any information to Singleton about PLP operations.[10]

116.   After business operations of all entities ceased, Cummings demanded that Capitol/Singleton give him releases for any liability arising from any of his conduct and in addition to transfer to Cummings all investment real estate including the Toledo Bend development property and all member interests in most all companies they had common ownership in including Delta, Delta II, Myrtle Grove, Rock Mart, PLP, and C Hill. In exchange, Cummings would grant Capitol the option to buy back the Toledo Bend development properties for some four million dollars with Cummings still retaining an undivided 25% ownership in that real estate, This was no remedy at all given that Cummings conduct had wrecked Singleton and Capitol's ability to do business, much

---

[10] In November 2012, after BS&G ceased business operations due to Cummings conduct, Cummings acquired all member interests in Tangi Holdings, which owned additional land contiguous to the PLP gravel mine.

less borrow four million dollars. This is especially egregious given that according to Cummings own figures in his best-case scenario the most owed to him was some $1,800,000, an amount that could have easily been paid given the value of the assets involved had Cummings only agreed to unlock their liquidity.

117.    Following Singleton's refusal to agree, Cummings launched an avalanche of litigation against Capitol and Singleton in the Civil District Court for the Parish of Orleans, falsely claiming that certain documents sued upon were signed in Orleans Parish when they clearly had not been, wrongfully seeking to have mortgages recognized in Orleans Parish against Capitol Properties when he clearly know venue was only proper in Sabine Parish for those actions, falsely asserting the validity of mortgages which were either not valid or never funded and seeking to have recognized mortgages fraudulently obtained to secure "debt" that was never owed. Exceptions of improper venue were granted and all matters were transferred to the 11th Judicial District Court in Sabine Parish, Louisiana.

118.    When Capitol exercised its rights to sell part of its interest in PLP to raise funds in November 2014, Cummings retaliated through PLP suing Capitol over that transaction in Orleans Parish, even though Cummings had been given the opportunity, in accordance with the terms of the operating agreement, to purchase the member interest being sold. The suit is still pending.

119.    The foregoing was a concerted effort consisting of numerous illegal predicate acts designed to and implemented for the purpose of defrauding Plaintiffs In Reconvention of their real estate, cash savings, labor, reputation, business goodwill, interest in companies and property rights. This scheme was carried out in person, and through the use of the United States Postal Service mail system, telephone wires and federal banking wires. There were more than two predicate acts of mail and wire fraud within ten years, the conduct has been continuing in nature and the most recent actions are within the last four years. The sand, gravel and clay business affected interstate commerce in that: BS&G's plant was in the state of Louisiana and its products were certified in the state of Mississippi at the laboratory for the USACE in Vicksburg, Mississippi; Boh Brothers and Baker Ready Mix used the sand and gravel products in connection with work bid for federal and state agencies with respect to which federal funds were used resulting in wire

activity and transfer of funds across state lines; BS&G through Cummings and Singleton met with and discussed a sand and gravel location in the state of Mississippi with the point of contact being Jesse Connerly; BS&G and Delta and Myrtle Grove employed labor from Mississippi and Arkansas to perform work in Louisiana thus affecting interstate commerce; BS&G sold gravel out of Louisiana into Mississippi; BS&G purchased plant and other equipment for use in Louisiana from California, Texas, Alabama and Mississippi, thus directly affecting interstate commerce; and Myrtle Grove contracted with an Arkansas based company in connection with mining rights for clay, thus affecting interstate commerce.

## VIII.

## FEDERAL LAW CLAIMS

## COUNT 1– RICO

120.    Plaintiffs-in-Reconvention restate and re-allege the above paragraphs as if fully set forth herein.

121.    Plaintiffs-in-Reconvention are "persons" within the meaning of 18 U.S.C.§1961(3) and §1964(c).

122.    Defendants-in-Reconvention, Maggie-D, Cummings, and Babin are made RICO Defendants and constitute a RICO enterprise for purposes of 18 U.S.C.§1961(4), as does BS&G. Also made a RICO Defendant herein is LPIC, its association in fact with Cummings also constituting a RICO Enterprise.

123.    Alternatively, Maggie-D, Cummings, and Babin formed an association-in-fact for and acted jointly for the purpose of depriving Plaintiffs-in-Reconvention of their property, through use of Maggie D, Rock Mart, Delta, Delta II and Myrtle Grove; and Cummings, acting through himself, CCD, PLP, Rock Mart, C Hill and LPIC formed yet another association-in-fact for the purpose of depriving and defrauding Plaintiffs-in-Reconvention of their property, rights and credits. Each of these associations is an "Enterprise" within the meaning of 18 U.S.C.§1962(c).

124.    This enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. §1962(c).

125.    Defendants-in-Reconvention, including persons employed by or associated with the Enterprise, specifically the Defendants, and its members, conducted or participated,

directly or indirectly, in the operation and/or management of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5) and §1962(c).

126.    Defendants along with the Enterprise engaged in "Racketeering Activity" within the meaning of 18 U.S.C. §1961(1) by engaging in the acts set forth above.  The acts set forth above constitute predicate acts and constitute violations of Mail Fraud, 18 U.S.C. §1341; Wire Fraud, 18 U.S.C. §1343; Bank Fraud, 18 U.S.C. §1344; and Money Laundering, 18 U.S.C. 1956(a)(3)(A), which together, describe the existence of a pattern of racketeering activity, as set forth more fully in the foregoing paragraphs of this Reconventional Demand.  Defendants each committed and/or aided or abetted in the commission of two or more of these acts of racketeering activity within the last ten (10) years, including but not limited to fraud, mail fraud, wire fraud and filing of false documents in official public records [including seeking to foreclose on mortgages fraudulently obtained which conduct is continuing] through the use of the United States mail and/or private or commercial carriers involved in interstate commerce.

127.    Defendants-in-Reconvention, or their agents, have engaged or conspired to engage in the use or investment of income, which arise from racketeering activities, in the acquisition, establishment or operation of enterprises which affected interstate commerce, in violation of 18 U.S.C. §1962(a), such that:

      a.    Under the fraudulent Maggie D contract BS&G made the following payments on the dates indicated:

      [Remainder of this page intentionally blank]

| Type | Num | Date | Amount |
|------|-----|------|--------|
| Check | 3178 | 12/15/2010 | 10,000.00 |
| Check | 3171 | 12/10/2010 | 10,000.00 |
| Check | 3922 | 10/7/2009 | 3,842.41 |
| Check | 3792 | 9/9/2009 | 4,457.39 |
| Check | 3651 | 8/10/2009 | 5,200.58 |
| Check | 3524 | 7/16/2009 | 5,649.40 |
| Check | 3343 | 6/10/2009 | 5,310.73 |
| Check | 3207 | 5/15/2009 | 1,689.05 |
| Check | 3212 | 5/15/2009 | 2,940.62 |
| Check | 3032 | 4/10/2009 | 1,277.85 |
| Bill Pmt -Check | 2626 | 12/29/2008 | 1,077.23 |
| Check | 2550 | 12/5/2008 | 462.33 |
| Check | 2506 | 11/24/2008 | 367.59 |
| Check | 2477 | 11/20/2008 | 569.58 |
| Check | 2413 | 11/5/2008 | 168.39 |
| Check | 2118 | 8/22/2008 | 4,623.31 |
| **Total** | | | **57,636.46** |

b.      Maggie D fraudulently sought additional payments from BS&G through March 2012 as follows:

| | |
|---|---|
| Maggie D LLC December 2010 Balance | $   3687.26 |
| Maggie D LLC March 31, 2012 | $126,704.56 |

c.      Additional, but as yet unknown in total amount of fraudulent payments were charged and or made in connection with Premier Aggregates, LLC prior to August 22, 2008. According to the bankruptcy claim of Maggie D LLC and the records filed in support thereof, in the Premier Aggregates LLC bankruptcy proceeding in the U. S. Bankruptcy Court for the Eastern District of Louisiana under Docket Number 09-10541, Maggie D claimed $6,096.25 to be due it by the bankruptcy estate and reflected that it had already been paid by Premier [pre-bankruptcy] the amount of $12,676.20. The trustee filed an objection to this claim but it is unclear whether the claim was paid. The trustee did not assume the 'Executory Contract' between Maggie D and Premier; yet, Cummings fraudulently claimed the contract 'rolled over' to apply to the BS&G operations although there was never any writing between BS&G and Maggie D reflecting any agreement between the two companies.

128.    The acts of racketeering activity referred to in this Reconventional Demand constitute a pattern of racketeering within the meaning of 18 U.S.C. 18 U.S.C. §1961(5). The acts were related to each other by virtue of common participants, a common class of victims, a common method of commission, and the common purpose and common result

of depriving the Plaintiffs-in-Reconvention of their property and enriching the Defendants-in-Reconvention. The schemes and actions of the Defendants-in-Reconvention began as early as 2007 and continue to this day.

129.    Each Defendant-in-Reconvention, either participated in or directed the Enterprise in violation of RICO under 18 U.S.C.§1962(b) and (c), by directly or indirectly maintaining an interest in or control of an enterprise engaged in interstate commerce through a pattern of racketeering activity or through collection of an unlawful debt or associating with an enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.  Further, Defendants-in-Reconvention worked in concert as part of a conspiracy in violation of RICO, under 18 U.S.C. §1962(d).  The RICO conduct stated herein also violates the Louisiana Anti-Racketeering Statute found at LSA-R.S. 15:1352 *et. seq.*, which is also pled in conjunction with the federal cause of action.

130.    The Plaintiffs-in-Reconvention were injured in their property and in their business as a result of these RICO violations.

131.    As a result of their misconduct, Defendants-in-Reconvention are liable to Plaintiffs-in-Reconvention for their losses in an amount to be determined at trial.

132.    Pursuant to 18 U.S.C. §1964(c) and LSA-R.S. 15:1352, Plaintiffs-in-Reconvention are entitled to recover threefold the damages sustained, plus costs including attorney's fees, from the Defendants-in-Reconvention.

133.    The criminal enterprise was crafted, controlled and directed by Cummings.

## IX.

## STATE LAW CLAIMS

134.    Defendants-in-Reconvention's conduct also violated other state laws and each such violation of state law is an additional predicate act under RICO and is specifically plead as such. In the alternative Plaintiffs-in-Reconvention plead each of the following state law claims as a basis of recovery of damages separately and independently from the RICO claims

**COUNT 2:    INTENTIONAL TORT – La. Civil Code article 2315 Liability**

135**.**   The conduct complained of in all of the preceding paragraphs was and is unrelenting, continuing, intentional, in bad faith, and designed to deliberately damage Plaintiffs-in Reconvention in their property rights and credits and has in fact caused serious and substantial financial damage to Plaintiffs-in Reconvention with respect to their property rights and credits.

**COUNT 3:    DETRIMENTAL RELIANCE – La. Civil Code article 1967 Liability**

136.   For a considerable period of time Plaintiffs-in Reconvention reposed trust and confidence in Cummings and believed that which he spoke to be true and believed for a period of time that his motives were pure. Cummings did not explain the significance of the transactions he instructed Singleton to undertake and specifically represented that he was a financier, that he would provide needed financing to the various entities, that if the C Hill transaction worked that he would continue the arrangement, that if the Archer Western contract for some $13,000,000 was obtained that he would not only provide needed financing for BS&G but that he also had a Wall Street exit strategy in place that would produce enormous returns for all of the investors in BS&G. He made similar representations as to the clay initiatives of Delta and Myrtle Grove. Singleton and Capitol believed these representations to be true and relied upon them to their detriment. None of this was true but it was the inducement for Singleton to endorse notes to Cummings or his affiliates, to pledge notes to Cummings or his affiliates and for Capitol to execute notes and grant mortgages to Cummings. CCD and LPIC. Cummings breached each such agreement and representation. This conduct also violated the Rule of Professional Conduct governing attorney conduct in the State of Louisiana and in particular Rules 1.7 and 1.8. Accordingly under the theory of detrimental reliance Plaintiffs-in Reconvention are entitled to recover all damages they have sustained from Cummings and to the extent appropriate all other Defendants-in Reconvention.

**COUNT 4: FRAUD - La. Civil Code article 1953**

137.   Fraud may result from misrepresentation or from silence. Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

138.   The conduct of Cummings and the RICO defendants and or their employees or associates acting under their direction, described in the preceding paragraphs is fraudulent, entitling Plaintiffs-in-Reconvention to recover all damages occasioned by that fraudulent conduct.

## COUNT 5: THEFT La. R.S. 14:67

139.   Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, *or by means of fraudulent conduct, practices, or representations*. Intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

140.   Cummings and the RICO defendants have by means of fraudulent conduct, practices and representations, with an intent to permanently deprive, taken mortgages and notes on real property, acquired pledges and endorsements of other notes, failed to fund certain notes and mortgages taken, yet asserted foreclosure rights with respect thereto, and wrongfully taken money from BS&G through Maggie D, all to the detriment and loss of Plaintiffs-in-Reconvention.

## COUNT 6 - BREACH OF FIDUCIARY DUTY

141.   The Louisiana Limited Liability Company Law specifically provides that members with management responsibilities have fiduciary obligations, including a duty of care and duty of loyalty, not only to the limited liability company but to the other members as individuals also. Pursuant to La.R.S. 12:1314(A)(1)(emphasis supplied), a member who has management responsibilities "shall be deemed to stand in a fiduciary relationship to the limited liability company and its members and shall discharge his duties in good faith, with the diligence, care, judgment, and skill which an ordinary prudent person in a like position would exercise under similar circumstances."

142.   The Limited Liability Company Law further provides that a member "shall not be held personally liable to the limited liability company or the members" unless the member "acted in a grossly negligent manner . . . or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortuous conduct or intentional breach of his duty of loyalty." La.R.S. 12:1314(B). Gross negligence is defined "as a reckless disregard or a

carelessness amounting to indifference to the best interests of the limited liability company or the members thereof." La.R.S. 12:1314(C).

143.   Cummings and the RICO defendants, who are members of and to the extent they are members of, the hereinafter listed affiliated companies have deliberately engaged in conduct as members of BS&G, C Hill, Delta, Delta II, Myrtle Grove, PLP and Rock Mart, amounting to intentional breach of duty and loyalty which has caused damages to Capitol.

**COUNT 7: BAD FAITH BREACH OF CONTRACT – La. Civil Code article 1997**

144.   LPIC breached, in bad faith, the $900,000.0 Loan Agreement and Cummings breached, in bad faith, the oral agreements he made with Capitol and Singleton as to the continuation of the C Hill arrangement and to provide proper financing for BS&G, Myrtle Grove and Delta, all of which entitles Plaintiffs-in-Reconvention, as their interest may appear, to recover all consequential and other damages flowing from such bad faith breach.

**COUNT 8: DECLARATORY JUDGMENT AS TO AMOUNTS OWED, THE VALIDITY AND ENFORCEABILITY OF MORTGAGES, AND BOND AMOUNT FOR CANCELLATION OF MORTGAGES**

145.   Plaintiffs-in-Reconvention desire to pay any just debt that may be due to anyone they owe, subject to all rights of reduction and offset to which they may be entitled under the circumstances presented here. They also desire the cancellation of all mortgages affecting the property in Sabine Parish, Louisiana and the partition of all property owned in co-ownership with SHJJ, LLC [a Cummings company] and any other Cummings affiliated company in Sabine Parish, Louisiana. This partition will likely be the source of repayment of any just debt they might owe to Cummings and his affiliated companies. A fair interpretation of the allegations of this suit is that Cummings, individually and through others, designed and implemented a strategy to encumber in his favor practically all assets of the victims, remove their access to liquidity, wrongfully encumber property with excessive and fraudulent mortgages and prevent the use of such property in a manner that would enable the victims to pay any just debt to Cummings or his associated

companies, all for the purpose of Cummings and his associates ending up as the owners of all of the affected properties.

146.    Without conceding the validity or enforceability of any note or mortgage at issue in these proceedings, under the circumstances hereinabove stated, Plaintiffs-in Reconvention would show that: the $300,000.00 note and mortgage to Cummings was not funded and is not enforceable; the $500,000.00 Note secured by the $1,250,000 mortgage was not funded and is not enforceable; the $445,000.00 note to CCD Law Firm secured by the $650,000.00 mortgage is subject to defenses under the circumstances extant; and the $1,250,000.00 mortgage securing advances under the $900,000.00 Loan Agreement is subject to defenses and damage claims arising from the breach of the Loan Agreement by LPIC. Despite requests to do so, Cummings and his affiliated companies have failed and refused to cancel any of the mortgages.

147.    Plaintiffs-in Reconvention's only realistic remedy is to have this court determine a just amount to be posted as a Bond to require the cancellation of all such mortgages and any other mortgages that might later be produced and put into issue. This will enable the property to be sold *via partition by licitation* with all claims being referred to the sale proceeds thereof, pending a final determination of these proceedings. This will protect the interests of all parties during the pendency of these proceedings. Plaintiffs-in Reconvention therefore seek a declaratory judgment of this court to that effect.

## XI.

### DAMAGES

148.    Plaintiffs-in-Reconvention request that they obtain against Defendants-in-Reconvention and Third Party Defendants a judgment for all damages sustained by them in a sum within the jurisdictional limits of this court, treble damages, exemplary damages, attorney's fees, and costs of suit.

150.    Plaintiffs seek pre-judgment and post-judgment interest as allowed by law.

151.    Plaintiffs desire and are entitled to trial by jury.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs-in-Reconvention pray that Defendants-in-Reconvention be cited to appear and answer herein, that this cause be set

[30]

down for trial before a jury, and that Plaintiffs recover judgment of and from the

Defendants-in-Reconvention, jointly and in solido, for their trebled actual and exemplary

damages in such amount as the evidence may show and the jury may determine to be

proper, together with pre-judgment interest, post-judgment interest, costs of suit, attorney

fees and such other and further relief to which they may show themselves to be justly

entitled.

Further Pray for Declaratory Judgment consistent with the requests set forth in

Paragraphs 145 -147, including the amount of just indebtedness that may be owed by

Plaintiffs in Reconvention.

Further Pray for Trial by Jury as to all issues except the Declaratory Judgment

Bond and mortgage cancellation relief requested in Paragraphs 145-147.

Respectfully submitted,

DOLLAR LAW FIRM, LLC
Post Office Box 14310
Monroe, Louisiana 71207-4310
Telephone: 318/387-9000
Facsimile: 318/387-9976

By: _____
Johnny E. Dollar, Bar No. 05004
johnny.dollar@thedollarlawfirm.com

PLEASE SERVE:

John J. Cummings, III
Cummings Cummings & Dudenhefer APLC
Little Pine Island Corporation
Through their attorney of record
R. Patrick Vance
JONES WALKER, LLP
201 St. Charles Avenue
New Orleans, LA 70170


Maggie D, LLC
Through its agent for service of process
John J. Cummings, III
416 Gravier Street
New Orleans, LA 70130

SHJJ, LLC
Through its agent for service of process
John D. Wogan
701 Poydras Street, Suite 5000
New Orleans, LA 70139

Peter J. Babin, III
68 Inlet Drive
Slidell, LA 70458

STATE OF LOUISIANA PARISH OF SABINE
11TH JUDICIAL DISTRICT COURT

JOHN J. CUMMINGS, III
CUMMINGS CUMMINGS &
DUDENHEFER A PROFESSIONAL
LAW CORPORATION, LITTLE
PINE ISLAND CORPORATION                         JURY DEMAND


VERSUS                                          CIVIL ACTION NO: 66,609

CAPITOL PROPERTIES, LLC
NANTUCKET PLAZA, LLC,
JACK SINGLETON, AND
NANTUCKET BAY
SUBDIVISION, LLC


V E R I F I C A T I O N

STATE OF LOUISIANA
PARISH OF SABINE

BEFORE ME, the undersigned authority, personally came and appeared JACK SINGLETON, ("Affiant") who, after being duly sworn did depose and state:

That he is Plaintiff in Reconvention in the above entitled and numbered cause;

That he has read the allegations contained in the above and foregoing, Reconventional and Third Party Demand and that all allegations contained therein are true and correct to the best of his information, knowledge and belief

Further, Affiant sayeth not.

_____
Jack Singleton

SWORN TO AND SUBSCRIBED BEFORE ME, Notary, this 14 day of April 2015.

_____
Notary Public

#05004
My Commission is for life.